

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed June 24, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| **STILLWATER ABBOTT** | § | Case No. 24-30097-MVL7 |
| **DEVELOPMENT, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| **MONDARA CONDOMINIUMS** | § | |
| **ASSOCIATION, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Pro. No. 24-03002-MVL |
| | § | |
| **STILLWATER ABBOTT** | § | |
| **DEVELOPMENT, LLC, et al.,** | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

1

## <u>MEMORANDUM OPINION,</u>
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

The Court conducted a trial on the Complaint titled *Plaintiff's Fourth Amended Petition*[1]

(the "**Complaint**") filed by Plaintiff Mondara Condominiums Association, Inc. (the "**Plaintiff**")

against Defendants Stillwater Abbott Development, LLC ("**Stillwater Development**" or the

"**Debtor**"), Stillwater Capital Investments, LLC ("**Stillwater Capital**"), Stillwater Abbott

Management, LLC ("**Stillwater Management**"), Robert C. Elliot, individually ("**Elliot**"), Aaron

Sherman a/k/a Robert A. Sherman, individually ("**Sherman**"), and Richard Coady, individually

("**Coady**", and, collectively, the "**Defendants**")[2].

By its Complaint, the Plaintiff seeks a judgment with regard to the following claims: (1)

Negligence against Stillwater Capital and Stillwater Management; (2) Breach of Express and

Implied Warranties against Stillwater Capital and Stillwater Management; (3) Negligent

Misrepresentation against all Defendants; and (4) Violations of the Texas Deceptive Trade

Practices Act (the "**DTPA**", and collectively, the "**Construction Defect Claims**")[3] against all

Defendants.[4]

---

[1] Although the Complaint names Stillwater GC as a Defendant, the Court notes that Stillwater GC is not a Defendant in this case, and that the Complaint was originally filed in connection with a state court trial between the parties in the 95th Judicial District, Dallas County, in Cause No. DC-20-07653. *See* ECF No. 1, Ex. 2, 410.

[2] The Court notes that it issued its *Order Granting Joint Motion to Compromise Controversy Under Rule 9019 Between the Trustee and Plaintiff Mondara Condominiums Association, Inc*., on November 21, 2024, in Case No. 24-30097 [ECF No. 74], wherein it approved a Settlement and Release Agreement between Daniel J. Sherman—the duly-appointed Chapter 7 Trustee (the "**Trustee**")—on the Debtor's behalf, and the Plaintiff, resolving the Plaintiff's claims in this Adversary Proceeding as they pertain solely to Stillwater Development.

[3] The Plaintiff has brought additional claims against the Defendants, respectively, for (1) Fraud, Fraudulent Concealment, and Estoppel; (2) Breach of Fiduciary Duty; (3) LLC Member Liability/Alter Ego; (4) Fraudulent Transfers; and (5) Civil Conspiracy (the "**Fraud Claims**"). *See* ECF No. 90, 3–4. As part of its *Order Denying Motion for Relief of Stay and Plaintiff's Amended Motion for Remand and Abstention*, the Court ordered that the Construction Defect Claims and the Fraud Claims remain bifurcated for trial purposes, and that the Court would address the issue of remand or withdrawal of the reference of the Fraud Claims after its decision as to the Construction Defect Claims following this trial.

[4] The Court additionally notes that there is no reference to Count C of the Complaint (Breach of the Uniform Condominium Act) in the Plaintiff's *Pre-Trial Brief* (ECF No. 89) or its *Proposed Findings of Fact and Conclusions of Law* (ECF No. 88). Likewise, such Count was not addressed substantively at trial. Accordingly, the Court does not address such Count herein.

The Defendants denied the factual bases for the Complaint and asserted the following claims and affirmative defenses in their *Third Amended Answer, Objections, and Motions to Dismiss and Show Authority, Supplemental Answer and Counterclaim,* and *Second Supplemental Answer* (collectively, the "**Answer**"): (1) lack of "consumer" standing under the DTPA; (2) statute of limitations; (3) proportionate responsibility among the Defendants, settling defendants, the Plaintiff, and third parties; (4) economic loss rule; (5) a lack of damages suffered by the Plaintiff; (6) the economic feasibility exception to temporary injury to real property; (7) the Defendants' entitlement to settlement credits, offsetting the Plaintiff's damages; (8) expiration of the original unit owners' express one-year warranties; (9) lack of entitlement to treble damages under the DTPA; (10) inaccurate repair estimates for damages purposes; (11) failure to mitigate damages; and (12) that reliance by the Plaintiff on the Defendants' alleged misrepresentations was not reasonable or justifiable.[5]

The Court has considered the pleadings and all briefing filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel.  The following constitutes the Court's findings of fact and conclusions of law[6] in support of its ruling as required under Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

As will be set forth more fully below, the Court finds that Defendants Robert Elliot, Stillwater Capital Investments, LLC, and Stillwater Management, LLC are jointly and severally liable for: (1) negligent misrepresentation under Texas common law; (2) violations of § 17.46(b)(2), (b)(5), and (b)(7) of the DTPA; (3) breach of the warranty of good and workmanlike

---

[5] *See* ECF No. 90, 5–6.
[6] Any finding of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

manner under § 17.50 of the DTPA; and (4) unconscionable actions under § 17.50 of the DTPA.

Additionally, the Court finds that Defendants Stillwater Capital Investments, LLC and Stillwater

Management, LLC are jointly and severally liable for breach of the warranty of good and

workmanlike manner under Texas common law.

Therefore, the Court finds that the Plaintiff is entitled to economic damages under the

Texas Residential Construction Liability Act (the "**RCLA**"), minus the total amount of credits

pursuant to settlement agreements between the Plaintiff and various settling parties. Additionally,

the Court finds that the Defendants knowingly violated the DTPA, entitling the Plaintiff to two (2)

times the total of economic damages, the full and accurate accounting of which will be computed

at a further hearing date.[7]

## I.      JURISDICTION AND VENUE.

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C.

§ 1334. Although the Construction Defect Claims do not constitute core proceedings under 28

U.S.C. § 157(b), the bankruptcy court has authority to adjudicate this matter pursuant to the United

States District Court for the Northern District of Texas Miscellaneous Order No. 33, and more

specifically, all parties consent to this Court hearing this matter and determining the issues on a

final basis, pursuant to 28 U.S.C. § 157(c)(2).[8]

## II.     PROCEDURAL POSTURE

This case comes before the Court under unique and unusual circumstances. As extensively

laid out by the parties in the associated Bankruptcy Proceeding,[9] on June 3, 2020, the Plaintiff

---

[7] A further hearing on damages was anticipated given the Plaintiff's request for attorney's fees. The Court found that such evidence would be adduced only if liability were determined.

[8] *See* ECF No. 36., 18–19 ("Notably, both the Plaintiff and Stillwater parties consent to this Court conducting a bench trial as to the Construction Defect Claims pursuant to 28 U.S.C. § 157(c)(2).").

[9] All references to the Bankruptcy Proceeding will be referenced herein to Case No. 24-30097.

originally brought its claims against the Defendants, alongside a slew of other defendants that were either not named in this case or have since settled with the Plaintiff in the 95th District Court, Dallas County (the "**State Court**"), with the Honorable Monica Purdy ("**Judge Purdy**") presiding.[10] Three and a half years later, the State Court trial began as to the Construction Defect Claims on January 3, 2024, and concluded January 10, 2024, with a formal jury charge conference set for January 11, 2024.[11]

However, on the morning of the jury charge conference, Judge Purdy was informed by the Defendants' counsel that Stillwater Development had filed a Suggestion of Bankruptcy in this Court.[12] In response, Judge Purdy requested the case number from counsel and stated that, although she would confirm whether or not a bankruptcy had been filed, the jury *would* be charged and they *would* deliberate until reaching a verdict, at which point, Judge Purdy stated that she could "conform the judgment" after the jury had rendered its judgment.[13]

Several times, counsel for the Defendants attempted to inform the State Court that the bankruptcy filing functioned as an automatic stay of the proceedings in their entirety, but the State Court did not sever the Debtor or otherwise alter its course of action, presumably due to a misunderstanding of the consequences of a bankruptcy filing, believing the Debtor's bankruptcy filing to be a "strategy all along."[14]

Judge Purdy proceeded to charge the jury, which deliberated throughout the day on January 11, 2024, without reaching a verdict. After deliberations resumed on January 12, 2024, counsel for the Defendants informed Judge Purdy that Defendant Coady had filed a *Notice of Removal of the*

---

[10] *See* Cause No. DC-20-07653; *see also* Case No. 24-03002, ECF Nos. 12, 23.
[11] *See* Case No. 24-30097, ECF Nos. 12, 23.
[12] *See id.*
[13] *See* Case No. 24-30097, ECF No. 12, Ex. B.
[14] *Id.* at Ex. D.

*State Court Action* (the "**Notice of Removal**").[15] Presented with this information, Judge Purdy asked counsel for the Plaintiff how the court should proceed. Counsel for the Plaintiff stated that he had also received a copy of the Notice of Removal and although the Plaintiff had its own attorneys "headed over to bankruptcy court," it was the Plaintiff's position that the jury should not be released until they had had the chance to approach the trustee and bankruptcy court on this issue because "cases can be remanded."[16]

Plaintiff's counsel further advised the State Court on the record that a conclusion to a jury's deliberation can be approved "after the fact" by a bankruptcy judge, citing the State Court to *In re Kissinger*, 72 F.3d 107 (9th Cir. 1995).[17] Notably, Plaintiff's counsel further argued that in his own "experience" in bankruptcy court, it was "frequently the case" for the bankruptcy court to allow the State Court to liquidate the existing debt, and that he was "guessing . . . that the trustee and the bankruptcy judge would agree under these circumstances that the debt ought to be liquidated here."[18]

After hearing further arguments from the parties' counsel, Judge Purdy once again repeated that, although she took the automatic stay very seriously, she had no intention of halting the jury's deliberations, and that "just because one person has filed bankruptcy doesn't mean everybody gets the protection of the bankruptcy court."[19]

On Friday, January 12, 2024, counsel for the Plaintiff filed the *Plaintiff's Emergency Motion to Lift Stay and Remand to State Court* (the "**Emergency Motion**") in this Adversary Proceeding [ECF No. 3], simultaneously moving the Court for expedited consideration of the

---

[15] Case No. 24-30097, ECF No. 23; *see also* Case No. 24-30097, ECF No. 36, Ex. C.
[16] Case No. 24-30097, ECF No. 36, Ex. BB, 10–14.
[17] *Id.* at 10–11.
[18] *Id.* at 13.
[19] *Id.* at 30.

Emergency Motion [ECF No. 4].  The Emergency Motion was presented to the State Court by Plaintiff's counsel, who also represented to the State Court that the Trustee "does not oppose the request for relief to allow the verdict to be rendered."[20]  Judge Purdy asked whether this Court had heard the motion, to which the parties informed her that this Court was involved in another proceeding. Before this Court even had an opportunity to review the Emergency Motion that had been filed just over an hour before, confoundingly, and despite the fact that Judge Purdy articulated that she would "wait" for this Court to review the Emergency Motion and determine next steps, the State Court proceeded to invite the jury back and allow it to render its verdict.[21]

Later that afternoon, as soon as the Court had finished hearing closing arguments in the proceeding that was before her at the time of the Emergency Motion's filing, this Court conducted a status conference on the matter at hand. The Debtor asserted a lack of notice of the Emergency Motion. The Court denied the Plaintiff's motion to expedite the hearing on this matter after being presented with a brief update as to the status of the State Court proceeding, expressing sincere incredulity of what had transpired over the course of the day.

On March 20, 2024, the Court held a hearing on the *Plaintiff's Motion for Relief from Stay and its Amended Motion for Remand and Abstention*, which gave the parties ample time to brief their respective positions on the matters in contention.[22] At that hearing, the Court made the observation that many of the parties' arguments had not been fully realized until the final stage of briefing, if not at oral argument itself.  Seeing such, the Court agreed to hold the matter in abeyance to provide the parties with an opportunity to further confer as to their differences and determine whether a resolution could be amicably reached.

---

[20] *Id.* at 7–38.
[21] *See* Case No. 24-30097, ECF No. 34-17, 37–38.
[22] *See* ECF No. 17; *see also* Case No. 24-30097, ECF No. 12.

Approximately two weeks later, the Court conducted a further status conference, which resulted in a further abeyance of the matter, until April 10, 2024.  On that date, the parties had informed the Court that they had come to a tenuous agreement to pursue the matter to trial either in this Court or the United States District Court for the Northern District of Texas (the "**District Court**").[23]

At the conclusion of the status conference, the Court ordered the parties to file a statement on the docket regarding their position on whether the proceeding should be remanded to the State Court, whether bifurcation is still necessary or desirable, whether the parties consented to this Court hearing the matter, and what their estimated time requirements for a trial would be. The Court further requested that the parties specify whether they would be open to mediation. Those position statements were filed by each of the parties to this proceeding, with the exception of the Trustee, on April 19, 2024.[24] Additionally, these position statements included the parties' consent to this Court's jurisdiction to hear this action and issue final orders.

On June 4, 2024, the Court held a status conference, ultimately scheduling a bench trial in this Court over the Construction Defect Claims.[25] Subsequently, this Court issued orders granting respective motions to dismiss for the following parties: (1) Metrotex Construction Services, LLC; (2) Cemplex Group Texas, LLC; (3) Savannah Developers of Texas Urban, LLC,; (4) Savannah Developers of Texas, LLC; (5) Timothy Baumann; and (6) and Steven King.[26] On August 6, 2024,

---

[23] Counsel for Defendants Steven King, Timothy Baumann, the King Family Limited Partnership, and the Baumann Family Limited Partnership—defendants in the planned second phase of trial regarding the Fraud Claims—asserted that they wished for a jury trial before the United States District Court. Those same defendants specifically stated that <u>they did not object</u> to the Plaintiff and the Stillwater Defendants' agreement to go forward with a trial in the Bankruptcy Court as to the Construction Defect Claims.

[24] *See* ECF Nos. 31–33.

[25] Pursuant to L.B.R. 9027-1(c), the parties docketed the records from the State Court trial, making them part of this Adversary Proceeding.

[26] *See* ECF Nos. 60–62.

the Plaintiff also issued Notices of Dismissal for parties Harding Pools, LLC and Outdoor Concepts Maintenance, LLC.[27]

Prior to trial, the Court heard arguments and issued orders regarding two dispositive motions—the Defendants' *Motion for Partial Summary Judgment* (the "**Motion for Summary Judgment**"), and the Plaintiff's *Motion in Limine*.[28] As to the Motion for Summary Judgment, the Defendants argued that there was no genuine dispute of material fact as to the Plaintiff's DTPA claim because: (1) the Mondara Homeowners' Association (the "**HOA**"), as a plaintiff, was not a "consumer" under the DTPA; and (2) the HOA failed to plead sufficient facts supporting any allegations that the Defendants violated any provision under the DTPA.[29] As for the *Motion in Limine*, the Plaintiff argued that the Court should exclude any evidence or arguments at the impending trial regarding whether the Plaintiff properly adhered to the procedural requirements under the RCLA, the DTPA, and the Texas Uniform Condominium Act ("**TUCA**") prior to filing the Complaint.[30] The Court issued oral bench rulings as to both motions on October 22, 2024, denying the Defendant's Motion for Summary Judgment and granting the Plaintiff's *Motion in Limine*.[31] To the extent not addressed substantively herein, those rulings are incorporated by reference.

The Court conducted the Construction Defect Claims trial over seven days, from October 28 through November 1, 2024, and then subsequently on December 16 and 18, 2024. The Court heard the testimony of six fact witnesses and nine expert witnesses.

### III.    FINDINGS OF FACT

---

[27] *See* ECF Nos. 71, 72.
[28] *See* ECF Nos. 63, 86.
[29] *See* ECF No. 64.
[30] *See* ECF No. 86.
[31] *See* ECF No. 101–03.

## A. THE PARTIES

<u>The Plaintiff</u>

The Mondara is a "residential luxury condominium project" located in Highland Park, Texas, consisting of 40 residential condominium units across two phases.[32]  As described in its required Condominium Information Statement, the two phases are comprised of twenty units across three stories in each phase, alongside respective concierge suites in each Phase owned by the HOA formed by Stillwater Development as a non-profit corporation on July 10, 2015, to "administer" the project through certain rights and obligations designated in its Declaration of Covenants, Conditions, and Restrictions (the "**DCCR**").[33] Per the DCCR, Stillwater Development maintained control over the operation and management of the HOA during a "Declarant Control Period," defined in the DCCR as lasting no later than one hundred and twenty (120) days after title to seventy-five percent (75%) of the units at the Mondara had been conveyed to purchasing unit owners.[34] At that point, operation and management would be turned over to the unit owners under a resident-controlled HOA. This transition occurred around September 2017.

Among other rights, the DCCR vests the HOA with the "management of the Common Elements," which include the duty and power to "maintain, repair, replace, restore, operate and manage all of the Common Elements."[35] The DCCR mandates that the HOA serves as the unit owners' "attorney-in-fact" as to any "destruction or repair" pertaining to the project.[36]

---

[32]Pl.'s Ex. 583, 3; Pl.'s Ex. 661, 7. The parties did not upload their exhibits to the Court's docket in the traditional sense, which makes citation to the docket nearly impossible. For sake of the records, the Plaintiff's exhibits can be found at ECF Nos. 73 and 129. The Defendants' exhibits can generally be found at ECF No. 131. For ease of reference, the Court will cite to the <u>exact</u> exhibit by trial reference.
[33] Pl.'s Ex. 504, 30–68; Pl.'s Ex. 583, 3–4.
[34] Pl.'s Ex. 504, 35.
[35] Pl.'s Ex. 583, 22, 27. The Common Elements are the elements of the property that do not extend to any portion of the units required to be maintained by individual unit owners, and are instead the elements of the Mondara jointly owned by the unit owners.
[36] *Id.* at 41.

Accordingly, and as reflected in the Complaint, the HOA—on behalf of the unit owners—is the Plaintiff in this matter.

The Defendants

The Defendants in this case consist of multiple individuals and managing entities within the greater Stillwater nexus, each with their own respective ties to each other. First, Stillwater Capital is a limited liability company, managed and owned by Elliot—the President of Stillwater Capital—alongside Coady and Sherman.[37] In turn, Stillwater Capital is a member of both Stillwater Management, as well as Stillwater GC—a former defendant in the State Court trial that served as one of two general contractors in the Mondara's construction.[38]

Stillwater Management was formed on April 8, 2014, by Stillwater Capital, Savannah Developers of Texas Urban, LLC ("**Savannah Developers**") and Montgomery Capital Advisors, LLC.[39] As stated in the Stillwater Management Company Agreement, Stillwater Management's purpose was to "provide the construction management and administration for [Stillwater Development]," to which Stillwater Development's focus would then be to purchase real property, construct residences on that property, and sell those residences for profit.[40]

While not all the entities listed above remain defendants in this case, it is important to note the relationships among the parties. Defendant Coady testified at trial that if he, Elliot, or Sherman had any interests in Stillwater Capital, and if Stillwater Capital subsequently had any interests in the downstream entities formed and managed by it—such as Stillwater Management, Stillwater

---

[37] Pl.'s Ex. 65; Pl.'s Ex. 530, 2.
[38] *Id.*
[39] Pl.'s Ex. 29, 1, 13–14; Pl.'s Ex. 532, 2.
[40] Pl.'s Ex. 29, 3. Stillwater Management was also both the sole member and manager of Stillwater Development, with Sherman serving as its registered agent.

Development, and Stillwater GC—Elliot, Coady, and Sherman would therefore have an interest in those downstream entities too.[41]

### B. FACTUAL BACKGROUND

<u>The Design and Contract Administration Stage</u>

The history of this case dates back more than a decade at this point. In January 2014, Elliot contracted with architectural firm Stocker Hoesterey Montenegro ("**SHM**") to begin work on a new Highland Park residential project originally titled "Abbott Flats," but would eventually be named the Mondara.[42] Initially, SHM sent a proposal designating itself as the contract administrator for "all architectural, interior, structural, mechanical, electrical, and plumbing design."[43] Elliot responded that he would prefer to pay SHM for the "schematic design" and "hire guys or have my in house guy do all the heavy lifting."[44] Essentially, Elliot represented that he and Sherman each planned to have an "active role" in building the project themselves, and therefore would not require SHM to oversee and administer any of the construction services.[45]

The implications of Elliot's representation to SHM that he and Sherman would serve as contract administrators are best distilled by walking through what typically occurs during the contract administration process. The Plaintiff's expert witness, Kerry Lee ("**Lee**") of Forensix Consulting ("**Forensix**"), explained that contract administration involves the administrator overseeing the project by making site visits to confirm the construction is in conformance with the design plans, approving payments of contractors and subcontractors, and answering questions and resolving disputes.[46]

---

[41] *See* ECF No. 124, 130:8–131:20.
[42] Pl.'s Ex. 64. For clarity purposes, the Court will hereinafter exclusively refer to the project as "the Mondara."
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] Kerry Lee Trial Testimony, 10/28/2024, at 11:33 a.m.

As for making sure the construction is conformance with the design plans, the contract administrator would be tasked with handling submittals by examining the design and/or subcontractor specifications intended to be used on the project, and submitting those specifications to the design team to make sure the materials being requested comply with the plans. As for dispute resolution duties, typically, contract administration will involve Requests for Information ("**RFIs**")—a process where the contractor, on behalf of the subcontractor, requests information or further guidance on what to do regarding certain design specifications from the "design professional."[47] The design professional role, according to Lee, is typically given to either the general contractor or the developer, depending on how the particular contract is set up.

Curiously, no evidence was presented regarding any formal RFI process adopted as part of the construction process, and Lee testified that there seemed to be no record of an "avenue" for resolving problems and addressing questions through RFIs.[48] However, Troy English ("**English**")—the on-site superintendent of Stillwater GC—testified that when he began work on the project in 2016, the project included a less formal RFI substitute that involved "direct contact" with the project's lead architect—Scott Nunn ("**Nunn**").[49] English testified that, while the RFI's are there to better understand the necessary details of the plans, Nunn's frequent on-site visits— given that he worked "less than five minutes" from the construction site—supplanted any need for a formal RFI process.[50] Yet, no documentation was produced.

Eventually, Stillwater Development and SHM finalized and submitted architectural plans for Phase I of the Mondara on June 30, 2014,[51] as well as civil and structural designs on August

---

[47] *Id.*

[48] Furthermore, Lee testified that, although it was industry standard for there to be manufacturer specification books on hand for the various parties involved in the construction process to review if necessary, no "spec books" were identified during the course of his investigation.

[49] ECF No. 124, 73:17–74:21.

[50] *Id.*

[51] Pl.'s Ex. 14, 1–70.

29, 2014, for the project's (1) grading and drainage design; (2) mechanical, electrical, and plumbing designs; and (3) its HVAC and heating designs.[52] Following the approval of the Phase I plans, Stillwater Development and SHM finalized architectural and civil design plans for Phase II of the project on February 5, 2015 (collectively, the "**Design Plans**").[53]

Concurrent with hiring an architect for the initial design, Stillwater Development also reached a construction agreement with its other managing entity—Savannah Developers—for the former to serve as the Owner and the latter to serve as the project's general contractor in building Phase I (the "**Savannah Contract**"), which entailed twenty-one residential units, podium slabbing, and a subterranean parking garage.[54] Per the Savannah Contract, Savannah Developers was responsible for an array of different tasks, including: (1) managing and coordinating all work and delivery of materials for the various subcontractors; (2) inspection of all completed work to make sure it was in proper condition; (3) notifying Stillwater Development of any inconsistent or unanticipated conditions that would affect the cost, scope, or date of substantial completion; (4) assisting in architectural services; and (5) administration of structural engineering services, among many others.[55] Notably, the Savannah Contract also stipulated that Savannah Developers would regularly meet and consult with Stillwater Development regarding any issues involving construction feasibility, selection of materials, and any conditions that might result in "alternative designs" to the project.[56]

Like most construction projects, the Mondara involved numerous entities and moving parts throughout the development process. The record established that the key players were as follows:

---

[52] Pl.'s Exs. 15, 19.
[53] Pl.'s Exs. 17–18.
[54] Pl.'s Ex. 31, 1.
[55] *Id.* at 3–5.
[56] *Id.*

Stillwater Development held the title of Owner, SHM was the Architect, Archiverde, LLC was the Landscape Architect, Bury + Partners-DFW, Inc. was the Civil Engineer, and Savannah Developers was the General Contractor.[57] Additionally, the project contained numerous subcontractors for the various components of the project's construction, including roof installation, electrical wiring, and soundproofing/acoustics consulting, among others.[58]

The Pre-Construction Stage

After the Design Plans were submitted and approved, the project's construction was ready to begin in 2015. At this stage, Stillwater Development and Savannah Developers contracted with several consulting groups to analyze the project's Design Plans and provide recommendations in the consultants' respective areas of expertise.

### 1) Idibri

The first of these groups that Stillwater Development and Savannah Developers contracted with was Idibri. Idibri was tasked with conferring with Nunn to review the soundproofing specifications in the Design Plans, and prepare a proposal that would effectively establish "sound isolation requirements" for both the partitions separating horizontal units and the floor/ceiling assemblies between vertical units.[59] In essence, the Senior Designer for Idibri—Courtney Schoedel ("**Schoedel**")—was hired to propose an "Acoustical Program" of requirements that would seek to control and/or mitigate three types acoustic disruptions common in multi-unit residential projects: (1) background noise levels (NC/RC), (2) sound isolation (STC), and (3) floor to floor impact isolation (IIC).[60]

---

[57] Pl.'s Ex. 14, 1.
[58] *See* Pl.'s Ex. 592, 17–18; Pl.'s Ex. 693A, 1–2. Not all of these subcontractors, however, were hired by Savannah Developers. According to deposition testimony from Steve King ("**King**") of Savannah Developers, some subcontractors, like Texas Masonry Company, LLC d/b/a The Mason ("**Texas Masonry**"), were hired by "Stillwater."
[59] Pl.'s Ex. 352,.4.
[60] *Id.* at 5. STC stands for "Sound Transmission Class" and IIC stands for "Impact Insulation Class."

As Schoedel testified and Idibri's May 1, 2015 report reflects, STC is a single number rating that compares partition and sound isolation performance based largely on frequencies generally associated with speech, while IIC is a single number rating that compares the effectiveness of floor/ceiling assemblies in their ability to reduce "impact generated noise," such as footsteps.[61] These two metrics each fall on a respective scale of "commonly accepted" ratings for different levels of builds; STC/IIC ratings of 50 are the minimum requirement for the International Building Code (the "**IBC**"),[62] while ratings of 80 would be generally considered "inaudible."[63] Most importantly, the ratings scale also provides for a "luxury" design, which entails STC/IIC ratings of 60 to 65, respectively. Although "luxury" is not a code-defined term, Schoedel credibly testified that "luxury" is a commonly referenced industry standard for measuring acoustics in high-end residential projects.

After reviewing and assessing the Mondara's Design Plans, Idibri found that the project's base construction proposals as of August 29, 2014, would produce a STC rating of 45 (based on Idibri's computer calculation software) and an IIC rating of less than 50, putting both ratings below even the minimum IBC requirements.[64] The shortfall was due to certain design choices in the Design Plans, such as a 1/8 inch sound matt, 3/4 Floor Topping Mixture, and only one 5/8 Layer of GWB.[65] Per Idibri's recommendations, substituting these materials for higher-quality soundproofing materials—such as a "Resilient Mat Underlayment," or adding an additional GWB Layer—would potentially raise the STC ratings to between 58 and 62, and the IIC ratings to between 56 and 60.[66] In simpler terms, materials like the underlayment—a "squishy material"

---

[61] *Id.* at 13.
[62] Pl.'s Ex. 436, 11.
[63] Pl.'s Ex. 588, 4
[64] Pl.'s Ex. 436.
[65] Pl.'s Ex. 352, 20.
[66] *Id.*

found in the third layer of floor construction beneath the floor finish and Gypcrete—help improve soundproofing quality for the floor/ceiling assembly.

Although the increased soundproofing levels would not only bring the project above minimum IBC requirements but within "luxury" range as well, Schoedel credibly testified that the lower end of the range could still produce soundproofing sufficient for the Design Plans, but beneath the "luxury" threshold. Additionally, Schoedel testified that in-field testing for STC/IIC ratings—commonly referred to as ASTC/AIIC—could produce up to a 5-point deviation in results in either direction.[67] Following Schoedel's report, correspondence between Savannah Developers and Idibri indicates that Idibri's recommendations were to be incorporated into the initial construction phases as early as August 2015, and were in fact officially incorporated into the designs by SHM on November 11, 2015.[68]

### 2) *Boyd Consulting Group*

Additionally, Mike Boyd ("**Boyd**") of Boyd Consulting Group ("**BCG**") was hired to serve as the project's waterproofing consultant, given that Boyd had worked with other Stillwater entities on projects both before and after the Mondara. On April 17, 2015, Boyd provided a proposal on behalf of BCG to review the project's Phase I's plans and specifications for the exterior wall envelope, providing comments and observations as needed.[69] Boyd's review of the Design Plans led him to recommend several changes. In his August 7, 2015 report, Boyd specifically recommended: (1) adding control joints within the plaster system and where the substrate changes from concrete to a custom masonry unit ("**CMU**"); (2) adding end dams and a backstop to all metal

---

[67] Pl.'s Ex. 588, 3. ASTC officially stands for "Apparent Sound Transmission Class" and AIIC officially stands for "Apparent Impact Isolation Class."

[68] Pl.'s Exs. 521–22; Pl.'s Ex. 588, 2.

[69] Pl.'s Ex. 535, 4. Additionally, Boyd's proposal included intermittent site visits during construction to examine flashings, exterior doors and windows installation, exterior wall cladding installation, and installation of the weather barrier.

sill pan flashings and exterior doors; and (3) implementing a more detailed weeping method for the concrete block wall, among several other recommendations.[70]

Email correspondence between Boyd, Savannah Developers, Nunn, and Stillwater Capital employee Billy Avila ("**Avila**")—which also included Elliot, Sherman, and Coady—indicates that the parties subsequently met on August 21, 2015, to discuss Boyd's recommended revisions to the Design Plans.[71] Following the meeting, Nunn submitted revised waterproofing designs based on Boyd's recommendations, alongside "a few changes from other meetings and Stillwater requests."[72]

On September 18, 2015, Boyd found several more deficiencies in the revisions; most notably, he identified a lack of compliant control joints to conform to IBC requirements. The primary issue with the revisions was that there were still some control joint locations where the Design Plans did not adhere to the 2.5:1 ratio required by Advancing Standards Transforming Markets International ("**ASTM**") C1063.[73] After finalizing the plans and conducting consultant reviews with Idibri and BCG, construction officially began on the Mondara in mid to late 2015.

<u>The Construction Stage Begins</u>

The Mondara's construction stage deviated from the design and review stages in several material respects pertinent to this litigation. First, Boyd's recommendations, according to King's testimony, were not wholly adopted, and this decision was made by "Stillwater" in some capacity. As King's testimony reflects, Boyd had personal concerns about the "lack of weep holes" and "head flashing" that could impact water intrusion and expression from the building, and that he

---

[70] *Id.* at 10–11.
[71] Pl.'s Ex. 46.
[72] *Id.*
[73] *Id.* However, Boyd further testified that in his professional experience, he had never been on site for a build that had actually been in complete compliance with this required ratio, and that he had "always been told" architects were given a certain level of discretion to place control joints for aesthetic reasons so long as that placement did not present a "life safety issue."

had expressed those concerns during weekly meetings with Elliot, Sherman, Coady, and/or Avila.[74] According to King, these concerns were overridden by the Defendants' aesthetic concerns, and that, despite Boyd's recommendations, it became clear that the Defendants did not want modifications like head flashing at the window heads to be added into the Design Plans.[75]

Additionally, Boyd's recommendations for adding control joints across several areas within the Design Plans were not adopted. Not only did King testify that Savannah Developers became aware of complaints regarding Texas Masonry's work, including rough finishes and a lack of expansion joints in the stucco used,[76] but an email exchange between Elliot and the architect on September 17, 2015, showed that Elliot explicitly stated that he did not want control joints in front of the interior courtyard, seemingly for aesthetics.[77]

As construction continued, Boyd and Schoedel each visited the construction site, respectively, as part of their ongoing consulting regarding the Mondara. Boyd made two site visits to investigate the waterproofing features of the building envelope in early 2016. During his January 7, 2016, site visit, Boyd marked several items as needing "completion or repair," primarily involving the ZipWall (the "**ZIP**") exterior sheathing.[78] Boyd recommended that "more attention" needed to be paid to the details involving the ZIP sheathing, and that the respective elevations needed to be completed and released before the CMU could be installed.[79] Per Boyd's specific instructions, another inspection was required prior to starting CMU block work.[80]

Boyd eventually made a second visit on March 11, 2016, where he found even more issues with the project's weeping conditions constructed thus far. As expressed in his email to Avila on

---

[74] Pl.'s Ex. 693A, 3, 6.
[75] *Id.* at 5–6.
[76] *Id.*
[77] Pl.'s Ex. 74.
[78] Ex. 535, 13.
[79] *Id.*
[80] *Id.* Boyd's January 7, 2016, visit preceded construction of Phase II.

March 13, 2016, Boyd noted that it appeared "nothing was ever done to correct my concerns [from the August 7, 2015, design review] about the window headers and weep conditions at the base of the wall."[81] In fact, Boyd articulated that the weeping construction details had been "changed dramatically" from the plans he had reviewed to the ones used on the project.[82] Boyd also found: (1) there were still issues regarding stucco placement and installation along the ZIP sheathing; (2) waterproofing along the balcony contained a "systematically wrong problem with either the materials used or the installation procedure or both"; and (3) the installation of the ZIP sheathing on Phase II of the project contained multiple locations of incomplete, improper, or "failing" work.[83] The deficiencies that Boyd observed were uncommon in his previous experience working with the Defendants. Rather, he testified that the Defendants had followed his recommendations on previous projects. Following Boyd's second site visit, Avila forwarded Boyd's findings to Savannah Developers, Nunn, and, most notably, Elliot, stating, "WE MUST ADDRESS THESE ISSUES ASAP!"[84]

As for Idbri, Schoedel, along with another of Idibri's consultants—Robert Brenneman ("**Brenneman**")—also made five total visits to the project in March 2016. Schoedel credibly testified that her visit on March 4, 2016, revealed that the "hangars" for the ceiling—intended to be a single point of contact design per the Design Plans—had been constructed as an "RC-2", which has a two-legged structure with two points of contact, and that this decision was made by Savannah Developers.[85] Schoedel elaborated that, based on Idibri's "limited" lab testing, the change to a RC-2 design would cause a two-point IIC deduction compared to the Design Plans,

---

[81] Ex. 535, 6.

[82] *Id.*

[83] *Id.*

[84] Pl.'s Ex. 7. The Court notes that Boyd further testified that, after his site visits and subsequent recommendations, he was never called back out to the Mondara construction site again.

[85] Courtney Schoedel Trial Testimony, 10/29/2024, at 5:29 p.m.

changing the intended range from 56-60 to 54-58, and thereby taking the Mondara's design out of any "luxury" soundproofing range.[86]

During Idibri's third site visit on March 18, 2016, Brenneman's primary task was to "observe the installation of [the] resilient mat underlayment" inside two second-floor units.[87] Although Brenneman noted that the underlayment's mesh was installed per the installation guidelines, the "alternative" perimeter isolation barrier installation being used would require additional wrapping around penetrations and pipes and further field testing prior to lightweight concrete being poured.[88] Additionally, Brenneman noted that there were "significant gaps" where the underlayment had not been pushed up tightly against the perimeter isolation barrier, creating a type of bridging that would "undermine" the floor/ceiling assembly design's intended soundproofing performance, especially with the third-floor units' construction.[89]

Stillwater GC Replaces Savannah Developers

On May 3, 2016, King, on behalf of Savannah Developers, notified all subcontractors and vendors working on the Mondara that, effective March 1, 2016, Savannah Developers was no longer involved in the project as the general contractor.[90] According to credible testimony from both English and the HOA's current President—Bruce Mamary ("**Mamary**")—Savannah Developers was terminated for "delays" as well as issues with "workmanship," among other reasons.[91] In place of Savannah Developers, Stillwater GC took over as general contractor on the Mondara in April 2016, with English serving as Stillwater GC's on-site superintendent.[92]

---

[86] *Id.* at 5:31 p.m.
[87] Pl.'s Ex. 370, 1.
[88] *Id.* at 2.
[89] *Id.* Following the five site visits, Idibri met with Savannah Developers to discuss its findings along with the floor/ceiling components being used in the construction on April 29, 2016.
[90] Pl.'s Ex. 37, 1.
[91] ECF No. 123, 100:6–100:16; ECF No. 124, 29:23–30:8.
[92] ECF No. 124, 29:12–29:22.

According to English, by the time Stillwater GC arrived on the project, Savannah Developers had completed the concrete podium structure, Phases I and II had both been framed, Phase I's sheet rock had been installed, and Phase II's sheet rock installation had just begun.[93] However, Stillwater GC, under the Defendants' supervision, assumed control of two essential components to the Mondara that were still under construction when Savannah Developers left the project: (1) the civil and site drainage systems impacting the garage; and (2) the podium slab construction and its accompanying drainage system.

With respect to the site grading and drainage systems, proper grading and drainage can influence a structure's ability to prevent water from "ponding" at a foundation's perimeter and then migrating through deficient waterproofing installations.[94] Put simply, proper drainage allows for a more efficient removal of storm water before it impacts the subgrade or below-grade spaces, such as a parking garage.[95] As the evidence reflects, the IBC requires a minimum 5% positive slope of site grading and a 2% slope at impervious surfaces to divert water from the foundation properly and efficiently.[96] The Design Plans for the Mondara included area drains on the buildings' east and west side, downspouts designed to be routed through the project's subsurface draining system, and trench drains at each entrance of the garage to divert water away from the foundation and prevent flooding in the parking garage.[97]

With respect to the podium slab, the slab's construction "serves as the roof of the below-grade parking garage."[98] Its purpose, especially for waterproofing, is to prevent water from slipping into penetrations in the top lever of the podium, and ultimately seeping through the

---

[93] *Id.* at 90:4–90:9.
[94] Pl.'s Ex. 592, 44.
[95] *Id.*
[96] *Id.*
[97] *Id.* at 45–47.
[98] *Id.* at 84.

garage's exterior walls.[99] To prevent water penetration in outside areas, such as the project's courtyard and first-floor patios (most of which were constructed above the slab and the garage), the Design Plans called for a multitude of waterproofing specifications, including: (1) a liquid-applied "membrane" with an IBC-required 2% slope draining away from the buildings; and (2) an "integrated" drainage system to pump out water draining down from the surface and through the podium, thereby preventing it from sitting on the surface and/or flooding the garage.

According to English and Defendants' expert witness Jacob Bice ("**Bice**"), Savannah Developers installed the below-grade waterproofing in the garage, subcontracting that work out to AquaTek.[100] However, Stillwater GC oversaw AquaTek's waterproofing for the podium slab, planter, and patio waterproofing, including the liquid membrane application.[101]

<u>The Purchasing Stage</u>

Equally important to the Court are the unit owner purchases that were occurring simultaneously with the construction in 2016. Although the project was still underway, the first purchases for units at the Mondara began as early as Summer 2015, according to Mamary's testimony.[102] Mamary testified that he saw an advertisement for the Mondara from Robert Elliot Custom Homes, which prompted discussions about purchasing a unit. Mamary testified that significant selling points during those discussions with Elliot were the Mondara's "high end" nature, its quality—according to Elliot—being "as good as it gets," and the Mondara being "[one] of the most well-built product[s] in Highland Park."[103] According to Mamary, Elliot's pitch to him

---

[99] ECF No. 124, 42:1–42:9.
[100] *Id.* at 41:16–41:23; Defs.' Ex. L, 59.
[101] Defs.' Ex. L, 59. English further testified that Stillwater GC remained the general contractor on the project through completion of Phase II and through any necessary "warranty repairs" after units had been completed and sold to the original unit owners.
[102] ECF No. 123, 14:9–14:12.
[103] *Id.* at 22:24–23:18.

"was all about quality, all about luxury," and that following those discussions, Mamary and his wife "were convinced."[104]

Elliot had a similar discussion in March 2017 with Karl Dial ("**Dial**")—the HOA's President from 2017–2019—when Dial and his wife purchased Unit 107.[105] According to Dial's testimony, the purchasing process for his unit involved him, his wife, and their realtor on one side, and Elliot and a Stillwater-affiliated broker, Brandon Meek, on the other.[106] Dial credibly testified that his discussions with Elliot largely resembled Mamary's recitation; Elliot represented that the Mondara was a "luxury" project, its construction had gone "way over and above" what the IBC required, improvements to the property were being completed in accordance with the Design Plans, and that the Design Plans called for "significantly more" than the IBC required.[107] As Dial summarized, Elliot referred to the Mondara as "top shelf construction."[108] Dial credibly testified that he relied on both Elliot's representations and the Multi-Listing Service ("**MLS**") reports that Dial received regarding specific Mondara units in eventually purchasing his unit.[109]

However, *which* specific representations Elliot or the other Defendants did or did not make to original unit owners like Mamary and Dial was a point of contention at trial. The two primary representations at issue were: (1) the Mondara's purported "Green Built" certification; and (2) the project's soundproofing quality.

The Plaintiff's expert witness Ben Beckelman ("**Beckelman**") explained that the Green Built certification is a program that certifies a "higher standard" of residential property, requiring certain protocols to qualify as Green Built. A Green Built Texas certification requires that "each

---

[104] *Id.*
[105] Karl Dial Trial Testimony, 10/30/2024, at 3:25 p.m.
[106] *Id.* at 3:35 p.m.
[107] *Id.* at 3:37 p.m.
[108] *Id.*
[109] *Id.* at 3:39; Pl.'s Ex. 524, 1.

unit/building/project must be verified" under specific guidelines, including established waste reduction strategies, water and energy efficiency requirements, indoor air and environmental quality standards, and even the use of certain construction and engineering materials.[110] Beginning in 2017, the Mondara's listings specified that the units were Green Built certified.[111] However, not only were the Design Plans and materials used not in conformance with necessary Green Built requirements, but the Mondara's units are not found in the Green Built Texas Registry.[112]

Many of the Mondara MLS reports showed Robert Elliot and Associates as the listing office, Brandon Meek as the listing agent (with a Stillwater Capital email address), and Elliot as the listing office point of contact (with his Stillwater Capital email address).[113] Additionally, the MLS reports also stated that Elliot was the "Builder" and "Seller" on the project, and that Stillwater Development was the "Owner."[114] Despite the inaccurate information on the listings, no original owners testified that the Mondara's supposed Green Built certification was something Elliot or the other Defendants directly represented to them, or that any owner specifically relied on any Green Built representations in making their respective purchases.[115]

As for soundproofing representations, this evidence was primarily introduced through Mamary and Dial. According to Mamary, acoustics were the "one thing" he and his wife were concerned about in transitioning from a single residence home to a multi-unit residential property.[116] Likewise, Mamary testified that he discussed these issues with Elliot and affirmatively stated that he did not want to live somewhere with noise above him. According to Mamary, Elliot

---

[110] Pl.'s Ex. 607, 32–41. Notably, Green Built certifications also require a minimum 10-year warranty for all materials used in installing exterior wall cladding.
[111] Pl.'s Ex. 524, 1–20.
[112] Pl.'s Ex. 607, 1.
[113] *Id.* at 1–8. Other MLS reports substituted Brandon Meek for Ty Vaughn, but also included Elliot as the second listing agent with his Stillwater Capital email address as the point of contact.
[114] *Id.*
[115] ECF No. 123, 23:19–24:16; Karl Dial Trial Testimony, 10/30/2024, at 5:30 p.m.
[116] ECF No. 123, 24:19–24:20.

assuaged those worries by stating the Mondara's design would be "the highest quality" and that "you should not be able to hear the noise above you."[117]

Dial, on the other hand, testified that while touring units with his wife, Elliot, and English, the group walked down to an adjacent unit to physically test the soundproofing. Both Dial and English testified that the "test" went as follows: (1) Dial, English, and another contractor walked upstairs to the unit above while Mrs. Dial and Elliot stayed in the unit below; (2) the three upstairs walked across the unfinished upstairs unit, which English testified still had only wood flooring; and (3) the group reconvened in the downstairs unit to discuss the soundproofing quality.[118] According to Dial, upon reconvening, Elliot described all the various soundproofing layers that were installed that went "over and above" the design specifications. English testified that Mr. and Mrs. Dial were "very impressed," and signed a contract for their unit the same day."[119]

Alongside the Green Built and soundproofing representations, purchasers were also provided with a Condominium Information Statement, which notably contained a limited one-year warranty (the "**Limited Warranty**").[120] The Limited Warranty specifically warranted that the workmanship on the project "will be of good quality, free from material defects in workmanship" for one year post-closing, and defined a "Material Defect" as a "defect which . . . fails to conform to the latest version of the plans and specifications . . . as of the date of this Limited Warranty."[121]

What is equally important to the Court, beyond what representations were made to the original unit owners, is what information about the project was *not* disclosed to unit owners during the purchasing process. According to Mamary, despite conversations with Elliot, Brandon Meek,

---

[117] *Id.* at 25:5–25:10.
[118] ECF No. 124, 68:20–69:13; Karl Dial Trial Testimony, 10/30/2024, at 3:37 p.m.
[119] ECF No. 124, 69:11–69:13.
[120] Pl.'s Ex. 583, 147–50.
[121] *Id.* at 147.

and others during the purchasing process, no discussions were had nor disclosures made regarding the stucco installation violating IBC requirements, the window installation not being in accordance with manufacturer specifications, improper flashing installation, or any information about further acoustics testing previously done by Idibri.[122] Dial similarly testified that the original "developer-controlled" HOA board—which Elliot and Sherman were members of—did not disclose any information about the construction defects identified by BCG and Idibri to the incoming HOA board, of which Dial became President in September 2017.[123]

Problems Arise

While the purchasing process continued with original unit owners through the middle of 2018, several post-construction issues began to arise. The first substantive issue arose in late 2017, when Elliot and Steve Garrison of Stillwater Capital reached out to Idibri and Schoedel to do further sound testing on the premises following noise complaints by unit owners. Schoedel testified that further testing was needed to determine whether the Mondara's soundproofing specifications met the IBC's *minimum* requirements. Idibri's proposal was for a one-day field test involving up to four floor/ceiling assemblies, which could be tested in the living rooms and master bedrooms in two individual units across both Phases.[124]

Prior to Idibri's testing, on December 1, 2017, Elliot requested that Schoedel only test one floor/ceiling assembly as opposed to the four assemblies that Idibri recommended, and instructed Schoedel in two separate instances to refrain from: (1) discussing her in-field test results with any of the unit owners; (2) submitting Idibri's findings in writing. On November 28, 2017, Elliot specifically told Schoedel, "It is important that we don't talk to homeowners," for concern that one

---

[122] ECF No. 123, 25:18–28:6.
[123] Karl Dial Trial Testimony, 10/30/2024, at 3:32 p.m.
[124] Pl.'s Ex. 595, 1.

of the complaining unit owners would supposedly "[mishear], [misquote], twist words and make things up on a regular basis."[125] Schoedel further testified that Elliot instructed her to call with her results as opposed to submitting her findings in writing, contrary to Idibri's typical policy.[126] Schoedel testified that the AIIC testing resulted in a 51 rating, which would have been at the bottom of the range for the Design Plans. Putting this rating further into perspective, a 51 AIIC rating would be slightly above IBC requirements, borderline compliant with the Design Plans, and significantly below a "luxury" rating of a minimum AIIC of 55 and Idibri's original recommendations.[127]

Following Idibri's testing, Mamary testified that he asked the Defendants for the soundproofing results, to which he was told the test "came out within specs," and that to get the full report it would cost the HOA $25,000.[128] However, Schoedel credibly testified that it was Idibri's policy to release its results as part of its services and without additional charge, let alone $25,000.[129]

Despite Idibri's 2017 testing, the soundproofing issues continued as Dial sent a letter to Elliot on February 25, 2018, providing written notice of several material defects in accordance with his Limited Warranty, including "unreasonable noise" emanating from the unit above.[130] Several months later in July 2018, Dial drafted and proposed a tolling agreement with Elliot to forestall the running of any potential statute of limitations related to the noise complaints.[131] As

---

[125] Pl.'s Ex. 221.

[126] Courtney Schoedel Trial Testimony, 10/29/2024, at 5:47 p.m. The Court notes that Schoedel did not testify as to the ASTC ratings recorded during Idibri's 2017 testing.

[127] *See* Pl.'s Ex. 588, 8.

[128] ECF No. 123, 32:4–32:14.

[129] Courtney Schoedel Trial Testimony, 10/29/2024, at 5:48 p.m.

[130] Defs.' Ex. T, 1–2. The basis for this letter, according to Dial's testimony, was that the upstairs unit had not been occupied by its owners when Dial and his wife first moved in, and that it was only after the upstairs neighbors returned that they became aware of the noise issues.

[131] Defs.' Exs. V–W.

referenced in emails between Dial and Elliot, the tolling agreement would freeze any such claims for two years, but only as to Mr. and Mrs. Dial's causes of action.[132] Dial, however, notified Elliot that others were interested in reaching a similar agreement with Elliot if Dial's tolling agreement were approved.[133] Elliot replied that he would forward the agreement to his attorney; Elliot never signed it, and no further agreements with other unit owners were ever produced. [134]

Other unit owners, according to Mamary, voiced their concerns regarding the noise during an HOA meeting in the spring of 2018.[135] English, who was also present for the 2018 HOA meeting, testified that during his time at the Mondara noise complaints were pervasive.[136] The HOA meeting did not just address noise concerns, however; Mamary confirmed that noise was simply "at the top of [the] list," which also included floor issues, drainage issues involving the roof, courtyard, and driveways, and flooding in the garage.[137] As for the garage specifically, video evidence shows that the Mondara was also experiencing "ankle-deep" flooding in the garage from water overflowing from the Mondara's roofs and nearby balconies and onto the ramps leading into the garage.[138]

Both Mamary and English testified that the garage flooding primarily stemmed from the drainage and pump systems installed in the garage. English claimed that the garage's flooding was largely due to debris, which was comprised of rock, leaves, trash, "contractors dropping things," as well as other materials that would flow into the draining system and overload the garage's

---

[132] Defs.' Ex. V.
[133] *Id.*
[134] Defs.' Ex. W.
[135] ECF No. 123, 92:10–92:16.
[136] ECF No. 124, 114:18–114:24.
[137] ECF No. 123, 92:12–92:21.
[138] Pl.'s Exs. 627, 629; ECF No. 123 47:1–47:14.

cistern pumps and trip the electrical units.[139] Stillwater GC added additional pumps at some point in the middle of 2016 to mitigate the flooding issue, but Mamary testified that this mitigation effort was unsuccessful.[140] Additionally, the HOA attempted to mitigate the flooding by adding another cistern pump in early 2019, which Mamary testified was also unsuccessful in fixing the issue.[141] The HOA eventually resorted to retaining Texas Concrete to reconfigure the drainage system in 2021, which Mamary testified had significantly improved the drainage system but that water continues to pool throughout the garage.[142]

These issues persisted throughout 2018 and 2019, as English and other employees of Stillwater GC continued to do "warranty work" to repair certain units upon request.[143] During this timeframe, English also testified that he was receiving calls about stucco cracking, sheetrock cracking, water intrusion, discharge from the gutters falling onto adjacent balconies, and continued leaking throughout the garage.[144]

The Conley Report

The cycle of mitigation efforts and warranty work continued until September 3, 2019, when the HOA Board of Directors hired the Conley Group to complete an exterior façade spray test and sample core assessment on the vertical elevation of Units 113, 213, and 313 to assess water infiltration issues in the façade's wall assembly.[145] The Conley Group reported its initial findings to Kevin Orlando ("**Orlando**")—the Mondara's interim general manager—on September 6, 2019,

---

[139] ECF No. 123, 32:21–34:19. English also testified that the Design Plans provided for "sleeves" to be placed throughout the podium slab, allowing water to drain through the slab and integrate with the sewer system, as opposed to water draining onto the garage ramps. According to English, Savannah Developers never installed the sleeves.
[140] ECF No. 124, 32:3–32:20; ECF No. 123, 51:23–52:5.
[141] *Id.* at 52:6–52:15.
[142] Pl.'s Ex. 504, 446; ECF No. 123, 53:5–59:11.
[143] ECF No. 123, 94:3–94:11.
[144] ECF No. 123, 94:12–96:7.
[145] Pl.'s Ex. 49, 2.

providing findings and recommendations regarding several significant construction defects. These defects included: (1) improperly installed stucco system, primarily due to a lack of control joint installation and improper sealants around the doors and window frames; and (2) a deficiently constructed metal roofing system, due to improper flashing and gutter sizing/placement.[146] The Conley Group recommended: (1) complete removal and reinstallation of the stucco system and all associated flashings to the existing ZIP sheathing; (2) new sealant installation over all necessary joints, openings, penetrations, and transitions; (3) proper sealants along all window and door penetrations; and (4) complete removal and replacement of the metal panel roofing system, as well as its accompanying drip edge flashings, felt paper slip sheets, and improperly-sized gutters.[147]

On September 13, 2019, Dial, on behalf of the HOA Board, sent Elliot and SHM a letter notifying them of the HOA's retention of the Conley Group to investigate the numerous and recurrent water issues around the Mondara.[148] In response, both English and Elliot represented to Orlando and Dial that the Conley Group should reduce its inspection findings to writing "before we meet to discuss anything."[149]

The Conley Group issued its final report (the "**Conley Report**") on December 18, 2019, in which it further detailed its findings from its preliminary report, provided more recommendations, and outlined the various on-site testing that it did at the Mondara. However, the Conley Report explicitly stated that the scope of work done was limited to identifying potential waterproofing issues related to the building envelope and parking garage, and did not include a comprehensive review of the Mondara's civil landscaping, site walls, concrete flatwork, structural, mechanical,

---

[146] *Id.* at 2–9.
[147] *Id.*
[148] *Id.* at p. 1.
[149] Pl.'s Ex. 504.

electrical, and plumbing engineering, acoustical issues, and any contractor or manufacturer warranties.[150]

Despite the limited scope, the Conley Report contained significant findings regarding water intrusion issues at the Mondara.[151] These findings were incorporated into the Conley Report issued to the HOA, alongside projected cost of repair options.[152] However, Mamary testified that the primary purpose behind the HOA's retention of the Conley Group was to give the HOA "an idea on why things that [it] thought were being fixed never ended up being fixed," and that, notwithstanding the cost estimates, the scope of the Conley Report was not for litigation purposes at that time.[153] Mamary testified that it was at this point that the HOA became aware that the Mondara had not been constructed according to the Design Plans, and it was when he and his wife became aware of the Mondara's numerous hidden defects.[154]

Following the Conley Report, HOA board member Michael Rochelle ("**Rochelle**") sent Elliot, Stillwater Capital, and Stillwater Development a demand letter, notifying the Defendants of the construction defects identified in the Conley Report and demanding immediate repairs to the identified areas in the report within sixty (60) days.[155] The HOA threatened to bring a lawsuit pursuant to the RCLA, along with any other applicable law, if the Defendants did not agree to perform said repairs.[156] Discussions between the HOA and the Defendants' counsel followed, with the parties attempting to coordinate a meeting with the Conley Group. That meeting was eventually

---

[150] *Id.* at p. 3.
[151] *Id.* at 22–42. Furthermore, the Conley Group, with the HOA's approval, contracted with two engineering firms—Frank W. Neal & Associates and Farnsworth Group—to conduct additional testing to the Mondara's structural integrity with interior wall cracking and site drainage around the courtyard and garage areas, respectively.
[152] *Id.*
[153] ECF No. 123, 84:11–86:8.
[154] *Id.* at 37:3–37:23, 160:5–160:8.
[155] Pl.'s Ex. 504.
[156] *Id.*

held on February 20, 2020, with Elliot, English, SHM, the Conley Group, and the HOA's Board

of Directors in attendance.[157]

Minutes of the February 20th meeting indicate that the HOA and the Conley Group

representatives explained to Elliot that, despite the Defendants' responsiveness to certain

necessary repairs, there remained significant issues regarding the roof, moisture barrier, gutters,

windows, doors, courtyard, stucco installation, and flooding in the garage.[158] The "Next Steps"

detailed in the meeting minutes show that Elliot promised to "do some homework" on the

Mondara's construction, and requested a comprehensive list of all requested repairs and the

Defendants' responses, or lack thereof, to those requests.[159] In the meantime, the HOA would draft

a letter to the rest of the twenty-seven unit owners, requesting that they examine and report any

other water leaks and/or damages to better understand the extent of the defects.[160] After this

meeting, English testified that Stillwater GC was prohibited from doing any further on-site work

and left the Mondara permanently.[161]

<u>The HOA Files Suit in State Court</u>

The HOA Board conducted a Special Homeowners Meeting on May 20, 2020, to address

continuing issues with both the Defendants' refusal to repair certain defects and their lack of

communication over the previous several months.[162] According to the minutes of the May 20th

meeting, Elliot had notified the HOA board that certain reported damages were either outside the

Limited Warranty window, thereby leaving the HOA responsible for the repairs, or that certain

damages were incurred due to unit owner actions and subsequent mitigation attempts made by the

---

[157] *Id.*
[158] Pl.'s Ex. 504.
[159] *Id.*
[160] *Id.*
[161] ECF No. 124, 122:6–122:16.
[162] Pl.'s Ex. 504.

HOA, which the Defendants refused to pay for.[163] Furthermore, the minutes note that Elliot had become non-responsive to the HOA's requests for copies of Stillwater Development's construction insurance policy, a list of subcontractors used on the project, or any of the Design Plans to compare to the construction's final build.[164] Finally, the May 20th meeting minutes reflect that concerns regarding statute of limitations issues were raised.[165] On May 21, 2020, the HOA sent a letter to all the Mondara unit owners, notifying them of the impending litigation.[166] The lawsuit was then filed in State Court on June 3, 2020.[167]

The Expert Reports

Following the HOA's lawsuit, the HOA and the Defendants engaged respective experts. The Court's findings regarding these experts' reports are addressed below:

### 1) Engineering Reports

The HOA retained Forensix Consulting ("**Forensix**"), led by Project Engineer Kerry Lee, to conduct several on-site investigations and perform destructive testing across the entirety of the Mondara from August 19, 2021, through January 5, 2022.[168] Forensix was hired for litigation purposes to provide a "more comprehensive, more statistically valid investigation" than that originally performed by the Conley Group.[169] Following a review of the Mondara's "as built" Design Plans, numerous invoices, assessment reports, and the applicable building codes, among

---

[163] *Id.*

[164] *Id.*

[165] *Id.* Thereafter, 79.94% of the total unit owners and 100% of the unit owners in attendance voted in favor of initiating a lawsuit against any of the responsible parties—including the Defendants—as well as initiating a special assessment for further destructive testing to be done.

[166] *Id.*

[167] ECF No. 123, 95:3–95:5.

[168] Pl.'s Ex. 592, 4.

[169] ECF No. 123, 39:9–39:15.

other things, and numerous on-site investigations, Forensix issued its Distress Evaluation and Scope of Repair (the "**Forensix Report**") on January 10, 2022.[170]

In response to the Forensix Report, the Defendants hired engineering firm Walter P. Moore and Associates, Inc. ("**WPM**") and Project Engineer Jacob Bice in early 2023 to conduct WPM's own investigation of the Mondara's construction and provide responses to Forensix's findings (the "**WPM Report**").[171] The WPM Report was written and issued by Bice on May 17, 2023.[172]

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[173] the Court finds the methodology in the Forensix Report, as well as Lee's testimony regarding the report, to be reliable, relevant, and tested. The scope of the Forensix Report involved: (1) reviewing information provided by other hired professionals and subcontractors before and after the Mondara's construction; (2) performing slope surveys along the elevated patios and balconies, storm drain lines along the podium slab, as well as a civil survey at the site's natural and artificial turf areas; (3) performing destructive testing along the roof, exterior veneer, patios, balconies, and courtyard; and (4) video inspection of the courtyard drainage lines.[174] The Forensix Report included summaries of reported defects involving: (1) civil and site drainage; (2) podium drainage and waterproofing; (3) wall cladding, patios, and balconies; (4) roofs; (5) soundproofing; and (6) other miscellaneous defects noted during Forensix's on-site inspections.[175] The Court finds Forensix's methodology to be both credible and sound as to its underlying principles.

The WPM Report, although relevant and credible under *Daubert* based on the methodology used by Bice, did not include any destructive testing and Bice's independent investigation was

---

[170] Pl.'s Ex. 592.
[171] Defs.' Ex. L.
[172] *Id.*
[173] 509 U.S. 579 (1993).
[174] Pl.'s Ex. 592, 7.
[175] *Id.* at 3.

contained primarily to three site visits in March and May 2023, respectively.[176] The Court finds Bice's testimony as to items examined during these specific visits to be based on sufficient facts and data, and reliable in understanding the scope of the Mondara's defects. In fact, on multiple occasions, the WPM Report and Bice's testimony align with the Forensix Report and Lee's testimony.

However, as highlighted in the WPM Report, Bice was not present for any observations related to openings at the podium, courtyard planters, artificial turf lawn, the bases of unit walls, window and door heads, nor for any penetration flashing breezeway connector testing.[177] Likewise, Bice never requested any further destructive testing to disprove Forensix's extrapolations. Accordingly, the Court does not find the entirety of either the WPM Report or Bice's testimony to be reliable or based on sufficient facts and data. While much of Bice's testimony was largely credible, sufficient, and helpful to the Court, the Court finds the WPM Report to be lacking and inconsistent in its findings and scope of repairs.[178] At several instances within the WPM Report, detailed more extensively below, Bice's findings are unsupported. Additionally, the WPM Report aligns with the Forensix Report as to documentary findings at numerous points, only to then disagree with Forensix's scope of repairs because Forensix did not do <u>enough</u> destructive testing.

In considering both reports and both Lee and Bice's testimony, alongside the extensive visual evidence presented at trial, the Court makes the following findings as to the specific areas containing construction defects at the Mondara:

### a. Civil and Site Drainage

---

[176] Defs.' Ex. L, 44. During his first visit on March 3, 2023, Bice observed demolition of the balcony at Unit 316 to further examine any defects related to water damage. Bice's second visit from March 13 to March 15, 2023, involved further observations of the demolition of the balcony to examine removal of the CMU and stucco placement below the balcony. Finally, Bice's third visit from May 2 to May 3, 2023, focused on the exterior facade, courtyard, select interior units, attics, and parking garage, examining the alleged defects.
[177] *Id.* at 46–59.
[178] Defs.' Ex. L.

The testing performed by Forensix included video inspection of the courtyard drainage lines, as well as a review of a 2019 inspection compiled by Farnsworth Group regarding the garage drainage system.[179] Forensix also reviewed the various civil and site drainage IBC requirements, alongside the project's construction and Design Plans, in conjunction with its inspections and findings.[180]

First, improper sloping and site grading were found at both the natural and artificial turf areas, as well as the site's hardscapes, which is noncompliant with both the project's Design Plans and 2009 IBC § 1804.3.[181] As well, there was insufficient weep screed between the base of the stucco veneer and both the natural and paved areas of the project, in violation of § 2512.1.2 of the IBC.[182] This inadequate grading has led to "differential movement" in the site's grade and ground-supported flatwork.[183] Additionally, there is uncontroverted evidence of improper installation of the area drains, downspouts, storm drain piping, and trench drain drainage pipes, all of which are noncompliant with the Design Plans, as well as the IBC and the International Plumbing Code ("**IPC**").[184]

Given the listed defects, the Court finds that the Mondara's civil and site grading defects require the following repairs: (1) regrading and/or replacement of the perimeter site grading to achieve IBC minimum requirements for sloping; (2) removal, reconfiguration, and/or replacement of the podium drainage systems, including the storm water drainage system, to the extent necessary

---

[179] Pl.'s Ex. 592, 31.
[180] *Id.* at 34–44.
[181] *Id.* at 20–32.
[182] *Id.* at 20.
[183] *Id.*
[184] *Id.* at 20–21. The evidence reflects that Savannah Developers was the general contractor during the work related to Phase I's site grading and drainage systems, utilizing subcontractors AquaTEK and Silvia Plumbing, respectively. Stillwater GC was the general contractor during the work related to Phase II's site grading and drainage systems, utilizing AquaTEK and Performance Piping and Outdoor Concepts, respectively. Mitigating repairs were made by Stillwater GC, as well as Texas Concrete, to reduce flooding in the garage due to improper podium drainage.

to supplement the completed mitigating repairs; (3) trench drain removal and replacement; and (4) waterproofing along the garage walls to prevent water flow in and through the subgrade conduits.[185]

### b. Podium Drainage and Waterproofing

Destructive testing was done in the Mondara's courtyard by Forensix across seven different locations, including adjacent trench drains and along the podium topping and waterproofing assemblies near the artificial turf.[186] Additionally, the Conley Group performed prior destructive testing in five other locations, as well as water testing in and around existing penetrations in the podium slab, the results of which are incorporated into the Forensix Report.[187]

Alongside the Design Plans, Forensix reviewed: (1) subcontractor reports, invoices, proposals, and change orders between Stillwater GC and AquaTEK related to the installation of the Tremco 250 GC Waterproofing Membrane; (2) photographs provided by the Mondara during trench drain cleaning in 2021; and (3) manufacturer specifications for the Mondara's podium drainage and waterproofing mechanisms, such as the Tremco membrane and drainage protection board, and models of the surrounding drainage manifolds.[188]

As noted in the Forensix Report, the manufacturer specifications for application of the Tremco membrane require horizontal applications that allow for unimpeded water flow to drain and evacuate the membrane surface.[189] Section 1507.15.1 of the IBC requires liquid-applied roofs to have a 2% design slope.[190] The Design Plans specified a podium slab, which would serve as the

---

[185] *Id.* at 53–55.
[186] *Id.* at 62–63.
[187] *Id.* at 62–70.
[188] *Id.* at 71–83. Conversely, WPM reviewed many of the same documents, excluding pictures submitted by the HOA, as well as the AquaTEK-related correspondence.
[189] Pl.'s Ex. 592, 84.
[190] Pl.'s Ex. 436, 22.

roof of the below-grade parking garage,[191] but without reference to any designated or required slope.[192] It was therefore constructed with 0% slope.[193] The Tremco membrane was then placed on top of the podium slab without proper drainage.[194] The lack of proper drainage, alongside improper installation of the draining bowls in the courtyard planters and improper vertical membrane installation along the CMU walls, allowed for water retention to occur on top of the membrane's surface.[195] This not only created flooding issues in the courtyard, but also allowed the retained water to migrate through penetrations in the podium slab, such as gas lines and electrical conduits.[196]

The Court also finds that Forensix sufficiently identified several other defects with respect to the  waterproofing installation: (1) the courtyard's water feature was leaking and contributing to the standing water on the podium slab; (2) the courtyard's drainage systems, such as the downspouts and trench drains, did not comply with the Design Plans and allowed for additional water retention; and (3) there was no waterproofing installed at the top of the podium slab below the patio floor tiles on the Mondara's east and west elevations.[197] Although the podium slab was technically constructed in accordance with the Design Plans, the podium's drainage and waterproofing systems were not constructed in accordance with the Design Plans, the manufacturer's specifications, or the IBC.[198]

---

[191] Pl.'s Ex. 592, 72.
[192] The Court notes that even Bice confirmed that the architectural drawings and the Design Plans for the Mondara were vague as to waterproofing in general, among other areas.
[193] Defs.' Ex. L, 60–61.
[194] Pl,'s Ex. 592, 56.
[195] Id. at 56–57, 84.
[196] Pl.'s Ex. 592, 56.
[197] Id. at 57.
[198] AquaTEK was the subcontractor that installed the Tremco membrane and was hired by Stillwater GC in or around February 2016.

The Court finds that the following repairs identified in the Forensix Report are reasonable

and necessary regarding podium drainage and waterproofing:

(1) removal of all amenities not directly impacting the structural integrity of the podium deck, including the putting green, fire pits, grill areas, all tile, all topping slabs, all trench drain assemblies, and all other fill materials or waterproofing systems unless noted otherwise in the Report;

(2) repairs to any mortar joints not flush in the CMU wall construction to allow for proper integration of the waterproofing systems;

(3) installation of a minimum 2% slope towards all existing and added through-podium drains at the podium's surface;

(4) installation of a French drain system in accordance with the Design Plans;

(5) installation of new trench drain assemblies with proper slope and integration;

(6) installation of any missing through-slab drainpipe penetrations below the west side of the courtyard;

(7) installation of new, properly flashed and sealed, waterproofing assemblies in accordance with the Design Plans;

(8) installation of new fill materials and topping slabs in accordance with the Design Plans;

(9) installation of new floor tiles equipped with expansion joints to allow for thermal movement;

(10) installation of any new amenities required by the removal of such items to properly repair the podium and waterproofing systems;

(11) removal and replacement of any waterproofing systems located in or around the planter drains to the extent they do not conform with the required 2% slope towards existing through-podium drains; and

(12) removal, repair, and/or replacement of all water feature finishes and fixtures to the extent they contain improperly installed waterproofing systems.

### c.  Wall Cladding, Patios, and Balconies

The Forensix Report details extensive destructive testing across all three floors of the

Mondara to examine waterproofing, stucco placement and installation, and ZIP flashing, among

other tested items.[199] The Forensix Report also included water testing performed by the Conley Group at Units 113 and 213.[200] Finally, Forensix also reviewed Chapters 6, 14, 15, and 25 of the IBC's requirements, industry standards set forth by the ASTM for exterior stucco wall cladding systems, the Design Plans specifications for wall cladding assemblies and ZIP sheathing, and the proposals and plans for waterproofing and flashing for the patios and balconies.[201]

As noted in the Forensix Report, the Court finds that, per the IBC, the exterior wall envelope must be designed and constructed to prevent the accumulation of water within the wall assembly by providing a water-resistive barrier behind the exterior veneer.[202] The water-resistive barrier must be properly attached and flashed in order to prevent moisture from entering the interior layers of the wall.[203] Similarly, the ASTM requires application of cement-based plaster along the exterior wall cladding to include proper flashing and/or weeping to allow for proper drainage.[204]

The IBC also requires the exterior veneer to be covered in a water-resistant membrane with proper flashing and weep holes to resist water penetration into the building's interior.[205] This exterior veneer should be affixed with corrugated sheet-metal anchors, and properly spaced and anchored to wood backing.[206] Finally, as to balconies and patios, the IBC treats such structures as the "roofs" of the spaces below—such as the parking garage and interior living spaces—and therefore requires a minimum 2% slope.[207]

---

[199] Pl.'s Ex. 592, 99–141. This destructive testing included openings made at multiple points within the tested units, including along the head and sill of the respective windows, the base of the walls, various vent penetrations, and Unit 316's balcony.
[200] *Id.* at 146–47.
[201] *Id.* at 155–69.
[202] Pl.'s Ex. 436.
[203] *Id.*
[204] Pl.'s Ex. 592, 150.
[205] *Id.* at 152.
[206] *Id.* at 153.
[207] *Id.* at 154.

The Court finds that the Design Plans required one of two wall cladding assemblies to be constructed: (1) stucco over CMU over ZIP sheathing over wood stud framing; or (2) stucco over building paper over ZIP sheathing over wood stud framing.[208] However, the Design Plans did not provide *any* drainage management details for the stucco assembly, and provided improper detailing of the flashing at the CMU layer.[209] Additionally, the Design Plans provided for weep holes at the first-floor patios to match the balconies above, but failed to specify or require weep holes at the above balconies.[210] Likewise, the Design Plans provided only for a 1% slope on first-floor patios, and did not provide for *any* slope specifications as to the balconies.[211]

As for the manufacturer specifications for utilization of the ZIP sheathing, ZIP flashing tape must be installed properly to protect the wall from water intrusion.[212] The specifications require ZIP flashing tape to be properly placed along the convergence of ZIP panels and without wrinkling during placement.[213] Finally, as to the MiraDRI 8860/861 Self-Adhering Waterproofing Membrane ("**MiraDRI**") applied at the second and third-floor balconies, manufacturer specifications require certain priming, detailing, and horizontal installation techniques to be followed for proper installation.[214]

The Court finds that multiple units exhibited water intrusion and moisture migration through deficiently installed wall assemblies, thereby failing to comply with the IBC and the Design Plans.[215] Both Forensix and WPM agreed that these construction deficiencies have resulted

---

[208] *Id.* at 155.
[209] *Id.* The Design Plans also detailed only ½ inch separation between the stucco veneer's base and any intersecting horizontal hardscapes, such as patios or balconies.
[210] *Id.* at 159.
[211] *Id.*
[212] *Id.* at 164.
[213] *Id.* at 164–65.
[214] *Id.* at 168–69. Additionally, manufacturer specifications provide for a strict set of reminders regarding installation of the ZIP tape, including that the panel surfaces be dry and free of dirt or sawdust before installation, and specific instructions for how to place ZIP tape at different places along the wall cladding, such as wall pipe penetrations or concrete/masonry intersections.
[215] *Id.* at 90.

in water intrusion into the buildings' inner layers, as well as damage to the building components, including the stucco, building paper, ZIP sheathing, wood stud framing, and the wood door/window assemblies.[216] Although WPM contends that this water damage was contained to only the base of walls during the destructive testing, the evidence reflects that there was moisture staining at points along the stucco veneer, roof-to-wall inspection locations, and at certain balcony edges.[217] Furthermore, both engineering reports reflect that this moisture migration into the wall assemblies caused interior distress and fracturing.[218] Finally, Bice did not dispute that this water migration caused damage to the structural wood framing and differential movement to the superstructure, thereby creating additional exterior finish fractures, inoperable windows, and inoperable interior and exterior doors.[219]

Alongside the water intrusion in the wall cladding, the Court also finds numerous deficiencies involved with the ZIP and anchoring installation. Both Forensix and WPM agree that there was "inadequate" and "inconsistent" ZIP flashing tape installation, and that there were multiple destructive testing locations that revealed no ZIP sheathing at all.[220] Furthermore, WPM does not dispute a lack of control joints across the project, nor a lack of adequate separation along multiple base of wall assemblies at the patios and the balconies.[221]

As for the windows and doors, while the Design Plans provide vague direction for installation specifications, numerous destructive testing locations show that the windows and door assemblies are noncompliant with § 1405.4 of the IBC regarding proper flashing installation.[222]

---

[216] Defs.' Ex. L, 68.
[217] Pl.'s Ex. 592, 92–95.
[218] Pl.'s Ex. 592, 90; Defs.' Ex. L, 68.
[219] Pl.'s Ex. 592, 90.
[220] Pl.'s Ex. 592, 171, Defs.' Ex. L, 73.
[221] Defs.' Ex. L, 72.
[222] *Id.* at 148, 155.

Furthermore, the Court finds numerous window and door assemblies contained defects not in accordance with the manufacturer specifications, including:

(1) missing, broken, and/or detached nailing flanges;

(2) insufficient fasteners at the window and door flanges;

(3) missing required sealant behind the window and door flanges;

(4) missing require corner gussets around the flanges;

(5) oversized openings at window and door penetrations, creating unsealed gaps around the assemblies;

(6) poorly installed FortiFlash flashing membrane at the heads and jambs of the window and door openings;

(7) gaps in the sill flashing at the corners of the openings; and

(8) unsealed openings in wall cavities behind the veneer under multiple first floor patio door thresholds.[223]

These defects, especially regarding the flashing required by the IBC, contributed to the pervasive water migration into the interior layers of the wall cladding assemblies.

The evidence presented also reflects improper installation of the waterproofing systems along the patios and balconies as well, in violation of the IBC and the manufacturer specifications. The Court notes that the destructive testing completed by Forensix across four second-floor balconies revealed a lack of MiraDRI membrane integrated with the wall assemblies.[224] The evidence also reflects that these defects have resulted in mineral leaching along the edges of the patios and balconies.[225]

Likewise, the Court adopts Forensix's findings that the second and third-floor balconies tested had "consistently less" than the IBC-required 2% sloping, and, in the testing done at Unit

---

[223] *Id.* at 172–73.
[224] *Id.* at p. 174.
[225] Pl.'s Ex. 592, 175.

301, even indicated positive sloping back towards the unit.[226] Despite Bice's contention that improper installation of balcony waterproofing was limited to Unit 316, the evidence reflects multiple balcony units with improper sloping and/or insufficient waterproofing installation.[227]

The Court finds that the following repairs are reasonable and necessary regarding the Mondara's wall cladding, windows and doors, and patios and balconies:

(1) complete removal and replacement of the stucco and CMU wall cladding to the extent those layers were improperly installed;

(2) complete removal and replacement of the stucco cladding over the ZIP sheathing to the extent the wall cladding was improperly installed and/or nonconforming with the IBC, the Design Plans, and/or the manufacturer's specifications;

(3) removal and replacement of the water damaged sheathing and framing for the exposed first-floor patios, and exposed second and third-floor balconies, including any required jacking of the third-floor framing to restore local levelness and operability to affected windows and doors at the sidewalls.

(4) removal and/or restoration of the following window and door units:
    (i) leaking window at unit 213;
    (ii) side wall windows, and main wall doors and windows at units 203, 205, 213, and 215; and
    (iii) windows and doors at units 103, 105, and 113;

(5) repairs to the ZIP sheathing to the extent such sheathing is missing, uneven, or damaged;

(6) installation of one (1) layer of building paper and/or wrap to the extent necessary to cover the entirety of the ZIP sheathing system;

(7) installation of the required flanges with corner gussets at 100% of the window and door units;

(8) reinstallation of the window and door units to the extent those units have:
    (i) improperly installed sill and threshold flashings for the windows and doors, respectively;
    (ii) incomplete sealant along the windows and nail flanges; and
    (iii) improperly fastened nailing flanges;

---

[226] *Id.* at 98, 154–56, 173–74.
[227] *See* Defs.' Ex. L, 69. Bice also did not contest Forensix's findings that corrugated sheet metal veneer anchors—instead of the adjustable veneer anchors detailed in the Design Plans—were improperly installed, including insufficient engagement into the mortar bed, as required by § 6.2.2.5 of the IBC.

(9) removal of all topping slabs along the balconies to the extent the underlying waterproofing assembly is improperly sloped;

(10) installation of a 2% slope throughout the balconies using a traffic coating system over a sloped mortar base material, as recommended by Forensix;

(11) integration of the traffic coating system with the base of wall conditions and balcony guttering system;

(12) reinstallation of both the topping slabs and any tile floor finishes over the properly integrated and sloped balconies; and

(13) removal of and/or proper replacement of any patio topping slabs along the courtyard with new waterproofing integration and a minimum 2% slope.[228]

### d.  Roofs

During its investigation, Forensix removed one area of metal panels adjacent to the rise walls, one area of slate tiles, and one chimney cap to evaluate both the flashing conditions the integrity of the underlying substrate, and the extent of any moisture distress.[229] Forensix also reviewed Chapter 15 of the IBC and Chapter 11 of the IPC, which provide explicit requirements for roof installation, flashing, drainage, secondary roof drains (scuppers), and drain sizing.[230]

The Court notes that the IBC and IPC require that: (1) roof coverings be designed and installed in accordance with IBC and approved manufacturer specifications; (2) flashing be installed at wall and roof intersections, gutters, and wherever a change in roof sloping occurs; (3) additional slope exist wherever necessary to ensure proper roof drainage within 48 hours; (4) scuppers having an opening bigger than four inches be installed where the roof perimeter extends

---

[228] Pl.'s Ex. 592, 176–81.
[229] Id. at 193–98.
[230] Id. at 201–02. Additionally, Forensix reviewed the invoices prepared by the subcontractor—Infinity Roofing— detailing the installation of the roofs.

above the roof in a way that would otherwise entrap water; and (5) any installation of thermoplastic single-ply roofing maintain a proper 2% horizontal slope upon installation.[231]

As for industry standards, the two most prominent associations are the National Roofing Contractors Association ("**NRCA**") and the Sheet Metal and Air Conditioning Contractors' National Association ("**SMACNA**"), each of which provide recommendations and guidelines for roofing installation as well as supporting metal components, respectively.[232] Both associations recommend the use of drip edges at metal coverings, such as chimney caps, to prevent water intrusion and staining around exterior cladding.[233]

The Court adopts Forensix's findings that undulations and localized kinking in the metal panels on Phase I were consistent with distress caused by improper installation.[234] The Court adopts Forensix's findings regarding: (1) unsealed openings along the metal closure ends at roof plane intersections; (2) insufficient flashing integration at roof-to-wall interfaces; (3) improperly installed slate tiles; (4) moisture staining and debris accumulation at the low-sloped roof section from improper drainage; (5) inadequately sized through-wall scuppers; and (6) accumulated water at the chimney caps, among other issues.[235] As Lee credibly testified, these deficiencies, while indicative of potential water intrusion throughout the Mondara, were more indicative of an "installation deficiency" and violation of the IBC and IPC, as opposed to a water intrusion issue.[236] Conversely, the Court does not believe WPM or Bice presented sufficient evidence to support a finding that the observed defects were simply "Oil Canning."[237]

---

[231] *Id.* at 200–02.
[232] *Id.* at 202–03.
[233] *Id.* at p. 203.
[234] Pl.'s Ex. 592, 182.
[235] *Id.* at 182–83.
[236] ECF No. 123, 182:21–183:6.
[237] The NRCA notes that "Oil Canning" may occur with metal panel roofing material, where aesthetic distortions appear in the metal, but that otherwise do not impact the roof's structural integrity or waterproofing.

The Court also finds that the roofing installation on both Phases was done primarily by Infinity Roofing, with Stillwater GC serving as the sole general contractor.[238]

### e. Soundproofing

Prior to the issuance of the Forensix Report, in connection with the State Court litigation, Idibri was hired directly by the HOA to run further sound testing on May 26, 2021, and once again test the soundproofing performance of the floor/ceiling assembly.[239]  Similar to its 2017 testing, Idibri selected four pairs of vertically adjacent units, testing both the ASTC and AIIC ratings of each pair's floor/ceiling assembly.

Idibri's results indicated that, as for the tested unit pairings' ASTC ratings, all four were within design requirements.  However, the AIIC ratings showed that three of the pairings were below design requirements.  Following these results, Idibri identified several remediation steps for improving the soundproofing across all the units, including identifying whether improper gypcrete seepage into the unit floors' underlayment was contributing to these issues, and either removing or replacing both the floor and ceiling systems.[240]

The Court adopts the findings made in the Idibri Report and incorporated into the Forensix Report.  Additionally, the Court notes that the Forensix Report and Schoedel's testimony emphasize that § 1207 of the IBC requires STC/IIC levels of 50 or above, and ASTC/AIIC levels of 45 or above.[241] As detailed by Idibri and Forensix: (1) the minimum code requirements for in-lab STC/IIC ratings are 50 for each, and the minimum ASTC/AIIC ratings for in-field testing are 45; (2) the proposed STC/IIC per the Mondara's Design Plans were 58–62 STC and 56-60 IIC,

---

[238] Defs.' Ex. L, 61. Additionally, Lee testified that Infinity Roofing has since remedied the installation defects noted in the Forensix Report.

[239] The Court notes that the Defendants did not provide any additional expert reporting regarding the soundproofing findings made in either the Idibri or Forensix Report, and the WPM Report did not address soundproofing deficiencies.

[240] Pl.'s Ex. 622.

[241] Pl.'s Ex. 592, 211.

meaning its ASTC/AIIC could test as low as 53–57 ASTC and 51–55 AIIC; and (3) a "luxury"

design requires STC/IIC ratings of 60–65, meaning the ASTC/AIIC ratings can test as low as 55–

60 in the field.

The Court adopts Idibri's conclusions that all four of the tested floor/ceiling assemblies

passed with ASTC/AIIC ratings higher than the minimum IBC requirements.[242] As for the Design

Plans, the Court additionally finds that that three of the eight total tests performed (two tests at

each assembly) failed to meet the minimum requirements of the Design Plans, and five of the eight

tests failed to meet the "luxury" standard.[243] Schoedel credibly testified, and the Forensix Report

accurately reflects, that the reason for these deficiencies was due to the Defendants' alterations to

the Design Plans and Idibri's initial recommendations.[244] For example, the Defendants consciously

chose not to involve Idibri in the initial concrete pouring process, which could have ensured that

that the underlayment and sealants necessary to achieve the Design Plans' soundproofing

requirements were installed properly in accordance with the manufacturer specifications.[245]

The Court notes, however, that neither Schoedel nor Idibri provided a scope of repair

regarding the soundproofing deficiencies. Furthermore, the Court cannot adopt the full scope of

repair provided by the Forensix Report as it relates to the soundproofing issues. The Court does

agree that, based on Idibri's testing and Schoedel's credible testimony, it is reasonable and

necessary for an acoustical consultant to perform sound transmission field testing at each unit's

floor/ceiling assembly to identify whether the soundproofing ratings: (1) meet IBC minimum

requirements; and (2) meet the minimum requirements of the Design Plans.[246] It would also be

---

[242] *Id.* at 217.
[243] *Id.*
[244] *Id.* at 211–17.
[245] *Id.*
[246] *Id.* at 218.

reasonable and necessary to remove the wood floor and base-of-wall finishes in the tested units that did not pass the minimum Design Plans ratings—namely the 103/203, 206/306, and 216/316 assemblies—to remedy any deficient concrete construction and install any missing isolation barriers around pipe penetrations through the respective slabs. [247] Finally, given Schoedel and English's credible testimony regarding the Defendants' installation of RC-2 channels, it would also be reasonable and necessary to remove and replace the RC-2 channels with single-legged RC-1 resilient channels, in accordance with the Design Plans.[248]

The Court does not agree that, although 50% of the *tested* first/second floor assemblies, and 75% of the *tested* second/third floor assemblies were deficient, *all* of units at the Mondara will need the same level of repairs as the tested units.[249] Although the evidence presented indicates that several of the tested assemblies were deficient, five of the eight total tests passed the minimum Design Plans requirements.[250]

Additionally, Schoedel's testimony, the Design Plans, and the evidence presented indicate that the units could be constructed in a manner that adhered to the Design Plans while still falling below the "luxury" standard. Therefore, the Court does not find it would be reasonable and necessary to repair the units so as to come within the "luxury" acoustical range. First, Schoedel testified that, based on the project's stick-built construction, it would be "very difficult" to construct Mondara to luxury standards in terms of soundproofing, and that Idibri "could not promise" luxury standards could be met.[251] Schoedel testified that the best case scenario for the Mondara's soundproofing was to reach STC/IIC levels of 60 and ASTC/AIIC levels of 55—the

---

[247] *Id.*
[248] *Id.* at 219.
[249] *Id.*
[250] *Id.* at 217.
[251] Courtney Schoedel Trial Testimony, 10/30/2024, at 10:26 a.m.

absolute floor for being considered "luxury" soundproofing. Second, based on the limited assemblies tested and the fact that the Design Plans mandated an acoustic range that included both luxury *and* non-luxury ratings, the Court finds that reasonable and necessary repairs should be limited to bringing any deficient units in compliance with the minimum requirements of the Design Plans. To the extent that the Forensix Report suggests repairs to the affected units beyond that, the Court does not adopt those findings.

### f.   Other Deficiencies

The Forensix Report also identified several miscellaneous deficiencies during its inspections at the Mondara outside of the previously mentioned categories. These deficiencies included: (1) improperly fixed and constructed fireplace installations; (2) incomplete construction of the CMU demising wall in the garage; (3) improperly sealed ventilation openings in the northern and southern garage walls; (4) sagging geothermal pipes in the garage; (5) improper concrete reinforcement on the podium slab's underside; (6) improper cleanout caps throughout the sanitary sewer system; (7) improper floor tile installation in the courtyard; and (8) poorly constructed fire protection systems.[252]

As for the fireplace installations, the evidence presented shows that Forensix both inspected the removed fireplace assemblies, as well as examined the respective dimensions of the units that contained fireplaces.[253] Per its inspection of Unit 211 and its review of photographs taken of Units 104 and 107 (both of which have been repaired), Forensix concluded that Unit 211 contained inadequate clearance as required by the manufacturer's specifications.[254]

---

[252] Pl.'s Ex. 592, 220. The WPM Report did not address these findings directly.

[253] *Id.* at 222–24. Forensix also evaluated the proper sizing calculations under the Air Conditioning Contractors of America (ACAA), HVAC installation guidelines according to the U.S. Department of Energy, and the manufacturer guidelines regarding placement of combustible materials, which specifically require a minimum one-inch clearance between such materials and any wood framing.

[254] *Id.* at 224–25. The Court notes that, per the Forensix Report, Performance Plumbing, Inc. was the primary subcontractor in charge of the fireplace installation, with Stillwater GC serving as the general contractor.

Given the credible testimonies of Lee, Mamary, and English regarding this issue, the Court adopts Forensix's findings for the fireplace assemblies to the extent that Forensix recommends the removal of all fireplace units at the Mondara to evaluate the placement of any combustible materials within one inch of the fireplace assembly.[255] The Court also adopts Forensix's findings that any improperly installed combustible materials be removed and/or replaced to come into accord with the minimum one-inch clearance requirements.

As for the remaining deficiencies identified by the Forensix Report, the Court finds that the scope of repairs related to each of these deficiencies are both reasonable and necessary. Certain deficiencies—such as the CMU wall and louvered vent construction in the garage—directly relate to the deficiencies associated with the podium slab construction, and civil and site drainage systems installation.[256] Other deficiencies—such as the sanitary sewer cleanout caps and courtyard/entry walkway tiles—were improperly installed as required by the IPC or manufacturer specifications.[257] Accordingly, the Court adopts the respective scopes of repair for these remaining deficiencies.

### 2) *Cost of Repairs Reports*

Following the Forensix Report, the HOA retained a construction and engineering firm—Socotec—and its Managing Director, Bryan Byrd ("**Byrd**") in January 2022 to analyze the recommended scope of repairs put forth in the Forensix Report, and prepare a reasonable cost of repairs estimate based on Forensix's findings.[258] In March 2023, Byrd issued a supplemental report of his initial findings, in which he included cost estimates for: (1) Wall Cladding, Patios, and

---

[255] *Id.* at 226.
[256] *Id.* at 226–30.
[257] *Id.* at 231–34.
[258] Pl.'s Ex. 597.

Balconies, (2) Soundproofing, and (3) General Site fees within the 2017 and 2018 timeframes as well (collectively, the "**Socotec Report**").[259]

In both the Socotec Report and during his testimony, Byrd testified that he both relied on the visual inspections made by Forensix in January 2022 and performed his own visual examination of the Mondara in formulating his estimates.[260] Byrd: (1) used a "quantity takeoff" software called Stack that he used in conjunction with the findings from the Forensix Report; (2) gathered supplier pricing to cross-reference with the scope of repairs recommended by Forensix; (3) attended the destructive testing done by Forensix on several occasions; and (4) reviewed photographs taken by Forensix during the course of its investigation.

As to his methodology, Byrd testified to the means with which he reached both the cost of the materials used—such as the cost of stucco per square foot—as well as the cost of the various line items included in the Socotec Report—such as contingency and contractor's fees.[261] Byrd also utilized a construction pricing guide—RSMeans—outside market pricing, and his prior experience in the field to calculate the various estimations.[262] However, Byrd testified that, rather than utilizing the "generic" pricing produced through RSMeans without question, he also cross-referenced those pricing estimations with outside market pricing for similar materials and/or repairs.[263]

Additionally, Byrd explained that the line-by-line breakdown of the various cost estimation categories included in the Socotec Report. As reflected in the Socotec Report, Byrd first calculated the "Hard Cost Total"—the cost of the labor and materials used in the actual repairs—by

---

[259] Pl.'s Ex. 599.
[260] Pl.'s Ex. 597, 1; Pl,'s Ex. 599, 1.
[261] Byran Byrd Trial Testimony, 10/29/2024, at 12:40 p.m.
[262] *Id*. at 12:41 p.m.
[263] *Id*. at 12:45 p.m.

determining the quantity of square footage in need of repair, the unit necessary to make the repair, and then multiplying the quantity and cost per unit.[264] Byrd also estimated various additional costs, including General Conditions (the "soft costs" or construction overhead used during the repairs process), contingency costs for "known unknown" variables that might occur during the repairs, insurance fees, contractor's fees, professional fees, storage costs for any items removed from units, and displacement costs for unit owners forced to relocate during the repairs. As reflected in the evidence presented, Socotec's reasonable and necessary cost of repairs estimate included a formula that could account for varying total cost estimates based on the corresponding year determined by the Court.[265]

The Court finds that Byrd also credibly testified to the reasonableness of various costs incurred prior to trial, including the repairs made to the roof by Infinity Roofing, the repairs made by Texas Concrete, the repairs made to the balconies at Units 216 and 316, and the costs of the various expert reports and investigations made by experts such as Forensix and Idibri.[266] Byrd also credibly testified that the respective totals of these costs would be approximately: (1) $355,000 for Forensix's work on the project; (2) $72,000 for in-kind repairs made by Infinity Roofing; (3) $60,000 for Texas Concrete's restoration repairs; (4) $144,000 for the repairs made to units 216 and 316; and (5) $363,000 for the multitude of other invoices related to various repairs done at the Mondara.[267]

Conversely, the Defendants retained the Berkeley Research Group ("**BRG**") and the director of its construction practice—Jeffrey Wentz ("**Wentz**")—to conduct both a preliminary

---

[264] Pl.'s Ex. 597, 5.

[265] Pl.'s Ex. 597; Pl.'s Ex. 599, 4. The Socotec Report provided cost of repairs estimates for 2017, 2018, and 2022. Furthermore, the Plaintiff provided a reasonable and necessary cost of repairs estimate for 2024 at trial, using the same formula provided in the Socotec Report.

[266] Bankruptcy Court for the Northern District of Texas, Trial Audio Day 2, at 12:25pm; *see also* Pl.'s Exs. 504, 611.

[267] *See* Pl.'s Exs. 504, 611.

report and supplemental report (collectively, the "**BRG Report**") evaluating the efficacy of Byrd's

estimations in the Socotec Report as well as the findings in both the Forensix and WPM Reports.[268]

As part of the BRG Report, Wentz provided his own cost estimate for reasonable and necessary

repairs of the construction defects found at the Mondara.[269] As reflected in both the BRG Report

and Wentz's testimony, the BRG Report was primarily a dollar-for-dollar comparison between

Byrd's initial 2022 estimations in the Socotec Report and the pricing listed on RSMeans.[270] A

comparison between the respective estimations made between the Socotec and BRG Reports is

shown below:

| Repairs Description: | Socotec 2022 Cost Estimate:[271] | BRG Cost Estimate:[272] |
|---|---|---|
| Civil and Site Drainage | $454,440.91 | $2,104.69 |
| Podium Drainage/ Waterproofing | $994,930.50 | $0 |
| Wall Cladding, Patios, and Balconies | $2,651,739.71 | $95,554.09 |
| Roof | $246,093.86 | $11,040.90 |
| Soundproofing | $1,966,735.31 | $0 |
| Other Deficiencies | $158,967.39 | $0 |
| General Site (Forklift + Dumpster + Five Laborers) | $448,732.00 | $16,248.60 |
| General Conditions (10% rate) | $692,165.97 | $12,493.83 |
| Contingency (20% rate) | $1,522,765.13 | $27,486.42 |
| Insurance (1.25% rate) | $95,172.82 | $1,717.90 |

---

[268] Defs.' Ex. N, O.

[269] *Id.*

[270] Defs.' Ex. O, 11–18.

[271] Pl.'s Ex. 597, 1–10.

[272] Defs.' Ex. O, 11–18. The Court notes that BRG's cost of repairs estimate did not contain an adjustable formula that would alter the cost of repairs based on the corresponding year.

| Contractor's Fee (10% rate) | $761,382.57 | $13,743.21 |
|---|---|---|
| Professional Fees (8% rate) | $517,834.21 | $9,995.06 |
| Storage for Residents' Contents for 1 Month | $19,464.90 | $0 |
| Displacement of 21 Units for 30 Days for Soundproofing Repairs | $270,900.00 | $0 |
| **Total:** | $10,801,345.28 | $190,374.70 |

Due to a resolution with Infinity Roofing after the Socotec Report, Byrd removed the roofing repairs from Socotec's cost estimate, reducing the estimated cost of repairs even further.[273] The Court also notes that Wentz provided further reductions to BRG's final estimate, removing a significant amount from its wall cladding, patios, and balconies total, reducing the contingency rate from 20% to 5%, reducing the contractor's fee from 10% to 5%, and reducing the professional fees from 8% to 4.9%.[274] Therefore, the total cost of repairs proposed by the BRG Report was $96,141.36.[275]

Upon review of the evidence presented, the Court finds and adopts the methodology used in the Socotec Report as to the estimated cost of repairs. Byrd credibly testified that his methodology: (1) utilized approximately 7,000 data points in formulating his estimations; (2) included both an extensive review of the Forensix Report, as well as Byrd's own on-site examination of the destructive testing done by Forensix; and (3) incorporated cross-referenced market pricing into the RSMeans pricing model to arrive at a reasonable and realistic value across all the categories included in the Socotec Report. Additionally, Byrd itemized the Socotec Report

---

[273] Bryan Byrd Trial Testimony, 10/29/2024, at 12:07 p.m. At trial, this reduction was presented in relation to Byrd's 2022 cost of repair estimate.
[274] Defs.' Ex. O, 19–27.
[275] *Id.* Although Wentz testified that the estimations found in the BRG Report were also made using RSMeans, these estimates were made without any alterations to the variables considered by Byrd in the Socotec Report.

to allow the Court to reasonably alter any of the cost estimations provided, and provided three separate estimates based on the time period the Court chose to evaluate the cost of repairs under.[276]

Conversely, the Court does not find that the BRG Report contains a reasonable cost estimate of the repairs for the construction deficiencies found at Mondara. First, Wentz testified that his estimations were made entirely within the scope of the findings in the WPM Report, rather than the Forensix Report, which the Court has herein primarily adopted. Furthermore, the Court finds that Wentz's testimony indicated that he: (1) did not review any of the actual costs incurred by the HOA for repairs made to Mondara; (2) had no reasonable refutation of the percentages of fees included in the Socotec Report, such as the contractor and professional's fees[277]; (3) excluded certain itemized repairs that were included in even the WPM Report, such as the installation of control joints; (4) could not sufficiently explain the differences in the estimation models provided in the BRG Report; and (5) did not provide any of his own unit pricing for certain repairs—such as soundproofing—to refute the Socotec Report unit pricing.

However, the Court does not entirely adopt the estimates in the Socotec Report. The primary estimate that the Court does not adopt relates to the cost of soundproofing repairs. As previously stated, while the Court found both Idibri's testing and Schoedel's testimony to be credible, the scope of the testing does not warrant the extent of reasonable and necessary repairs recommended by Forensix without further testing. Therefore, the Court only adopts the cost of repairs to the extent of Idibri's findings related to tested units that did *not* meet the requirements of the Design Plans and/or the IBC.

---

[276] The Court notes that, although Byrd provided cost of repairs estimates for 2017 and 2018, respectively—which the Plaintiff provided in order to give the Court options in calculating damages—neither the 2017 nor 2018 estimates align with the factual history of this case in a manner that warrants adopting either one. Conversely, the 2022 estimate best aligns with the facts, given that it entails the entirety of the damages found in the Forensix Report, as identified by Forensix in 2022.

[277] The Court specifically finds that the percentage fees for contingency, insurance, contractor's fees, and professional fees to be market and reasonable.

Instead, the Court finds that, per Idibri's testing, Units 103, 203, 206, 216, 306, and 316 require the repairs and associated costs identified in the Socotec Report.[278] The Court does not find, based on the evidence presented, that soundproofing repairs to *all* of the units at the Mondara would be reasonable and necessary. Thus, the Court's findings as to soundproofing cost of repairs damages will be limited to the units identified above.

Likewise, the Court notes that there remains confusion with regard to the reasonable and necessary scope of repairs with regard to the balconies identified in the Socotec Report as well as the Plaintiff's *Pre-Trial Brief*—namely, Units 216, 306, and 316.[279] The Socotec Report includes estimated repair costs for the balconies at Units 306 and 316, respectively. However, Byrd testified that a subsequent, more accurate estimate with regard to the balconies at Units 216 and 316 was $144,000, given the extensive damage revealed once Forensix concluded its investigation. As discussed further below, the Court adopts Byrd's findings that Units 216 and 316 required $144,000 in reasonable and necessary cost of repairs based on the construction defects uncovered by Forensix.

Notwithstanding that finding, it remains unclear whether the cost of repairs estimate in the Socotec Report related to Units 306 and 316 is duplicative to any amount already considered in Byrd's $144,000 estimate, given that Byrd testified that $144,000 was calculated once the entirety of the damage to the balconies at Units 216 and 316 was revealed. Therefore, while the Court adopts the entirety of the Forensix Report with regard to balcony repairs, it does not adopt any cost of repairs estimates with regard to the enumerated units to the extent those estimates are

---

[278] Pl.'s Ex. 622, 2.

[279] *Compare* Pl.'s Ex. 597, 5, *with* ECF No. 89, 33 (highlighting the discrepancy between estimated cost of repairs for Units 306 and 316 in the Socotec Report, and an updated cost of repairs for Units 216 and 316 in the Pre-Trial Brief).

duplicative. A final and accurate computation of these costs will be determined by the Court at a further hearing.

Finally, the Court does not find that the displacement costs associated with soundproofing repairs listed in the Socotec Report is reasonable and necessary, given that only six units are in need of soundproofing repairs at this time. Accordingly, the Court finds that reasonable and necessary displacement costs should be limited to the displacement of the unit owners associated with the units identified above.

Additionally, the Court finds that, pursuant to RCLA § 27.001(g), the costs associated with the work done by Forensix, the repairs made by Texas Concrete, the repairs made to Units 216 and 316, and the multitude of other interim repairs—totaling approximately $991,731.13[280]—should also reasonably and necessarily be included in the total cost of repairs to the Mondara. Finally, the Court finds that the total reasonable and necessary cost of repairs should be based on 2024 estimates, using the escalation factor identified and utilized by Byrd in the Socotec Report.[281] In consideration of the Court's adoption of the Socotec Report, as well as the reductions noted herein, a complete and accurate compuation of the total cost of repairs will be determined at a further hearing.

### 3)  *Market Value Reports*

Alongside Forensix and Socotec, the Plaintiff hired Andrew McRoberts ("**McRoberts**") and McRoberts & Company in late 2022 to conduct an appraisal report (the "**McRoberts Report**") of Mondara's market value as of February 6, 2023, evaluating Mondara's market value both with

---

[280] These totals are best reflected in *Mondara Condominium Association, Inc.'s Pre-Trial Brief*, ECF No. 89, 33.
[281] Although the Plaintiff provided the Court cost of repairs estimates for 2017, 2018, and 2022 as previously stated, the Court finds that the most accurate accounting of the total cost of repairs should be based on 2024—the year in which this trial took place and concluded.

and without construction defects.[282] The purpose of the McRoberts Report was to determine two respective values: (1) the prospective unimpaired market value—what Mondara would sell for under prevailing market conditions free of any patent or latent workmanship and material defects; and (2) the impaired market value—Mondara's value in consideration of the patent and latent defects outlined by Forensix and Socotec.[283]

McRoberts testified that he and another appraiser spent over 150 hours researching Mondara, including reviewing both the Forensix and Socotec Reports and the respective findings within them. Integral to the analysis, McRoberts completed a sales comparison analysis of unit purchases at the Mondara in comparison to unit purchases at similar, nearby properties between February 2021 and August 2022.[284] To do so, McRoberts took six comparable units across five properties—two of which were Units 105 and 201 at the Mondara—located in the Highland Park area.[285]

McRoberts found that, adjusted for market conditions, the six comparable units sold for anywhere between $590.89 to $779.84 average per square foot, concluding that, on average, the prospective unimpaired value of the Mondara units was approximately $700.00 per square foot.[286] Accordingly, the Mondara's prospective unimpaired value was $61,700,000.[287] As for the Mondara's impaired value, McRoberts reached these conclusions by calculating the diminution in value due to direct damages and indirect damages based upon "stigma." Per the McRoberts Report, McRoberts concluded that the Mondara had suffered $11,131,400 in direct damages—comprised of Socotec's cost of repairs estimation and $330,054.82 in repair costs incurred by the HOA as of

---

[282] Pl.'s Ex. 604, 2. McRoberts is a designated Member of the Appraisal Institute and holds both a Texas state real estate broker's license and appraiser's license.
[283] Pl.'s Ex. 604, 5–8.
[284] *Id.* at 72.
[285] *Id.* at 58–71. Both units at the Mondara were sold in March 2022.
[286] *Id.* at 76–78.
[287] *Id.* at 78.

September 23, 2022—and $3,085,000 in anticipated stigma costs based on the associated construction defects, resulting in a rounded impaired market value of $47,500,000.[288] Per square foot, McRoberts concluded that the Mondara's impaired value was approximately $538 per square foot.

In response to the McRoberts Report, the Defendants hired appraiser Jack Poe ("**Poe**") and Jack Poe Company Incorporated Commercial Real Estate Appraisal and Consulting in May 2023 to issue a Review Appraisal Report of the McRoberts Report (the "**Poe Report**").[289] Importantly, the Poe Report was intended to serve as an opinion on the "credibility of the opinions conveyed in the [McRoberts Report]," and was not a separate appraisal of the Mondara.[290]

Per the Poe Report, Poe's analysis primarily consisted of an exterior inspection of the Mondara in conjunction with a review of the comparable units used in the McRoberts Report. Poe concluded that there were several significant issues with the conclusions made in the McRoberts Report. Those issues included: (1) an appearance of "impropriety" by McRoberts, given that the McRoberts Report does not contain any comparable sales—especially with units sold at the Mondara—within the impaired value range of $538 per square foot; (2) an "incompletely supported paired data set analysis"[291] in reaching the $3,085,000 stigma cost; (3) failure to account for 17 unit sales since 2018 at an average of $708.53 per square foot; (4) reliance on the Forensix Report's findings to arrive at the Mondara's impaired value, without considering "common

---

[288] *Id.* at 79–85.
[289] Defs.' Ex. J, 1. As reflected in his report and his testimony, Poe holds a designation as a Member of the Appraisal Institute, and is a state certified real estate appraiser in six states.
[290] *Id.* at 2.
[291] Defs.' Ex. J, 2.

deterioration"[292] at the comparable properties used in the report; and (5) use of a sales comparison approach without consideration of a cost or income-based approach.[293]

As to the approach taken, the Ethics Rules of the Uniform Standards of Professional Appraisal Practice ("**USPAP**") require that appraisals state the reasons for excluding the sales comparison, cost, and/or income approaches if they have not been developed through the course of the appraisal.[294] Poe stated that the cost approach would have "benefited the user of the report" by identifying whether the defects were curable or incurable depreciation to the property, and would have provided the user with a more feasible analysis for spending $10,801,345 in estimated repairs.[295] As to appraiser duties, the Poe Report also highlighted that USPAP Rule 1-3(a) states that appraisers are "obligated" to consider cost estimates made by engineering experts and test those estimates for financial feasibility, which arguably did not occur.[296]

However, Poe testified that, while he believed McRoberts failed to utilize more effective approaches for evaluating the Mondara's impaired value, Poe did not have any criticism of McRoberts' choices in comparable properties to the two Mondara units.[297] Additionally, Poe testified that the adjustments made by McRoberts in his report sufficiently accounted for the dissimilarities between the six properties being compared.[298] Finally, Poe credibly testified about the unit sales documented in the McRoberts Report that took place between February 2021 and September 2022, and reinforced McRoberts' findings that several of the unit sales—pre and post-

---

[292] *Id.* at 5.
[293] *Id.* Poe also testified that, of the 17 unit sales since 2018, seven of the unit sales took place after the Forensix Report was issued.
[294] *Id.* at 7.
[295] *Id.*
[296] *Id.* at 10.
[297] Jack Poe Trial Testimony, 12/16/2024, at 4:52 p.m.
[298] *Id.* at 4:58 p.m.

Forensix Report—were in fact below the impaired value per square foot valuation provided by McRoberts.[299]

Notwithstanding Poe's reservations, there are portions of the McRoberts Report that the Court agrees with and hereby adopts. First, the Court is satisfied with McRoberts' choice to use the sales comparison approach in evaluating the Mondara's unimpaired and impaired values, even if it suffers a bit of heartburn at McRoberts' choice to not conduct this comparison using the six arm's length individual unit sales at the Mondara during the same timeframe. Poe credibly testified that, in appraisal theory, using outside comparable properties was a valid methodology for confirming the subject property's value in comparison to the rest of the market, even when comparable Mondara sales were available.[300] Second, the Court finds that McRoberts' reliance on the Forensix Report—which both McRoberts and Poe agreed was one of the most extensive engineering reports for a property they had ever seen—was not only reasonable but uncontroverted by any of the evidence presented.

However, the Court finds serious issues with fundamental aspects of both the McRoberts Report and McRoberts' testimony. First, while the Court is comfortable with McRoberts' choice to include outside comparable properties, it cannot reconcile McRoberts' selection in using Units 105 and 201 in his report to determine the Mondara's unimpaired value despite the fact that two other units—102 and 106—were also sold within the designated timeframe of the McRoberts Report at $882.68 and $832.03, respectively.[301] In other words, neither the McRoberts Report nor his testimony sufficiently explained his exclusion of two unit sales at the Mondara that were within the timeline identified in the report, but that would have significantly altered the overall

---

[299] *Id*. at 5:28 p.m.
[300] *Id*. at 5:39 p.m.
[301] Pl.'s Ex. 516.

unimpaired value estimate in the other direction. Even if the Court agrees with McRoberts' testimony that Unit 102's sale price was too close to the issuance of the Forensix Report to have been affected by the report, McRoberts could not logically explain why Unit 102 was excluded.[302] Regardless, such an explanation does nothing to justify excluding Unit 106's sale in August 2022, far after the Forensix Report had been issued.[303]

Second, while several unit sales were outside the scope of the McRoberts Report, McRoberts could not adequately explain how, if the impaired market value of the Mondara is $538 per square foot, the majority of the unit sales from 2022 to 2024 (well after the damages to the Mondara had been disclosed) have drastically exceeded both his impaired and unimpaired values.[304]

Third, the Court takes issue with McRoberts' use of stigma in ultimately reaching the Mondara's impaired value estimate. More specifically, the McRoberts Report and McRoberts' testimony did not sufficiently explain or justify why or how any reduction in the value of the unit sales was not already considered and reflected in the actual sales themselves. If the timeline of the McRoberts Report reflected unit sales after the Forensix Report had been issued, then the facts would indicate that any subsequent unit purchases would naturally include a reduction in price based on the disclosures in the Forensix Report. McRoberts' estimate for the Mondara's impaired value instead reduced the value of these units even further by subtracting stigma damages *after* the sales were complete; the Court cannot adopt that methodology.

Fourth, both the McRoberts Report and McRoberts' testimony were contradictory in explaining how and why there were unit sales above the Mondara's unimpaired value. According

---

[302] Andrew McRoberts Trial Testimony, 10/29/2024, at 3:53 p.m.
[303] Pl.'s Ex. 516.
[304] *Id.*

to the McRoberts Report, the Mondara was "riddled with construction defects, evident to the naked eye of individuals, not in the construction industry, i.e., a typical buyer."[305] The McRoberts Report also included a detailed summary of the various defects McRoberts viewed during his on-site inspection of the Mondara that he stated would be "noticeable to a potential buyer."[306] However, McRoberts testified that a potential reason for the higher unit sale prices was the buyers' lack of knowledge of the Forensix Report and latent construction defects. The Court cannot reconcile these points. If the Mondara's valuation was based on construction defects that were plainly visible to the average buyer, any data working against that valuation cannot be explained away by claiming the buyers must have necessarily purchased their respective units due to a lack of knowledge as to those same defects.

Finally, while the Court recognizes that the McRoberts Report is the only appraisal presented in this case, both the report and McRoberts' testimony do not provide a credible and consistent valuation of the Mondara's impaired market value. McRoberts testified inconsistently to the bases for the conclusions made in his report. He seemed, at times, unfamiliar with the findings in his report, and he could not sufficiently explain why he excluded unit sales from his appraisal that would have directly affected the Mondara's unimpaired and impaired values. While these inconsistencies do not rise to the level of any ethical violation by McRoberts, as proposed in the Poe Report, the Court cannot adopt a report and testimony with such significant analytical gaps.

At bottom, the Court's issues with the McRoberts Report and McRoberts' testimony are not with McRoberts' capabilities as an appraiser or as an expert witness. Rather, it is the reasoning behind his methodology that makes the Court uneasy, including his blending of the sales

---

[305] Pl.'s Ex. 604, 35.
[306] *Id.* at 34–35.

comparison and cost approaches, selectively excluding certain unit sales, and testifying to the Mondara's value based on the presence of both latent and visible defects, among other reasons. Therefore, the Court does not find that the evidence presented provides a reasonable estimate of damages related to the loss in the Mondara's market value due to the construction defects.

Settlements with Other Defendants

During the pendency of the underlying litigation, the Court notes that the Plaintiff has since reached a number of settlement agreements with previous defendants to both the State Court case and the current proceedings (the "**Settlement Agreements**").[307] The Settlement Agreements to this point are as follows:

| Defendant: | Settlement Date: | Settlement Amount[308]: |
|---|---|---|
| Owen-Adams, L.P. d/b/a Overhead Door Company of Dallas | November 3, 2023 | $55,000 |
| Aquatek Systems, Inc. | December 15, 2023 | $300,000 |
| Cemplex Group Texas, LLC | December 15, 2023 | $150,000 |
| J&E Commercial Construction, Inc., f/k/a J&E Masonry, Inc. | December 15, 2023 | $30,000 |
| MLB Landscape & Stoneworks LLC | July 18, 2023 | $8,000 |
| Ricardo David Anaya d/b/a Infinity Roofing and Sheet Metal | October 6, 2022 | In-kind consideration/roofing repairs made by the contractor. |
| Classic Stone & Tile, LLC | July 28, 2023 | $30,000 |
| Silva Plumbing Inc. | September 21, 2023 | $20,000 |
| Kirk Concrete Construction, Inc. d/b/a Beam Concrete Construction Inc. and/or Beam Concrete Construction, Inc. | October 23, 2023 | $200,000 |
| PFC Contracting, Inc. | October 27, 2023 | $685,000 |
| Envirotec Construction Services, Inc. | September 8, 2023 | $140,000 |
| Performance Piping, Inc. | December 15, 2023 | $250,000 |

---

[307] Defs.' Exs. GG–XX. The Court notes that it took judicial notice of Defs.' Ex. XX.
[308] The Court notes that, despite several of the Settlement Agreements being listed as "confidential", the agreements were not filed or admitted under seal at trial, and the parties stipulated to the admission of the Settlement Agreements on the record. See Bankruptcy Court for the Northern District of Texas, Trial Audio Day 6, at 9:12 a.m.

| Builder Services Group, Inc. d/b/a Williams Fireplaces and Gutters | December 15, 2023 | $70,000 |
| Stillwater GC, LLC, Outdoor Concepts, LLC, Texas Masonry Co., LLC d/b/a The Mason, and LGT Contractors, LLC | December 21, 2023 | $999,999 |
| Savannah Developers of Texas, LLC | December 29, 2023 | $600,000 |
| Metrotex Construction Services | December 15, 2023 | $250,000 |
| Vent Tech, LLC | September 14, 2023 | $30,000 |
| Stillwater Abbott Development, LLC[309] | November 21, 2024 | The Court approved the 9019 Agreement, resulting in the allowance of a claim against Stillwater Development in favor of the HOA in the amount of $5,625,001.00. |

Excluding the in-kind resolution with Infinity Roofing and the allowed secured claim amount agreed upon between the Plaintiff and the Stillwater Development in the underlying bankruptcy proceeding, the Settlement Agreements reached between the Plaintiff and the various parties total $3,817,999.00. Accordingly, $3,817,999.00 will be deducted from damages awarded by the Court.

## IV.   <u>CONCLUSIONS OF LAW</u>

As a threshold matter, the Court notes that the Plaintiff's asserted causes of action as to the Construction Defect Claims are purely state law causes of action under Texas statutes or Texas common law, and are therefore governed by Texas law. Accordingly, the Court's analysis looks to both the DTPA and Texas common law to determine the viability of each of the Plaintiff's causes of action. Additionally, the Court emphasizes that, despite the Construction Defect Claims

---

[309] During the underlying bankruptcy proceeding pertaining to Stillwater Development, the Trustee filed a Joint Motion to Compromise Controversy Under Rule 9019 with the Plaintiff with regard to the Construction Defect Claims (the "**9019 Agreement**"). The Trustee believed that, given the voided, yet instructive, results of the State Court trial that found in favor of the Plaintiff, it was in the best interests of the Debtor's estate to reach a settlement with the Plaintiff, thereby providing the Plaintiff with an allowed secured claim in the bankruptcy proceeding and releasing Stillwater Development as a defendant as to the Construction Defect Claims.

being non-core proceedings, the parties have consented to this Court's final order pursuant to 28

U.S.C. § 157(b)(2). [310]

## A. DEFENDANTS COADY AND SHERMAN

Before addressing the merits of the underlying causes of action, the Court must first address

the Plaintiff's claims as they specifically pertain to Defendants Richard Coady and Aaron

Sherman. As stipulated by the parties, the Plaintiff has brought claims against Coady and Sherman

only for Negligent Misrepresentation and violation of the DTPA, whereas all four of the

Construction Defect Claims are being brought against the remaining Defendants. Accordingly, for

the Court to find in favor of the Plaintiff as to these two claims, the Plaintiff must prove by a

preponderance of the evidence that Coady and Sherman are liable for Negligent Misrepresentation

and violating the DTPA.[311]

Proof by a preponderance of the evidence requires that the fact finder be "satisfied that the

fact is more likely true than not true or, taking the evidence as a whole, the fact to be provided is

more probable than not or that the existence of a fact is more probable than its nonexistence."[312]

Put more simply, "the trier of fact must believe that it is more likely than not that the evidence

establishes the proposition in question."[313] "In a case where the evidence is evenly balanced, the

[party with the burden of persuasion] must lose."[314]

---

[310] The Court likewise notes that it still maintains jurisdiction under 28 U.S.C. § 157(b)(2) to adjudicate these claims based on the fact that the Fraud Claims—which will be adjudicated in a subsequent trial—are "core" proceedings within the Court's jurisdiction. *See* 28 U.S.C. § 157(b)(2)(H), (N), (O).

[311] *See* George L. Blum, et.al., *Degree of Proof in Civil Cases*, 29 Am. Jur. 2d Evidence § 170 (2d ed. 2025) ("Unless an exception applies, only a preponderance of evidence is generally required as the standard of proof in civil cases.").

[312] *Id.*

[313] *E.g., In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010) (citation omitted) (internal quotations omitted).

[314] *In re Brent*, 539 B.R. 788, 796 (Bankr. S.D. Ohio, 2015) (quoting *Interwish v. Luong (In re Luong)*, Adv. No. 12-01023, Case No. 11-33875-HRT, 2013 WL 1385674, at *3 (Bankr. D. Colo. Apr. 4, 2013)) (internal quotations omitted).

Although a thorough discussion of the elements for each of the causes of action will be provided below, the Court need not reach such lengths as it pertains to these particular two Defendants. The Plaintiff, quite simply, has not met its burden in almost any respect to prove how either Coady or Sherman violated the DTPA or made negligent misrepresentations to the Plaintiff.

Starting with the DTPA claim first, the Court does not find Coady or Sherman liable, given the lack of evidence: (1) showing a false, misleading, or deceptive act committed by either of them in their individual capacities; and (2) showing how any perceived acts on their part were the producing cause of the HOA's injuries. As for Coady, the evidence presented indicates a substantial lack of knowledge and involvement on his part past the "pre-development" stage, when he attended meetings with the other Stillwater and Savannah Developers parties.[315] In fact, Coady testified that he had no prior experience with real estate development, attended only a "handful" of the pre-development meetings, and when it came to critical situations such as Boyd's waterproofing recommendations, Coady testified that he had "no idea" what Boyd's specific recommendations were.[316]

Based on the evidence presented and the Court's factual findings thus far, Coady's involvement amounts to a role as an "owner" of Stillwater Capital and an employee of Robert Elliot Custom Homes, who admitted that, to the extent Stillwater Capital had an interest in its downstream entities, he also maintained an interest in those entities. Beyond that information, the Court has not been provided with any additional evidence of a false, misleading, or deceptive act that Coady committed either in his personal capacity or in his official capacity as a member of Stillwater Capital. While the Court recognizes that a DTPA violation can be held against an agent

---

[315] ECF No. 124, 132:24–133:6.
[316] *Id.* at 132:21–134:23.

for "his own violations of the DTPA,"[317] the evidence did not indicate that Coady made any of the affirmative representations at issue. Conversely, the only evidence presented of Coady's involvement in the Mondara's construction is his awareness that a meeting with Boyd took place prior to construction, his presence at initial meetings between the Stillwater and Savannah Developers, and the inclusion of his email address in several email chains regarding the various pre-construction issues occurring on-site.[318]

Likewise, Sherman's involvement is equally bereft of a substantive false, misleading, or deceptive act on his part, or that Sherman's actions involved with the project were a producing cause of the HOA's injury. Not only does the evidence indicate that Sherman's role in the project was strikingly similar to Coady's involvement, but the Plaintiff provided no evidence indicating that Sherman, in his individual capacity, engaged in any acts constituting a violation of the DTPA. It is quite telling to the Court that the Plaintiff's own *Pre-Trial Brief* does not reference a single act committed by either Coady or Sherman in relation to a DTPA violation.[319] Any liability for violation of the DTPA would be by implication or association—a leap the Court is not willing to make.

As for the Plaintiff's negligent misrepresentation claim, the Court is once again left wanting as to what representations Coady or Sherman allegedly made. The Plaintiff has provided no evidence as to any representations made by the two Defendants, let alone any negligent misrepresentations. Accordingly, the Court cannot attach liability to Coady or Sherman on either claim, and any further analysis of the merits of the Plaintiff's causes of action will only be with

---

[317] *See In re Carroll*, 464 B.R. 293, 331 (Bankr. N.D. Tex. 2011) (Houser, J.) (noting that an agent for a disclosed principal may be held liable under the DTPA when making representations within the scope of their employment).
[318] *See* Pl.'s Exs. 46, 535.
[319] *See* ECF No. 89.

regard to the remaining Defendants—Robert Elliot, Stillwater Capital Investments, LLC, and Stillwater Abbott Management, LLC.

### B. NEGLIGENCE (COUNT B OF THE COMPLAINT - STILLWATER CAPITAL AND STILLWATER MANAGEMENT)[320]

The Court will first address the Plaintiff's negligence claim against Stillwater Capital and Stillwater Management. To prove a claim under Texas common law, a Plaintiff must be able to prove: "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damage approximately caused by the breach."[321] The Court examines each of these elements in turn:

#### 1) Duty

The primary contention among the parties at trial was whether a legal duty existed between the Defendants and the HOA specifically. In the Complaint, the Plaintiff argued that Stillwater Capital and Stillwater Management violated their "duty to supervise, improve, construct, market, sell and repair the Condominium in a good and workmanlike manner," according to the Design Plans, professional recommendations, manufacturer's specifications, and the IBC.[322] Defendants' counsel argued that, as a matter of law, Stillwater Capital and Stillwater Management do not owe the HOA any affirmative duty, given that neither Defendant served as the builder, general contractor, seller, or even the developer during the Mondara's construction.

"The existence of a legal duty owed by the defendant to the plaintiff is an essential element of negligence."[323] A legal duty may arise by statute or common law.[324] A statutory duty arises when the Plaintiff can establish that there is an applicable statute to the case at hand, in which (1)

---

[320] The Court notes that Count A of the Complaint contains a separate negligence cause of action against a multitude of non-parties, including Stillwater Development, the entirety of which have either settled with the Plaintiff or have been dismissed from this case. Accordingly, the Court does not address Count A herein.

[321] *E.g., Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. App.—El Paso 2012, no pet.).

[322] ECF No.1, 427–28.

[323] *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 638 (Tex. 2023).

[324] *See id.* at 640.

the Plaintiff proves they belong to the class of persons the statute was designed to protect, and (2) the Plaintiff's injury is of the type the statute was designed to prevent.[325]

In the absence of a statutory duty, courts typically turn to common law where a duty has been found to exist under the same or similar circumstances. However, the Supreme Court of Texas has recently noted that "courts should only consider recognizing a new duty when a duty has not been recognized in particular circumstances."[326] Additionally, if the court has not yet determined that a certain set of circumstances gives rise to a legal duty, "the relevant question is whether a duty *should* be imposed in a defined class of cases."[327] From there, courts typically engage in one of two tests to determine whether a duty exists: (1) the Risk-Utility test, and (2) the Special Relationship Test.

The Risk-Utility test is a multi-factor test geared around evaluating the risk, foreseeability, and likelihood of injury, and weighing those factors against the utility of the defendant's conduct, the importance of guarding against such an injury occurring, and the drawbacks to placing that legal duty on the defendant.[328] Foreseeability, although insufficient on its own to establish a legal duty, has typically been the "foremost and dominant consideration" within the courts' analyses.[329] Additionally, the Supreme Court of Texas has articulated that the test for foreseeability is: (1) that the injury be of such a general character as might reasonably have been anticipated; and (2) that the injured party should be so situated with relation to the wrongful act that injury to him or one similarly situated might reasonably have been foreseen."[330]

---

[325] *See, e.g.*, *Perr v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998).

[326] *HNMC, Inc. v. Chan*, 683 S.W.3d 373, 380 (Tex. 2024) (citation omitted) (internal quotations omitted).

[327] *Id.* (emphasis added)

[328] *See Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 583 (Tex. 2023).

[329] *United Rentals*, 668 S.W.3d at 639 (citation omitted) (internal quotations omitted).

[330] *Madison v. Williamson*, 241 S.W.3d 145, 152 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654 (Tex. 1999)). As for the Special Relationship test, courts have generally considered whether the parties are engaged in a "special relationship" that would necessitate specific duties owed to

Finally, a contract may also create a set of duties imposed under Texas tort law, under which the parties to the contract are held to a duty of care.[331] Although Texas courts have pontificated as to the limits of this rule—considering whether a plaintiff's claim entails a breach of contract or negligence action—the Supreme Court of Texas in *Montgomery Ward* clarified that "where there is a general duty even though it arises from the relation created by, or from the terms of a contract, and that duty is violated, either by negligent performance or negligent nonperformance, the breach of duty may constitute actionable negligence."[332]

In both the Complaint and at trial, the Plaintiff took a buckshot approach to its negligence cause of action, alleging that the Defendants owed the HOA a duty to "supervise, improve, construct, market, sell, and repair [the Mondara] in a good and workmanlike manner."[333] Given that the Plaintiff cites minimal case law to support this cause of action and, given that these alleged duties do not necessarily entail the same analysis, the Court is forced to painstakingly walk through whether the Plaintiff has proven the Defendants owed any of these duties by a preponderance of the evidence.

First, the Court does not find, and the Plaintiff has not articulated, a statutory hook for establishing an affirmative duty owed by the Defendants. The most pertinent statute, the RCLA, "does not create a cause of action" because it does not "contain a description of what conduct will

---

each other as a matter of law. The applicability of this test, however, primarily revolves around more traditional relationships such as the employer-employee, attorney-client, and doctor-patient relationships, and is likely not applicable in this case.

[331] *See Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947) ("Accompanying every contract is a common-law duty to perform with care, skill, and reasonable expedience and faithfulness the things agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract.").

[332] *Montgomery Ward*, 204 S.W.2d at 510.

[333] ECF No. 1, 427–28.

result in liability or an express statement of the elements of a cause of action."[334] Instead, the statute "simply limits and controls causes of action that otherwise exist."[335]

As to a contractual duty, however, the Court is satisfied that the Residential Condominium Contract (the "**Condominium Contract**") and the Limited Warranty effectively establish duties to: (1) construct the property with new materials unless specified otherwise; (2) construct the property with "good quality" workmanship; (3) ensure that the property, upon purchase, will be free of material defects, including any failure to conform to the Design Plans or applicable standards of quality construction; and (4) complete all improvements to the property in accordance with the Design Plans.[336] As well, the Limited Warranty, while unsigned, reflected the Defendants as Stillwater Development's managers and parties to the agreement.[337]

This contractual duty is only strengthened by review of Mamary's exemplar Warranty Deed and Condominium Contract.[338] Mamary's Condominium Contract—executed on September 10, 2015—includes a duty to "complete all improvements to the Property with due diligence in accordance with the [Design Plans]."[339] Mamary's Warranty Deed—subsequently executed on December 21, 2016—lists the Grantors as Stillwater Development, Stillwater Management, Stillwater Capital, and Elliot, with the document executed, "By [Elliot] . . . *on behalf of said entities*."[340] Although the Court acknowledges that the Residential Contract lists Robert Elliot Custom Homes as the "Seller" and that neither party produced any evidence at trial of an assignment of the Condominium Contract to the Defendants, the Court is nonetheless satisfied that

---

[334] *Gentry v. Squires Const., Inc.*, 188 S.W.3d 396, 404 (Tex. App.—Dallas 2006, no pet.).
[335] *Sanders v. Const. Equity, Inc.*, 42 S.W.3d 364, 370 (Tex. App.—Beaumont 2001, pet. denied).
[336] Pl.'s Ex. 583, 147; Defs.' Ex. S, 4.
[337] Pl.'s Ex. 583, 150.
[338] Defs.' Exs. R, S.
[339] Defs.' Ex. S.
[340] Defs.' Ex. R (emphasis added).

the documents, read in conjunction, impose a contractual duty upon the remaining Defendants.[341] In fact, Mamary credibly testified that purchasers, like Mamary, had no "ability to distinguish one [entity] from the other" when speaking with Elliot about purchasing their respective units, and that Mamary thought Elliot was "speaking for all entities."[342]

The Defendants also had a duty to supervise the Mondara's construction in accordance with the Design Plans and applicable law. Under Texas law, negligent supervision claims "are all simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability."[343] Although negligent hiring, retention, and supervision cases are often intertwined, the general underlying principle is that an employer "owes a duty to its other employees and the general public to ascertain the qualifications and competence of the employees it hires, where the occupation at issue could cause hazard to others or requires skilled or experienced persons."[344] Therefore, employers may be held liable for negligent supervision when they "[hire] an incompetent or unfit employee whom [they know], or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others."[345] Establishing this claim requires the plaintiff to show that "an employer's failure to supervise its employees caused his injuries."[346]

A threshold step in determining an employer's duty is first establishing whether there was an employer-employee relationship. While the employer-employee relationship has primarily been evaluated in the context of vicarious liability claims, an employee's status has previously been resolved by the Supreme Court of Texas by evaluating "whether the employer has the right to

---

[341] Defs.' Ex. S, 1; ECF No. 123, 170:2–175:4.

[342] ECF No. 123, 160:19–161:5.

[343] *E.g., Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 49 (Tex.App.—Fort Worth 2002, no pet.).

[344] *Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp.3d 640, 648 (S.D. Tex. 2016).

[345] *Id.* (quoting *Morris*, 78 S.W.3d at 49) (internal quotations omitted).

[346] *Dangerfield v. Ormsby*, 264 S.W.3d 904, 913 (Tex.App.—Fort Worth 2008, no pet.).

control the progress, details, and methods of operation of the work."[347] This right to control has generally been evaluated by looking at whether there is sufficient evidence of a contract with a right to control, or the conduct by the defendant exhibits a right to control.[348]

When looking at whether there has been an explicit contractual right to control granted, the Supreme Court of Texas has generally followed the principles of contract interpretation in evaluating both the intent of the parties and the provisions of the contract as a whole, so as to give the entire agreement meaning.[349] To accomplish that here, the Court must first connect the various contractual dots among the various parties. As noted in the Court's factual findings above, Stillwater Capital formed Stillwater Management with the explicit purpose of "management and administration for [Stillwater Development]" during Stillwater Development's purchase of the Mondara construction site, construction of the project, and its eventual sales to the public.[350] Likewise, the Stillwater Development Company Agreement articulates a nearly identical company purpose, alongside designating Stillwater Management—on behalf of Stillwater Capital—as its "Manager."[351] Furthermore, Stillwater Development's Company Agreement stipulates that any of the entity's powers "shall be exercised by or under the authority of, and the business and affairs . . . shall be managed by [Stillwater Management]."[352]

In summary: (1) Stillwater Development reached a construction contract with Savannah Developers; (2) the Savannah Contract explicitly defined the relationship between the parties and

---

[347] *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018); *see also* Tex. Civ. Prac. & Rem. Code § 142.001(1) (defining "Employee" as "a person other than an independent contractor who, for compensation, performs services for an employer under a written or oral contract for hire, whether express or implied").
[348] *See Renaissance Med. Found. v. Lugo*, 672 S.W.3d 901, 905 (Tex.App.—Corpus Christi-Edinburg 2023, pet. granted).
[349] *See generally Great Am. Ins. v. Primo*, 512 S.W.3d 890, 892–93 (Tex. 2017); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).
[350] Pl.'s Ex. 29, 4.
[351] *Id*. at 8.
[352] *Id*. at 9.

Savannah Developers' duties for constructing, furnishing, and coordinating the work on the Mondara using its "best skill and attention"; and (3) Savannah Developers had duties to reasonably compile schedules and budgets, employ a competent on-site superintendent, inspect the subcontractors' on-site work, and notify Stillwater Development as to any inconsistent or unanticipated conditions during the course of construction.[353] Each of these responsibilities establishes a contractual right of control on Stillwater Development's behalf, which in turn was acting at all times under the authority of Stillwater Management and Stillwater Capital.

The Defendants' right of control is strengthened even further by the numerous provisions in the Savannah Contract articulating Stillwater Development's ability to terminate its agreement with Savannah Developers and "[t]ake actions necessary" with respect to the "protection and preservation" of the the Mondara's construction.[354] Those very rights were *in fact* exercised by the Defendants in firing Savannah Developers and employing their affiliate Stillwater GC to finish construction.

The Court also finds that the Defendants possessed a right to control Savannah Developers and Stillwater GC through conduct as well. The Supreme Court of Texas has previously held that, absent a contractual relationship, the fact that the alleged employee was "performing services peculiar" to the principals' business or affairs is prima facie evidence of an employer-employee relationship.[355] Here, the Defendants' business was the development, management, and administration of the Mondara's construction, to which both Savannah Developers and Stillwater GC were hired to accomplish. Not only were subcontractor invoices directed towards Stillwater Capital—creating a presumption of control over the project—but communications with hired

---

[353] Pl.'s Ex. 31, 3–5.
[354] *Id*. at 11–13.
[355] *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 591–92 (Tex. 1964).

professionals such as Boyd and Schoedel included, and were directed towards, Stillwater Capital throughout the Mondara's construction. In fact, despite Stillwater Development's name being listed as the project's "Owner", even English could not credibly testify to what Stillwater Development did that would separate its level of control from Stillwater Capital or Stillwater Management's respective levels of control.

Having established an employer-employee relationship, the Court turns to whether the Defendants therefore had a duty to supervise the general contractors throughout the Mondara's construction. The Supreme Court of Texas has previously held that, while it has not definitively ruled on the "existence, elements, and scope" of an employer's duty to supervise, it has articulated that a court considering an employer's duty must engage in the Risk-Utility test based on the particular facts of the case.[356]

Turning first to the foreseeability factor, the Court finds that the property damage to the Mondara found in the Forensix Report and WPM Report should have been reasonably anticipated under the circumstances. The evidence presented underscores that not only did consultants like Boyd and Schoedel alert the Defendants to numerous defects in the project's construction and the risks associated with continuing to build on those defects, but Stillwater Capital's own employee, Billy Avila, cautioned against construction continuing without addressing those defects first. Additionally, the Court finds the HOA's relationship to the eventual property damage could have reasonably been foreseen, given that the Mondara's unit owners were the ones occupying the units rife with these same defects.

As for the risk factor, the issue is whether the Defendants' supervision of the Mondara's completion affected the probability of subsequent property damage. Failure to properly supervise

---

[356] *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 505–08 (Tex. 2017) (citing *Waffle House, Inc. v. Williams*, 313 S.W.3d 796 (Tex. 2010)).

the underlayment construction would increase the risk of soundproofing issues. Failure to supervise the waterproofing and flashing installation would increase the risk of water retention, wall cladding deterioration, and damage to the building envelopes. Failure to supervise the podium slab installation would increase the risk of improper water migration through the podium and into the parking garage. A lack of adequate supervision increased the risk of property damage.

The likelihood of injury due to a lack of supervision also weighs in favor of imposing a duty on the Defendants in this case. The Savannah Contract contemplated a thorough inspection and review process of the construction to ensure conformity with the IBC and the Design Plans. Lee's testimony also established that, while the RFI and contract administration processes are not necessarily required in all design builds, a comprehensive RFI process and the retention of competent contract administrators create safety valves in the event the construction goes awry. Failing to employ these stop gaps, as was done here, potentially creates a rutterless construction process with inconsistent accountability, therefore increasing the likelihood of injury.

Conversely, the Court does not find utility in *not* imposing a duty upon the Defendants under the facts presented. There is no social utility in managing multi-million dollar luxury, multi-family construction projects if the managing entities do not properly supervise the projects. Contract administration and construction are not an "inexact science"—a relatively straightforward line can be drawn from the lack of supervision of the construction phase to the property damage at issue. [357]

Finally, the consequence of placing such a burden on the Defendants is more limited than it may seem. The Court is not suggesting there is a duty upon all managing entities, *per se*, to properly supervise a residential construction project, no matter how far removed from the

---

[357] *See Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994) (holding that the magnitude of the burden is inherently "limited" by the resources available to the defendant at the time for an affirmative duty to be imposed).

contracting process they may be. Rather, a duty is only imposed when Defendants like Stillwater Capital and Stillwater Management are actively involved in the construction process, undertaking nearly identical roles to the project's developer, and are essential figures to any actions taken or not taken by the general contractors and subcontractors. The Defendants presented no persuasive evidence that—despite the entities carrying different names—Stillwater Development, Management, and Capital are not, for all intents and purposes, one and the same in terms of the project's supervisor and the general contractors' employer. Likewise, witnesses testified repeatedly regarding Elliot's hands-on relationship to the project. Therefore, the Defendants (other than Sherman and Coady) had a legal duty to supervise the Mondara's construction.

### 2) *Breach*

A breach under Texas law is the "failure to do that which a person of ordinary prudence would have done under the same or similar circumstances.[358] Here, the issue is whether the Defendants acted in the same or similar manner as other construction supervisors would have done under similar circumstances. The Court finds that the Defendants did not and therefore breached their duty of ordinary care.

Although there are no statutorily-defined standards of care in this case, the Court finds it instructive that both Texas state law and the City of Highland Park have adopted IBC requirements.[359] The Mondara's construction included explicit design and manufacturer specifications throughout the various components of the project. Despite these requirements, the Defendants failed to adhere to them in nearly every inspected area of the Mondara, and, in some instances, actively chose to ignore what hired professionals like Boyd recommended and that which were incorporated into the Design Plans. The Court's factual findings above emphasize that

---

[358] *Great Atl. & Pac. Tea Co. v. Evans*, 175 S.W.2d 249, 250–51 (Tex. 1943).
[359] *See* Tex. Loc. Gov't Code § 214.216; Highland Park, Tex., Code of Ordinances Ch. 3, art. 3.02, § .002.

the Defendants, time and time again, had opportunities to address the project's numerous construction issues and course-correct; for whatever conceivable reason, they failed to do so. That is a breach of their duty of ordinary care by any other name.

### 3) *Proximate Cause*

Proximate causation under Texas law has two distinct elements: (1) cause in fact, and (2) foreseeability.[360] As for cause in fact, the test is "whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred."[361] Although mere "conjecture, guess, or speculation" is insufficient, the plaintiff may establish cause in fact with direct or circumstantial evidence.[362]

Merely "furnish[ing] a condition that made the injuries possible" is not enough to establish cause in fact; the evidence must show "at least a reasonable probability" that the plaintiff's injury was caused by the defendant's negligence.[363] The distinction between merely furnishing a condition and proximately causing a plaintiff's injuries is primarily whether the defendant only "create[d] the condition" for the plaintiff's injury, and whether that injury was "too attenuated" to the defendant's original act.[364] If another party's act equally contributed to the injury, it may negate the original negligent act as a cause in fact.[365] The Supreme Court of Texas has also consistently relied on expert testimony as a means of proving cause in fact. In *Lenger v. Physician's General Hospital, Inc*., the court held that, alongside general experience and common sense, expert

---

[360] *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005).

[361] *Id.*

[362] *Excel Corp. v. Apodoca*, 81 S.W.3d 817, 820 (Tex. 2002) (citing *Havner v. E-Z Mart Stores, Inc*., 825 S.W.2d 456, 459 (Tex. 1992) (internal quotations omitted)).

[363] *Id.*; *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970).

[364] *Johannes v. Ace Transp., Inc*., 346 S.W.3d 640, 643–44 (Tex. App.—El Paso 2009, no pet.).

[365] *Id.*

testimony may also be used to establish a "probable causal relationship" and a "traceable chain of causation" from the plaintiff's injury back to the defendant's actions.[366]

Foreseeability, similar to the duty analysis under Texas law, requires proof that "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission."[367] This generally involves a "practical inquiry" based on "common experience applied to human conduct."[368] The test "requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury."[369] However, the test does not require the defendant anticipate the "precise manner" in which injury to the plaintiff will occur once the defendant has acted negligently.[370]

Applying the proximate cause elements to the instant facts, the Court once again finds that the Defendants' negligence was the proximate cause of the Plaintiff's injury in this case. Starting first with the cause in fact, the Defendants primarily contended at trial that: (1) the property damage at the Mondara was largely due to the collective negligence of the various general contractors and subcontractors related to the project; (2) portions of the property damage—such as the stucco cracking—were naturally occurring; and (3) the Plaintiff itself was the proximate cause of the property damage due to a lack of maintenance at the Mondara.[371] Each of these, the Defendants contend, would bar the Plaintiff's recovery on a negligence claim. The Court disagrees.

The other contractors' involvement in the negligent construction and supervision of the Mondara is not without merit entirely; the Court acknowledges that not all the subcontractors were directly hired by the Defendants and that many of the parties responsible for the confluence of

---

[366] *Lenger*, 455 S.W.2d at 706.
[367] *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995).
[368] *Id.* (quoting *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987)).
[369] *Doe*, 907 S.W.2d at 478 (citing *Restatement (Second) of Torts*, § 435(2) (1965)).
[370] *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).
[371] *See* ECF No. 91, ¶¶ 37, 52, 55, 58, 88.

events that created the Plaintiff's injury have since settled. However, focusing on the individual

parties' actions in relation to the Plaintiff's injury is losing sight of the forest for the trees. But for

the Defendants' failure to assure that the Mondara's construction was done to the promised

standards set forth in the purchase and sale agreements with unit owners, and but for the

Defendants' failure to supervise the construction so that it accorded with the IBC, Design Plans,

and manufacturer specifications, the ensuing property damage would not have occurred.

Additionally, the Plaintiff's experts, primarily Lee, Boyd, and Schoedel, collectively

established that the alleged defects could be reasonably traced back to the Defendants' negligent

actions and inactions in constructing the Mondara in accordance with the IBC and the Design

Plans. For example, the flooding in the parking garage and water damage to the courtyard can be

traced back to improper sloping of the podium slab, which can in turn be traced back to the

Defendants' failure to incorporate code-required specifications in the Design Plans.

Similarly, cause in fact can be found in the Defendants' failure to establish an RFI process,

failure to actively and properly manage its general contractors, and failure to address the defects

*during* the course of construction. This particular element would be a much closer call if only one

area of the Mondara suffered property damage. However, the widespread defects across the two

Phases of the project indicate that it was the Defendants' failure to fulfill the duties imposed upon

them that was the cause in fact of the Plaintiff's injury.

Likewise, the Defendants' negligent acts were foreseeable. A person of ordinary

intelligence—a bar the Court believes that it can safely hurdle—would reasonably anticipate that

failing to supervise and construct a residential property in accordance with the applicable building

code and design specifications would reasonably lead to damage directly tied to those failures. The

Defendants could reasonably anticipate that ignoring a waterproofing expert's warnings regarding

waterproofing installation would lead to water damage caused by improper installation, just as they could reasonably anticipate that a lack of sufficient control joints and flashing throughout the project—for the sake of aesthetics—would cause widespread cracking and deterioration of the wall cladding and the building envelopes.

The Defendants have offered no persuasive evidence as to how and why the property damage at the Mondara occurred—over which the Defendants had supervision of and maintained until 2020—other than with regard to the Plaintiff's supposed failure to maintain clean drains, much of which was a contractor issue.[372] Furthermore, there was no evidence that failure to maintain the cleanliness of the drains would remedy the waterproofing defects, improper sloping, or the lack of proper drains and downspouts. Therefore, the Court finds that the Defendants were, based on the evidence presented, the proximate cause of the Plaintiff's injury.

### 4) *Damages and the Economic Loss Rule*

Although the existence of damages is not an individual element of negligence, Section 41.002 of the Texas Civil Practice and Remedies Code applies to "any action" in which a claimant seeks damages. Here, the Plaintiff is seeking to recover cost of repair damages, which under Texas law would qualify as actual or compensatory damages.[373] More specifically, the Plaintiff seeks damages that qualify as economic damages, or "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss."[374]

The Defendants argue that the Plaintiff's damages resulted in purely "economic loss," and the Plaintiff is therefore not entitled to any damages rooted in a negligence claim.[375] The

---

[372] Again, it was the Defendants' job to supervise the general contractors.
[373] *See Hancock v. Variyam*, 400 S.W.3d 59, 65 (stating that actual or compensatory damages are intended to compensate a plaintiff for an injury incurred).
[374] Tex. Civ. Prac. & Rem. Code § 41.001(4).
[375] ECF No. 91, ¶ 48.

"economic loss rule", as termed under Texas law, states that "where the damage sought by the plaintiff in a tort action is only the economic loss to the subject of a contract itself, the remedy ordinarily is one of contract alone, not tort."[376] If the alleged damage caused by the defendant's negligence is "limited to the loss of a contractual benefit," the economic loss rule applies, thus barring the entire action.[377] However, if the defendant, pursuant to a contract, breaches a legal duty owed to the plaintiff "*independent of the contractual undertaking* and that results in damage to the plaintiff above and beyond the mere economic loss of the contractual benefit itself," the economic loss rule does not apply and the plaintiff is entitled to recovery.[378]

A threshold issue is determining what categories of damage qualify as "economic loss" under the doctrine. Texas courts have consistently held that "economic loss" is defined as "damages for inadequate value, *costs of repair*, and replacement of the defective product . . . without any claim of personal injury or damage to *other* property."[379] The Plaintiff's negligence claim in this case is for damages arising out of the Defendants' failure to design, supervise, improve, construct, market, sell, and repair the Mondara, thus resulting cost of repair damages. Therefore, the Plaintiff's claim constitutes an economic loss.

Although the Supreme Court of Texas concluded that legal duties may arise from a contract that may still be actionable in tort, whether the basis of the Plaintiff's recovery sounds more in contract or tort is a separate analysis.[380] In the context of this case, that would mean the Defendants' contractual duty to not negligently construct the Mondara or negligently supervise its

---

[376] *ConocoPhillips Co. v. Koopmann*, 542 S.W.3d 643, 664 (Tex.App.—Corpus Christi-Edinburg 2016, *aff'd on other grounds*, 547 S.W.3d 858 (Tex. 2018)).
[377] *Id.*
[378] *Id.* at 664–65 (emphasis added).
[379] *Bass v. City of Dallas*, 34 S.W.3d 1, 9 (Tex.App.—Amarillo 2000, no pet.) (emphasis added); *see also Thomson v. Espey Huston & Assocs., Inc.*, 899 S.W.2d 415, 421 (Tex.App.—Austin 1995, no writ).
[380] *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (holding that, while a party's acts might breach duties sounding in both contract and tort, the court still must look at the substance of the claim to determine whether the remedy sought is contract-based or tort-based).

construction may, on the surface, sound in tort, but the cost of repairs damages sought by the Plaintiff ultimately reflect a contract-based action instead.

While the economic loss rule was initially rooted in product liability cases, where the Supreme Court of Texas held that suits against manufacturer's for defective products were more appropriately resolved using contractual remedies,[381] the doctrine has been applied in the context of ordinary negligence cases as well. Among those applications, the economic loss rule has been applied in negligent supervision cases arising out of the construction of a home.[382] In such instances, the Supreme Court of Texas has articulated that when the plaintiff's injury boils down to "the house they were promised and paid for was not the house they received," this type of claim is best characterized as a breach of contract rather than a tort action.[383]

Two more recent Texas Court of Appeals decisions dictate application of the economic loss doctrine even further. First, in *Rio Grande City Consolidated Independent School District v. Puentes*, the court found that, even when a plaintiff school district brought a negligence action against a third-party engineer the plaintiff was not in contractual privity with, the "source" of the plaintiff's claim was "contractual in nature" and therefore the claim was "subsumed by the contractual chain."[384] Second, in *Thomson v. Espey Huston & Associates*—in which a property owner plaintiff sued a contractual third-party engineering firm for failing to uphold certain assurances to the construction company that hired the engineer with regard to construction defects— the court, held that the discovered defects to the building were central to the contractual purpose of providing "certain assurances that the construction would go according to plan," and

---

[381] *See generally Nobility Homes Tex., Inc. v. Shivers*, 557 S.W.2d (Tex. 1977).
[382] *Jim Walter Homes*, 711 S.W.2d at 617–18.
[383] *Id.* at 618; *see also Sw. Bell Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991) (finding that a negligence claim for failure to perform was a breach of a contractual duty, barred by the economic loss rule).
[384] No. 13-19-00033-CV, 2020 WL 6878736, at *7 (Tex.App.—Corpus Christi-Edinburg Nov. 24, 2020).

that the plaintiff's "mere failure to receive the benefit of the bargain" did not give rise to a tort action.[385]

The Court is guided by the substantial weight of authority on this issue and finds that the economic loss rule applies, barring the Plaintiff from recovery under its negligence claim. As echoed by the Supreme Court of Texas, the Texas Court of Appeals, and even the Fifth Circuit,[386] the Plaintiff's cause of action in this case, while arising from a breach of the Defendants' duties to adequately construct and supervise the Mondara's construction, ultimately revolves around the parties' contractual relationships.

The Plaintiff's cause of action, at bottom, is a claim that the unit owners purchased their respective units contingent on certain promises made by the Defendants in the purchasing agreements, and the unit owners did not receive the quality of property they were promised. Like *Thomson*, the Plaintiff's negligence claim is built upon the notion that the "construction would go according to plan," and because of the Defendants' negligent supervision, the Mondara was built defectively.[387] Notwithstanding the Defendants' actions, nothing in the substance of the Plaintiff's claim—from the Defendants' failure to perform their contractual duties up the chain to the remedy sought—is "beyond the subject of the contract itself."[388] The economic loss rule has been consistently applied as a literal exception; when the damages alleged are economic in nature, the cause of action does not sound in negligence.

---

[385] *Thomson v. Espey Huston & Assocs., Inc.*, 899 S.W.2d 415, 417–21 (Tex.App.—Austin 1995, no writ). Curiously, the *Thomson* court stipulated that the plaintiff may have a tort-based action if the engineer's scope of services performed caused damage to *other* parts of the property not within the bounds of the contract.

[386] *See Golden Spread Elec. Coop., Inc. v. Emerson Proc. Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804, 808 (5th Cir. 2020) ("In operation, the [economic loss] rule restricts contracting parties to contractual remedies for those economic losses associated with the relationship, even when the breach might reasonably be viewed as a consequence of a contracting party.") (quoting *Lamar Homes, Inc. v. Mid-Continent Cas. Co.,* 242 S.W.3d 1, 12–13 (Tex. 2007)) (internal quotations omitted).

[387] *Thomson*, 899 S.W.2d at 421.

[388] *Id.*

## C. NEGLIGENT MISREPRESENTATION (COUNT F OF THE COMPLAINT - ELLIOT, STILLWATER CAPITAL, AND STILLWATER MANAGEMENT)

Under Texas law, the elements for negligent misrepresentation are:

(1) a defendant provided information in the course of his business, or in a transaction in which defendant had a pecuniary interest; (2) the information supplied was false; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the information; and (5) the plaintiff suffered damages proximately caused by the reliance.[389]

The first element typically involves one of two scenarios under which a representation can occur—either during the course of the defendant's business, or as part of a transaction in which the defendant has a pecuniary interest.[390] The second element requires that the "false" representation must be: (1) a misstatement of an existing fact, (2) a misstatement of opinion "equally well known to both the supplier and the recipient,"; or, in some cases, (3) a failure to disclose information when there is a duty to disclose.[391] A defendant will not be liable for negligent misrepresentation if the defendant simply "make[s] a guess" as to a future, unknown event.[392] Whether a representation is an assertion of fact or "mere puffery" largely turns on the circumstances in which the statement was made or supplied.[393] Examples of "puffery" include claiming that an investment is "low risk", a settlement offer is "top dollar," or any statement that

---

[389] *In re Thrash*, 433 B.R. 585, 601 (Bankr. N.D. Tex. 2010) (Jernigan, C.J.).

[390] *See First Bank of Tex., N.A. v. S.B.F.I., Inc.*, 830 S.W.2d 239, 246 (Tex.App.—Dallas 1992, no writ) (holding that the defendant bank and its third-party loan officer had made representations both in the course of the bank's business and during a transaction in which the bank had a pecuniary interest when the bank's loan officer used information about one of the bank's particular accounts to gain additional business from the plaintiff ); *see also Restatement (Second) of Torts* § 552(1) cmt. c. (1977) ("If [the defendant] has no pecuniary interest and the information is given purely gratuitously, he is under no duty to exercise reasonable care and competence in giving it.").

[391] *Scherer v. Angell*, 253 S.W.3d 777, 781 (Tex.App.—Amarillo 2007, no pet.); *Restatement (Second) of Torts* § 552(1) cmt. b (1977); *see Brown v. Omni Metals, Inc.* 317 S.W.3d 361, 384 (Tex.App.—Houston [1st Dist.] 2010, pet. denied).

[392] *Sergeant Oil & Gas Co., Inc. v. Nat. Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1360 (S.D. Tex. 1994).

[393] *See GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex.App.—Austin 2008, no pet.) (holding that relevant circumstances may include the specificity of the statement, the speaker's knowledge, and whether the statement relates to present or future circumstances).

might include broad, vague, and commendatory language that would amount to nothing more than "mere sales talk" rather than a statement of fact.[394]

The alleged misrepresentation must also be "for the guidance of others," meaning that the plaintiff must show that it "fall[s] within the limited group of persons for whose benefit and guidance the information was provided."[395] This limitation serves to narrow the field of potential plaintiffs to (1) those for whose benefit the defendant intends to supply the information, or (2) those who know the defendant intends to supply it.[396]

The third element of negligent misrepresentation—reasonable care or competence in obtaining and communicating the information—is generally a fact-based analysis of what "the recipient of the information is entitled to expect in light of the circumstances."[397] What a plaintiff would be entitled to expect will typically depend on the characteristics of the information being supplied.[398]

The fourth, and arguably most important, element—reliance—requires that the plaintiff show "actual and justifiable reliance."[399] Whether the plaintiff's reliance was justifiable turns on a plaintiff's individual characteristics, abilities, and "appreciation of facts and circumstances at or before" the misrepresentation took place.[400] In other words, a plaintiff could not have justifiably relied on a misrepresentation if there were "red flags" that would have deemed such reliance as unwarranted.[401] A plaintiff's reliance cannot be deemed justified if the plaintiff undertakes an

---

[394] *Id.* (citations omitted).
[395] *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co*., 313 F.3d 305, 318 (5th Cir. 2002) (citing the *Restatement (Second) of Torts* in reference to Texas state law).
[396] *Scottish Heritable Tr., PLC v. Peat Marwick Main & Co*., 81 F.3d 606, 612 (5th Cir. 1996) (applying Texas law).
[397] *Restatement (Second) of Torts* § 552 cmt. e (1977).
[398] *Id.*
[399] *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).
[400] *Id.* (citation omitted) (internal quotations omitted).
[401] *Id.* (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)) (internal quotations omitted).

independent investigation as to the information being supplied by the defendant, indicating that the plaintiff has in fact relied on the alleged misrepresentation.[402]

Finally, the plaintiff must be able to establish that it suffered a pecuniary loss that was proximately caused by the defendant's misrepresentation.[403] However, the loss suffered by the plaintiff must typically be independent from what ultimately amounts to a breach of contract claim. For example, in *Scherer v. Angell*, the Texas Court of Appeals held that claims brought in relation to faulty construction amounted to damage resulting in a "promise of future action" that had been essential to the original contract negotiations between the parties.[404] Therefore, any of the alleged promises made by the defendant were essentially breach of contract allegations rather than negligent misrepresentations.

In this case, the Plaintiff alleges that the Defendants "made false representations or permitted false representations to be made" to the HOA and the unit owners regarding whether the Mondara was built in a good and workmanlike manner, and according to the Design Plans and applicable law.[405] The Plaintiff further alleges that these representations were made both orally and through advertising and sales materials, and were made primarily during the transfer process of the HOA's common elements from the Defendants to the unit owner-controlled HOA Board in late 2017.[406] Additionally, the Plaintiff contends that not only did Defendants fail to disclose material facts or information to the HOA regarding the construction defects at the Mondara, but the Plaintiff ultimately relied on that information in return.[407]

---

[402] *See Bartlett v. Schmidt*, 33 S.W.3d 35, 38 (Tex.A—Corpus Christi-Edinburg 2000, pet. denied).
[403] *See Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).
[404] 253 S.W.3d at 781–82.
[405] ECF No. 1, 430–32.
[406] *Id.*
[407] *Id.*

Based on the Court's factual findings, the alleged negligent misrepresentations in this case boil down to three separate categories: (1) Elliot's representations made to potential buyers like Dial and Mamary; (2) the Defendants' representations made in the MLS reports compiled by the Plaintiff's expert, Beckelman; and (3) the alleged failure to disclose construction defects at the Mondara in September 2017 when the Defendants transferred control of the HOA to the unit owners. The Court addresses these in turn:

### 1) *Elliot's Representations to Buyers*

Based on credible testimony of unit owners Dial and Mamary, Elliot made a number of representations to prospective buyers during purchase negotiations. Elliot's representations included referring to the Mondara's "high end" and luxury quality, the project, upon completion, being one of the highest quality projects in Highland Park, and the project's specific soundproofing qualities. As a threshold matter, there is no question that these representations occurred in the course of the Defendants' business and while Elliot maintained a pecuniary interest in selling a unit to buyers like Mamary and Dial.

The second element, the substance of Elliot's representations, is where the Court flies into headwinds with the case law. Statements like the Mondara being "high-end" and the project being one of the best in Highland Park resemble the non-actionable statements of puffery as illustrated in cases like *McNeely v. Salado Crossing Holding, L.P.*, where the court found claims that the property would be "well-managed" and that the defendant would resolve complaints "quickly" to be statements of opinion.[408] However, Elliot's representation to Mamary that "you should not be able to hear the noise above you"—knowing that Mamary and his wife were considering the Mondara specifically for its soundproofing quality—is the type of actionable misrepresentation

---

[408] *McNeely v. Salado Crossing Holding, L.P.*, No. 04-16-00678-CV, 2017 WL 2561551, at *6 (Tex.App.—San Antonio June 14, 2017, no pet.).

beyond mere puffery. Elliot's statements closely resemble the representations in *GJP, Inc. v. Ghosh*, where the court found the defendant's statements regarding the reliability and "strong mechanicals" of a Jaguar to be negligent misrepresentations based on the defendant's superior knowledge of the facts.[409]

The evidence reflects that Elliot knew that the Mondara was not being constructed in accordance with the soundproofing Design Plans, yet represented to unit owners like Mamary that it would meet their acoustic needs. Furthermore, Elliot's knowledge of the buyers' intended reliance is evidenced by the acoustic testing that buyers like the Dials requested. These statements cannot be deemed mere puffery; rather, they are actionable as false representations supplied by Elliot.

Likewise, Elliot's actions indicate that he did not use reasonable care either under the circumstances. Given Elliot's superior knowledge of the faulty design issues at the Mondara by that point, as well as Elliot's conscious choice to disregard the Design Plans and ignore professional recommendations from experts like Schoedel, there is no indication that Elliot communicated or supplied his representations to prospective buyers with any sort of reasonable care.

The Court also finds that Dial and Mamary justifiably relied on Elliot's misrepresentation in purchasing their respective units. Each witness provided a similar, uncontroverted recounting of their discussions with Elliot that the owners would not be able to hear anyone above them. Although Dial's testing arguably constituted an "investigation" of Elliot's representation in some capacity, the Court does not believe that rises to the level of an "independent investigation" wholly

---

[409] 251 S.W.3d at 889–90.

separate from what Elliot had represented to Dial regarding the acoustics/soundproofing of the Mondara as a whole.

Finally, the Court finds that Elliot's misrepresentations to Dial and Mamary, and therefore the Plaintiff, proximately caused the pecuniary loss suffered by the Plaintiff in the form of cost of repair damages.[410] However, the damages suffered by the Plaintiff are once again subject to the economic loss rule. State and federal courts applying Texas law remain consistent that the economic loss rule precludes recovery for torts resulting from a party's failure to perform under a contract, even when that failure to perform takes the form of a negligent misrepresentation.[411]

In determining whether the rule applies, courts generally look at: (1) the source of the duty being imposed; and (2) the nature of the remedy being sought by the plaintiff.[412] Here, the source of the duty likely stems from both the Condominium Contract and Limited Warranty, and the Defendants' duty to construct the Mondara with new materials, under good quality workmanship, and free from material defects.[413] Likewise, the nature of the remedy being sought by the Plaintiff is cost of repair damages. Much like the facts in *Severs v. Mira Vista Homeowners Association*— where the court applied the economic loss rule to a negligent misrepresentation claim between homeowners and their HOA—the Plaintiff's claim here arises solely out of the unit owners' purchasing agreements and the Defendants' warranty.[414] The Plaintiff, therefore, has not pleaded any injury beyond the scope of the unit owners' purchases, and is therefore barred by the economic loss rule.

---

[410] ECF No. 88, ¶¶ 31–33.

[411] *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998); *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442–43 (Tex. 1991); *cf. Hurd v. BAC Home Loans Serv., LP*, 800 F. Supp. 2d 747, 763–64 (N.D. Tex. 2012) (finding that the economic loss rule did not apply because the nature of the plaintiff's injury relating to a deed of trust included out-of-pocket expenses, mental anguish, and attorney fees).

[412] *See, e.g., DeLanney*, 809 S.W.2d at 494.

[413] Pl.'s Ex. 583, 147.

[414] *See Severs v. Mira Vista Homeowners Ass'n, Inc.*, 559 S.W.3d 684, 703 (Tex.App.—Fort Worth 2018, pet. denied).

### 2) *The MLS Reports*

The second bucket of alleged negligent misrepresentations is focused on the MLS Reports containing information regarding the sale of units at the Mondara. The Court is, once again, satisfied that the representations made in the MLS Reports—primarily the Mondara's Green-Built Certification and its use of the term "luxurious"—were made in the course of the Defendants' business of marketing and selling units at the Mondara, to which the Defendants had a pecuniary interest. However, while the Green Built certification marketing was false information of existing fact that was supplied by the Defendants, the use of phrasing like "luxurious finishes and amenities" does not constitute anything beyond mere puffery. The Court recognizes that the term "luxury," as Schoedel credibly testified, connotes a particular industry standard in terms of high-quality construction. But even if the Court were to hold that stating a particular product is "luxury" constitutes a misrepresentation, the MLS Reports do not contain representations that the Mondara is a luxury product held to luxury standards, nor do the reports speak to which specific amenities the luxury standard applies.

Focusing specifically on the Green Built misrepresentation, the Court finds that including this objectively false information on the MLS Reports was not supplied with reasonable care under the circumstances. There is no question that the Mondara was never certified, nor intended to be certified, as a Green Built project, and yet the Defendants failed to exercise reasonable care including that information on the Mondara listings. Notwithstanding the lack of care in including that information in the listings, the Plaintiff did not show that any party relied on the Green Built misrepresentation. The only two witnesses that could credibly attest to the original purchasing process for their units were Mamary and Dial, and neither of them testified that they had relied on the Mondara's supposed Green Built certification in purchasing their units. In fact, Dial testified

that he was not even aware of that representation until the State Court trial had begun.[415] There is

simply no actionable claim to the MLS Reports in terms of negligent misrepresentation.

### 3) Defendants' Non-Disclosure to the HOA

The final category of alleged misrepresentations pertains to the Defendants' alleged failure

to disclose information regarding the Mondara's material defects to the HOA and the unit owners,

primarily during the period in which the Defendants relinquished control of the HOA Board to the

unit owners. The Defendants did not inform the unit owner-controlled HOA Board about any of

the construction defects at the Mondara in 2017, and did not inform them of the various testing

done by Boyd and Schoedel regarding these known defects in the Design Plans and/or the "as

built" construction. In some cases, such as Elliot's conversations with Mamary regarding the 2017

Idibri test results, the Defendants actively hid the results from the HOA Board and the unit owners,

and lied about what it would cost for the unit owners to receive a copy of the results.

Elliot's lie to Mamary and the unit owners regarding the alleged cost to obtain the 2017

Idibri results, meets all the same elements as Elliot's misrepresentations during the purchasing

process. However, unlike Elliot's prior misrepresentations, the Court concludes that the Plaintiff

is not barred by the economic loss rule as it pertains to Elliot's 2017 misrepresentation to Mamary

and the unit owners regarding Idibri specifically. Despite the cost of repairs sought by the Plaintiff,

the Court finds that this specific misrepresentation was outside the bounds of any contractual

obligations owed by the Defendants to the unit owners.

---

[415] The Court notes the arguable discrepancy in Dial's testimony, given that he testified that he relied on the MLS reports in purchasing his unit, but did not rely on the Green Built certification representation contained in the reports. The Court believes these statements can be harmonized. First, while Dial relied on the MLS reports in terms of the "luxury" representations, his reliance is nevertheless mooted by the fact that those representations are not actionable. Second, while the Green Built misrepresentation would be actionable, Dial did not rely on that particular misrepresentation in purchasing his unit.

Elliot's decision to keep Schoedel from printing the Idibri results, followed by his lying to Mamary that obtaining those results would cost the HOA $25,000, are not connected to the Defendants' contractual duties to construct, supervise, or repair the Mondara in accordance with the various contracts between the Defendants and the unit owners. Instead, the Court finds that Elliot made a distinct factual misrepresentation in the course of the Defendants' business, which the unit owners justifiably relied upon during a period where the soundproofing defects, at least with respect to the units either still under construction or not yet purchased, could have been remediated. Further, Elliot's misrepresentation ultimately forced the HOA to retain Idibri itself in 2021, incurring further costs in the process, only to have Idibri certify the soundproofing defects that the Defendants had kept under wraps for years.

While the Court recognizes the breadth of the economic loss rule and its importance in distinguishing tort-based and contract-based causes of action, the rule cannot be applied to prioritize form over substance, barring recovery based on misrepresentations with no contractual affiliation simply because the damages pleaded are contractual in nature. Therefore, the Court finds the Defendants are liable for negligent misrepresentation under Texas law in connection with the cover-up of the 2017 Idibri results. However, the Court will address damages for the Defendants' negligent misrepresentation as part of its DTPA analysis.[416]

**D. DTPA VIOLATION – (COUNT G OF THE COMPLAINT - ELLIOT, STILLWATER CAPITAL, AND STILLWATER MANAGEMENT) & BREACH OF EXPRESS AND IMPLIED WARRANTIES – (COUNT D OF THE COMPLAINT - STILLWATER CAPITAL AND STILLWATER MANAGEMENT)**

---

[416] The Court notes that, although § 17.43 of the DTPA provides that remedies under the DTPA are "not exclusive", the Act further provides that "no recovery shall be permitted under both [the DTPA] and another law of both damages and penalties for the same act or practice." As discussed further below, the Defendants' negligent misrepresentation with regard to the 2017 Idibri report is also a violation of the DTPA. Therefore, the Plaintiff is only entitled to recover for the damages associated with the Defendants' actions pursuant to the Plaintiff's DTPA claim, despite the Court finding the Defendants liable for negligent misrepresentation as well.

As a threshold matter, the Court notes that the Plaintiff brought claims for breach of express and implied warranties under both Texas common law and § 17.50(a)(2) of the DTPA. Given that the claims involve an identical analysis by the Court, the Plaintiff's common law breach of warranty claim is incorporated into the Court's DTPA analysis herein.

The Deceptive Trade Practices Act provides a separate cause of action independent from common law tort-based claims, aimed at "protecting consumers from [1] false, misleading, or deceptive business practices, [2] unconscionable actions, and [3] breaches of warranty."[417] The Act applies to both "Goods"—meaning tangible chattels or real property purchased or leased for use—or "Services"—meaning work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods.[418] To effectuate the DTPA's purpose, the Texas legislature explicitly stated that the Act "shall be liberally construed and applied," subject only to the RCLA.[419]

In order to maintain a cause of action under the DTPA, the plaintiff must establish several elements: (1) the plaintiff must be a "consumer" as defined by the DTPA; (2) the defendant must be able to be sued under the Act; (3) the defendant must have committed at least (i) a false, misleading, or deceptive act or practice specifically enumerated in the "laundry list" of thirty-four actions in § 17.46(b), (ii) a breach of an express or implied warranty, or (iii) any unconscionable action or course of action as defined by the Act; and (4) the defendant's action was a "producing cause" of the plaintiff's damages.[420] Although breach of warranty actions are not further defined, the DTPA does define an "unconscionable action" as an "act or practice which, to a consumer's

---

[417] *Id*. at § 17.44(a).
[418] *Id*. at § 17.45(1)–(2).
[419] *Id*. at § 17.44(a), (b).
[420] *Id*. at § 17.50(a)(1)–(4).

detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[421]

The definition of "consumer" under the statute is any "individual, partnership, corporation . . . who seeks or acquires by purchase or lease, any goods or services."[422] However, the Act provides that "any person" may be sued by the plaintiff.[423] "Person" is defined as "an individual, partnership, corporation, association, or other group, however organized."[424]

If a plaintiff prevails on a DTPA cause of action, the Act dictates that the plaintiff may obtain economic damages.[425] The DTPA further provides that if the trier of fact finds that the defendant's conduct was committed either "knowingly" or "intentionally", the plaintiff may be awarded "not more than three times the amount of economic damages."[426] The Act defines "knowingly" as:

> [A]ctual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty.[427]

Furthermore, actual awareness may be inferred where "objective manifestations" indicate that the defendant acted with actual awareness.[428] Likewise, "intentionally" is defined as:

> [A]ctual awareness of the falsity, deception, or unfairness of the act or practice, or the condition, defect, or failure constituting a breach of warranty giving rise to the consumer's claim, coupled with the specific intent that the consumer act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.[429]

---

[421] *Id.* at § 17.45(5).
[422] *Id.* at § 17.45(4).
[423] *Id.* at § 17.50.
[424] *Id.* at § 17.45(3). The Act also contains a plethora of exemptions under § 17.49, including those involved in transactions for non-residential property over $500,000 and those operating as brokers or salespersons who act or fail to act within the scope of their employment.
[425] *Id.* at § 17.50(b)(1).
[426] *Id.*
[427] *Id.* at § 17.45(9)
[428] *Id.*
[429] *Id.* at § 17.45(13).

Intention can be inferred from objective manifestations or inferred from facts showing the defendant acted with "flagrant disregard of prudent and fair business practices" to the extent that the defendant should be treated as having acted intentionally.[430]

The Plaintiff first contends that, as a matter of law, the HOA—as the Plaintiff—is a "consumer" under the DTPA.[431] It contends that the Defendants' actions qualify as violations of the DTPA under all three categories of actions that warrant liability under § 17.50. The Plaintiff contends that (1) the Defendants engaged in "false, misleading, or deceptive acts or practices" that the HOA and unit owners relied on to their detriment; (2) the Defendants "failed to comply with a warranty"; and (3) the Defendants engaged in unconscionable action regarding the HOA, all of which were the producing cause of damages to the Plaintiff and violated the DTPA.[432] The Plaintiff additionally argues that the Court should award additional damages because the Defendants acted knowingly and intentionally.[433] Finally, the Court notes that, aside from its DTPA claim, the Plaintiff also contends that Stillwater Capital and Stillwater Management breached an implied warranty that the Mondara was built in a good and workmanlike manner.[434]

The Defendants counter as follows: (1) the HOA, on behalf of the unit owners, is not a "consumer" under the DTPA; (2) the Defendant cannot be sued under the DTPA because the unit owner purchases fall under the § 17.49 exceptions; (3) the Defendants did not engage in any of the alleged actions under § 17.50; (4) the Defendants were not the producing cause of any damages suffered by the Plaintiff; (5) to the extent any warranty was breached, the express warranties in the

---

[430] *Id.*
[431] ECF No. 88, 8.
[432] ECF No. 88, ¶¶ 7, 11, 15.
[433] *Id.* at ¶ 20.
[434] *See* ECF No. 1, 428–29; ECF No. 89, 24.

Condominium Contract take precedence over any implied warranties; and (6) the Defendants did not *knowingly or intentionally* engage in any of the alleged actions under § 17.50[435]

### 1) Plaintiff's "Consumer" Status under the DTPA

Whether a plaintiff is a consumer under the DTPA is a question of law.[436] A consumer under the DTPA has two primary characteristics: a plaintiff must show that it (1) sought or acquired goods or services by purchase or lease; and (2) the goods or services purchased or leased "form the basis of the complaint."[437] At bottom, this is a standing question, and the District Court for the Northern District of Texas has made clear that failure to establish a plaintiff's consumer status defeats the plaintiff's claim entirely.[438] The Supreme Court of Texas has held that a plaintiff establishes standing by establishing consumer status in relation to the transaction in question rather than the plaintiff's relationship to the defendant.[439]

This sentiment naturally opens the door to the current dispute between the parties as to the scope of the relationship between the HOA and the Defendants. Fortunately, the Supreme Court of Texas has provided some initial guidance. In *Cameron v. Terrell & Garrett, Inc.*, the court held that consumer status is not restricted by any contractual privity requirement.[440] Rather, to effectuate the DTPA's "liberal" construction and application and to align with Texas authority regarding negligence, implied warranty, and strict liability causes of action, the Act's design is instead focused on protecting consumers from deceptive trade practices "made in connection" with

---

[435] ECF No. 91.
[436] *See Rojas v. Wal-Mart Stores, Inc*., 857 F. Supp. 533, 536 (N.D. Tex. 1994).
[437] *Id.*
[438] *Id.*
[439] *See Flenniken v. Longview Bank & Tr. Co*., 661 S.W.2d 705, 707 (Tex. 1983) ("A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant.").
[440] *Cameron v. Terrell & Garrett, Inc*., 618 S.W.2d 535, 541 (Tex. 1981).

the transaction at hand.[441] Doing so accords with the language in § 17.45(4), which identifies a consumer as one who "seeks *or* acquires" any goods or services.[442]

Building out the scope of this definition, Texas courts have held that a plaintiff qualifies as a consumer if they are the "beneficiary" of the goods or services in the transaction.[443] However, beneficiary-consumer status is applied in "very limited situations." [444] For a plaintiff to obtain beneficiary-consumer status, it must show the transaction was (1) "specifically required by or intended to benefit" the plaintiff as a third party, and (2) the goods or services were "rendered to benefit" the plaintiff.[445] If the facts indicate that the plaintiff's beneficiary status was simply "incidental" to the transaction, the plaintiff does not qualify as a "consumer" under the DTPA.[446]

Many courts applying Texas law have attempted to delineate an intended beneficiary from an incidental one for purposes of consumer status, applying a broad interpretation of "consumer" based on the facts of each case. In *Kennedy v. Sale*, the court held that the third-party employee who received the benefits of his employer's group insurance policy purchase was a beneficiary, and therefore a consumer, because the insurance was "consummated for [the plaintiff's] benefit."[447] In *Reynoso v. Ford Motor Company*, the court held that a plaintiff who did not participate in "any part of the purchase" of a Ford Explorer was arguably a beneficiary-consumer because the car was "purchased for her, kept at her house, and driven and maintained by her driver."[448] In *Wellborn v. Sears, Roebuck & Company*, a decedent obtained consumer status

---

[441] *Id.*

[442] *See Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985) (holding that while the plaintiff did not "seek" the benefits from his employer's insurance policy, he nevertheless "acquired" those benefits by being covered under the policy, and was therefore a consumer under the DTPA).

[443] *Arther Anderson & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 815 (Tex. 1997); *Lukasik v. San Antonio Blue Haven Pools, Inc*., 21 S.W.3d 394, 401 (Tex.App.—San Antonio 2000, no pet.).

[444] *Lukasik*, 21 S.W.3d at 401.

[445] *Id.*

[446] *Id.*

[447] 689 S.W.2d at 892.

[448] C.A. No. B-03-120, 2005 WL 8168751, at *9 (S.D. Tex. Sept. 12, 2005).

through his mother's purchase of a defective garage door opener because, he "acquired the garage door opener and the benefits it provided," even though he was not in a "contractual relationship" with the defendants.[449]

Several courts, however, have held that beneficiary status under the DTPA is not without limits. In *Lukasik v. San Antonio Blue Haven Pools, Inc.*, the court held that the plaintiffs were not "consumers" under the DTPA with respect to a defective pool alarm installed on their landlord's property prior to the plaintiffs moving onto the property.[450] The court focused primarily on the fact that the plaintiffs "did not reside on the property until two weeks after the pool's completion," did not "independently pursue acquisition" of the pool alarm, and only inquired about a pool alarm for their decedent son "after they moved onto [the owner's] property."[451]  Additionally, in *Chamrad v. Volvo Cars of North America*, the plaintiff was determined to be only an incidental beneficiary because he did not make "logistical or financial arrangements" for the purchase in question.[452]

Here, the primary point of contention is whether the HOA, on behalf of the unit owners, constitutes a "consumer" under the DTPA. At trial, the Defendants contended that the HOA is not an intended beneficiary because it did not purchase anything, does not own any property, and the DCCR provides only "burdens", not benefits, to the HOA itself. The Court disagrees.

The Court recognizes the delicacy of granting the Plaintiff consumer status in this case. In reaching this conclusion, the Court finds both the timing and language in the DCCR instructive.

---

[449] 970 F.2d 1420, 1426 (5th Cir. 1992).

[450] 21 S.W.3d at 401.

[451] *Id.* at 401–02; *see also In re N.Y. Inn Inc.*, No. 21-30958-mvl11, Adv. Proc. No. 22-03037, 2023 WL 2938371, at *5 (Bankr. N.D. Tex. Apr. 13, 2023) (finding against a plaintiff's alleged consumer status and holding that any attempt to add the plaintiff to the insurance policy after-the-fact was insufficient to constitute a "consumer" under the DTPA because it was the plaintiff's burden to show some form of intended benefit through the evidence presented).

[452] 145 F.3d 671, 672 (5th Cir. 1998). This Court also found a lack of consumer status in *New York Inn Inc.*, and granted a motion to dismiss, on the basis that the plaintiff was never intended to receive benefits of the insurance policy in question, nor was the plaintiff in contractual privity.

First, as is typical in multi-family residential construction, the DCCR, officially recorded July 10, 2015, *preceded* all unit owner purchases.[453] The DCCR was designed explicitly for the purposes of "enhancing and protecting" the Mondara's value and attractiveness.[454]

The DCCR not only provides that the HOA will be made up of all unit owners "upon becoming an [o]wner," but provides the HOA with rights, including the right to complete improvements, perform necessary repair work to the Common Elements, and exercise any other development rights set forth in the DCCR.[455] As soon as the units were purchased, the HOA was comprised of unit owners, thereby activating the very benefits that were conferred to the HOA from the start. Despite the Defendants' contention, the HOA was not just conferred "burdens" to manage and repair the common elements, but the *power* to enforce the DCCR's provisions and serve as the unit owners' attorney-in-fact in § 9.8.6, among other rights.[456] By the very terms of its formulating documents, every unit purchase at the Mondara directly consummated a benefit to the HOA. The powers given to the HOA are not merely incidental; they give a collective voice to the unit owners.

This holding also accords with the holding in *Meredith v. Rose*, where the court held that an HOA has a "justiciable interest", and therefore sufficient standing as a plaintiff, when it has been charged with the duties of "maintenance, repair, and reconstruction" by the DCCR.[457] As was the case in *Meredith*, a lack of ownership rights in the Common Elements by the HOA in this case does not preclude its ability to serve as the Plaintiff on behalf of the unit owners given the Mondara's DCCR places affirmative duties on the HOA to maintain and repair the Common

---

[453] Pl.'s Ex. 504, 4.
[454] *Id.*
[455] Pl.'s Ex. 504, 1–38.
[456] *Id.* at 61–62.
[457] No. 05-15-00054-CV, 2016 WL 4205686, at *8 (Tex.App.—Dallas Aug. 9, 2016, no pet.).

Elements.[458] At bottom, both the benefits and burdens assigned to the HOA through the DCCR provide the HOA with standing to sue the Defendants on behalf of the unit owners. Therefore, the Plaintiff's consumer status is satisfied for purposes of the DTPA.

### 2) Defendants' Ability to Be Sued Under the DTPA

In pre-trial briefing, the Defendants assert that they cannot be sued under the DTPA because the unit owners' purchases fall under the § 17.49 exception precluding transactions over $500,000 that involve property other than the consumer's residence. This argument was never raised at trial, in the *Defendants' Third Amended Answer, Objections, and Motions to Dismiss and Show Authority* (the Defendants' live pleading in this case), or in the Defendants' *Motion for Partial Summary Judgement* with regard to the Plaintiff's DTPA claim,[459] and was therefore waived.

### 3) Defendants' Alleged Actions under § 17.50

The Plaintiff asserts three independent theories for how the Defendants' actions violated the DTPA: (1) the "laundry list" of enumerated offenses; (2) breach of warranty; and (3) unconscionable conduct. The Court addresses the arguments under each of these categories in turn.

#### a. Laundry List Offenses under § 17.46

The first category under which a plaintiff can maintain a cause of action under § 17.50 is through subsection (a)(1), specifically where the plaintiff can prove the use or employment of a false, misleading, or deceptive act or practice that: (1) is specifically enumerated in § 17.46; and (2) is relied upon by the consumer to their detriment.[460] Out of the thirty-four enumerated actions, the Plaintiff identifies six. These alleged actions include:

---

[458] *See id.* ("Thus, regardless of ownership, the HOA has the duty to maintain and repair the retaining walls, the cross-easement areas, and structures . . . under the terms of the [DCCR].").
[459] *See* ECF No. 1, 370–409; *see also* ECF Nos. 63–64.
[460] Tex. Bus. & Comm. Code § 17.50(a)(1)(A), (B).

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

(6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand;

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.[461]

The Court need not address each of these claims separately, as it finds that not only do several of these claims overlap in terms of the Defendants' alleged actions, but that two of the misrepresentations made by the Defendants—Elliot's misrepresentation to Mamary about the Idibri 2017 testing, and the misrepresentation with regard to the Mondara's Green Built certification—fall within the laundry list of liable actions under § 17.46(b)(2), (b)(5), and (b)(7), respectively.

The evidence shows that the purchasing process with the original unit owners took place through 2017 and into 2018, and that Elliot's misrepresentation to Mamary and the HOA Board as to the purported $25,000 cost to receive Idibri's 2017 test results took place during that original purchasing process. Not only did Elliot's misrepresentation create confusion and misunderstanding as to the certification of the soundproofing materials used in the Mondara's construction, but he represented to Mamary that the Idibri testing possessed a certain quality (an

---

[461] ECF No. 88, 25–26; *see also* Tex. Bus. & Comm. Code § 17.46(b)(2), (5), (6), (7), (12), (24).

additional $25,000 cost) which it did not. These actions, in the Court's mind, violate both § 17.46(b)(2) and (b)(5). The same is true with regard to the Defendants' misrepresentation that the Mondara was Green Built certified. The MLS Reports clearly indicate that the Defendants represented the goods (the units for sale) were of a particular standard or grade (Green Built) that they were never intended to be, as all parties agree. Therefore, the Defendants' misrepresentation, while also connected to the contract formation stage, fits the mold of a violation under § 17.46(b)(7).

The remaining issue is whether the Plaintiff relied on these misrepresentations to its detriment. As discussed in the Court's negligent misrepresentation analysis above, there was no evidence that the Plaintiff, on behalf of the unit owners, relied upon the Green Built certification misrepresentation to the Plaintiff's detriment. Therefore, the Plaintiff does not have a viable claim under § 17.46(b)(7). Conversely, the Court finds the Plaintiff did rely on Elliot's soundproofing misrepresentation to its detriment by allowing the soundproofing issues to continue at the Mondara for over two years based on misinformation. Therefore, the Court finds in favor of the Plaintiff as to its DTPA claim under § 17.46(b)(2) and (b)(5).

However, the remaining issue is whether the Plaintiff's allegations constitute viable DTPA claims or breach of contract claims. The Supreme Court of Texas held in *Crawford v. Ace Sign, Inc.* that, an "allegation of a mere breach of contract, without more, does not constitute a 'false, misleading, or deceptive act' in violation of the DTPA."[462] In *Crawford*, the court explained that, in essence, the plaintiff's DTPA claim was that the defendant made representations that: (1) the defendant would perform its end of the contract to publish the plaintiff's ad; and (2) the defendant's

---

[462] *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (per curiam) (quoting *Ashford Dev., Inc., v. USLife Real Est. Servs.*, 661 S.W.2d 933 (Tex. 1983)) (internal quotations omitted).

nonperformance was a misrepresentation of the intention to perform under the contract.[463] These allegations, without more, "were nothing more than representations that the defendants would fulfill their contractual duty to publish, and the breach of that duty sounds only in contract."[464]

Several courts have since distinguished *Crawford*'s holding, including the Fifth Circuit, which stated that while a breach of contract by itself does not constitute an actionable DTPA claim, the "underlying conduct that breaches an agreement" may still violate both the DTPA and the contract.[465] As succinctly noted by the court in *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, "[t]he duty to not make misrepresentations or to make certain disclosures during the contract formation stage is imposed by law independent of a contract and thus, is actionable under the DTPA."[466] Likewise, "[t]he fact that damages are 'economic' does not mean they may not be damages for tort or violation of the DTPA."[467]

Under either § 17.46(b)(2) or (b)(5), these representations are substantially different from the holding in *Crawford*. Although undoubtedly connected to the underlying contract formation stage (the unit purchases), Elliot's misrepresentations are not actions that solely breached his contractual duties; his actions, on behalf of the Defendants, are definitionally false, misleading, and deceptive. Therefore, the Court finds that the Plaintiff's claims under § 17.46(a)(2) and (a)(5) of the DTPA are not barred by the economic loss rule.

### b.  Breach of Warranty

The Plaintiff contends that the Defendants also violated the DTPA by breaching the warranty of performing services in a good and workmanlike manner. Somewhat confusingly, the

---

[463] *Id.*
[464] *Id.*
[465] *McCraig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 475 (5th Cir. 2015).
[466] *E.g., Howell Crude Oil Co. v. Donna Ref. Partners, Ltd.*, 928 S.W.2d 100, 109 (Tex.App.—Houston [14th Dist.] 1996, writ denied).
[467] *Howell*, 2020 WL 10229102, at *109.

Plaintiff's Complaint and its *Pre-Trial Brief* present its breach of warranty cause of action differently. In the Complaint, the Plaintiff alleges that the Defendants violated express and implied warranties, while the *Pre-Trial Brief* references the implied warranty of good and workmanlike manner.[468] Given that the Supreme Court of Texas recognized the warranty of good and workmanlike manner in both the express and implied context in *Gonzales v. Southwest Olshan Foundation Repair Co., LLC*, the Court addresses the Plaintiff's claim in both contexts.[469]

Turning first to the implied warranty of good and workmanlike manner, the Supreme Court of Texas has somewhat coarsely lamented that breach of implied warranties claims "defy simple categorization because an implied warranty is 'a freak hybrid born of the illicit intercourse of tort and contract.'"[470] Despite the fact that an implied warranty has "feet in both camps" in terms of tort and contract law, the Supreme Court of Texas has held, especially in the DTPA context, that implied warranties are "grounded more in tort than in contract."[471]

However, Texas law permits the exclusion or modification of warranties in contractual agreements "wherever reasonable," with such modifications being negated or limited by related provisions involving parol or extrinsic evidence.[472] Accordingly, the Texas Uniform Commercial Code ("**UCC**") § 2.316 stipulates that "all implied warranties are excluded by expressions like 'as

---

[468] The Court notes that, in its Complaint, the Plaintiff alluded to a slew of implied warranties that the Defendants allegedly breached, including what appear to be habitability, fitness for intended use, and that the Mondara was free from defects, among others. However, the Plaintiff's *Pre-Trial Brief* addressed only the Defendants' alleged breach of the warranty of good and workmanlike manner; the remaining warranties were neither specifically nor substantively raised at trial. Therefore, the Court solely addresses the alleged breach of warranty of good and workmanlike manner.

[469] 400 S.W.3d 52, 57 (Tex. 2013) (holding that the court could "consider the good-and-workmanlike requirement" of a warranty to determine whether an express warranty to perform services in a good and workmanlike manner superseded an implied warranty under the same standard).

[470] *Nghiem v. Sajib*, 567 S.W.3d 718, 723 (Tex. 2019) (quoting *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 705 (Tex. 2000)).

[471] 741 S.W.2d 349, 352 (Tex. 1987).

[472] *See* Tex. Bus. & Comm. Code § 2.316(a) (citing § 2.02 regarding the application of parol evidence in contract interpretation).

is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty."[473]

The result is different, however, when it involves the implied warranty of good and workmanlike manner. Work that is of "good and workmanlike" quality warrants that it is completed by one who "has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work."[474] The implied warranty of good and workmanlike manner does not necessarily require those who repair or modify existing tangible goods to guarantee the results of their work, so long as they perform those services in a good and workmanlike manner.[475]

This implied warranty is heavily protected by public policy. The Supreme Court of Texas held in *Melody Home Manufacturing Company v. Barnes*: "Consistent with the trend in recent consumer protection legislation and sound public policy, . . . the implied warranty that repair or modification services of existing tangible good or property will be performed in a good and workmanlike manner **may not be waived or disclaimed**."[476] This sentiment echoes § 17.42 of the DTPA, which mandates that any waiver of a consumer's rights under the Act is unenforceable and void, absent extremely narrow exceptions.[477]

The court's rationale behind its holding in *Melody Home* makes a good deal of sense; if public policy dictates the creation of an implied warranty, it would be "incongruous" with that public policy to then allow for certain implied warranties to be disclaimed by standard contractual waiver provisions.[478] Equally important, the implied warranty of good and workmanlike manner

---

[473] *Id.* at § 2.316(c)(1).
[474] *Melody Home*, 741 S.W.2d at 354.
[475] *Id.* at 355.
[476] *Id.* (emphasis added).
[477] *See* Tex. Bus. & Comm. Code. § 17.42.
[478] *Id.*

involves a consumer's expectations that, regardless of the contract they signed, the provider of the services cannot simply circumvent their expectations and escape liability.[479]

Despite this seemingly clear directive, both the Supreme Court of Texas and the Fifth Circuit have drawn razor thin distinctions from the *Melody Home* holding. The Supreme Court of Texas in *Rocky Mountain Helicopters, Inc. v. Lubbock County Hospital District* distinguished *Melody Home* by holding that the court had recognized the implied warranty of good and workmanlike manner "only when the services relate to the *repair or modification* of existing tangible goods or property."[480]

As the Fifth Circuit articulated, there is no inherent implied warranty to perform services in a good and workmanlike manner, and any such warranty would only be imposed if public policy justified imposing one based on a compelling need.[481] This "compelling need" would only arise when there are no other "adequate remedies" available to the consumer, such as when privity or reliance requirements, or even difficulty in assigning appropriate responsibility, obfuscate the plaintiff's ability to seek redress.[482] At bottom, these distinctions indicate that courts are generally willing to consider an implied warranty of good and workmanlike manner when the services in question relate specifically to the repair or modification of a product already in existence, but are hesitant to extend that warranty absent a compelling public policy need.

No matter what nuanced standard applies, the Court finds that the Defendants breached the implied warranty of performing repairs and modifications to the Mondara in a good and workmanlike manner. The evidence presented clearly indicates that the Defendants had the knowledge, training, and experience with residential construction and contract administration, yet

---

[479] *Id.*
[480] *Rocky Mount. Helicopters, Inc. v. Lubbock Cnty. Hosp. Dist.*, 987 S.W.2d 50, 53 (Tex. 1998) (emphasis added).
[481] *Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 294–95 (5th Cir. 2016).
[482] *Rocky Mountain*, 987 S.W.2d at 53.

failed in nearly every capacity to adhere to those duties as the construction defects at the Mondara—many of which were self-inflicted through the Defendants' own actions—became apparent. The Defendants consciously chose to disregard specifications within the IBC and the Design Plans, and install materials in ways that were similarly non-compliant with the IBC and the Design Plans. Likewise, they routinely performed "Band-Aid" repairs and modifications to their foundational mistakes in equally reckless fashion.

By way of example, when the Defendants were notified by Boyd as to the deficient waterproofing installations during the construction of Phase I, they failed to change course and repair those mistakes. When they were notified by the HOA about flooding in the garage due to the poor construction of the site and podium drainage systems, they responded with patchwork modifications to the pumping system without addressing the wholly deficient design and construction of the systems causing the flooding. When Idibri issued its 2017 report regarding the soundproofing defects present in several assemblies, the Defendants sat on their hands and stonewalled the homeowners with the results. At numerous inflection points, the Defendants were tasked with following through on their contractual promise to provide quality construction and warranty work and they overtly and consciously breached those obligations.

The Court recognizes the substantial work that those like English completed at the Mondara in pursuit of remedying the numerous on-site issues and upholding the obligations dictated by the Condominium Contract, and that not every individual associated with the Defendants contributed to the breaches at hand. However, as experts like Lee, Boyd, Schoedel, and even Bice agreed, the defects found at the Mondara did not wholly originate during its construction; most of the defects identified in the expert reports linger to this day because of the Defendants' collective failure to adequately rectify and remediate their own mistakes over several years. The Defendants' own case

proved as much, highlighting that they were on site for years after construction was largely complete, unable or unwilling to address the persistent issues that were brought to their attention. The Defendants' actions are the antithesis of good and workmanlike performance of services and undoubtedly a breach of an implied warranty.

Alternatively, the Defendants breached the express warranty of good and workmanlike manner. The Supreme Court of Texas held in *Gonzales* that the implied warranty of good and workmanlike manner can be superseded by an express warranty, if the express warranty "sufficiently describes the manner, performance, or quality of the services."[483] In other words, if the parties' contract sufficiently describes the performance of the services, then there is no need for an implied warranty and it is therefore superseded by the warranty in the contract.[484] The Supreme Court of Texas reinforced this notion by holding recently that "a warranty which the law implies from the existence of a written contract is as much a part of the writing as the express terms of the contract," given that, absent a contract at all, "the warranty would not arise."[485] Under those circumstances, the warranty would only serve as a "default warranty" unless and until the parties expressed a "contrary intention."[486]

In this case, there is an argument to be made that the express warranty in the Condominium Contract and in the Limited Warranty expressly sets forth the manner, performance, and quality of the Defendants' construction and repair of the Mondara, and that the express warranty should therefore control. However, even if that were the case under Texas law, the Court nevertheless arrives at the same conclusion based on the holding in *Gonzales*; the Defendants' actions breached

---

[483] *Gonzales,* 400 S.W. 3d at 55–57.
[484] *Id.*
[485] *Lennar Homes of Tex. Land & Const., Ltd. v. Whiteley*, 672 S.W.3d 367, 377 (Tex. 2023) (citation omitted) (internal quotations omitted).
[486] *Id.* at 378 (citation omitted) (internal quotations omitted).

the warranty of good and workmanlike manner, regardless of whether that warranty is express or implied.[487] The Court therefore finds that the Plaintiff sufficiently proved that the Defendants violated § 17.50(a)(2) of the DTPA for breach of warranty.

Accordingly, the Court also finds that Defendants Stillwater Capital and Stillwater Management breached the warranty of good and workmanlike manner at Texas common law. However, consistent with the Court's analysis with regard to the Plaintiff's negligent misrepresentation claim, § 17.43 of the DTPA precludes the Plaintiff from recovering cumulative remedies under Texas common law for the same act or practice. Therefore, the Plaintiff is only entitled to damages for the Defendants' breach of warranty under the DTPA.

### c. Unconscionability

The DTPA defines an "unconscionable action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[488] Proving unconscionability generally requires the plaintiff to prove: (1) the defendant took advantage of the plaintiff's lack of knowledge; and (2) the result of the defendant's action was grossly unfair.[489] The term "grossly unfair" has been further articulated by courts applying Texas law as unfairness that is "glaringly noticeable, flagrant, complete and unmitigated."[490] However, the Fifth Circuit has held that the inquiry into whether a defendant's actions were unconscionable still depends on whether the injury could have resulted

---

[487] *See Design Tech Homes, Ltd. v. Maywald*, No. 09-11-00589-CV, 2013 WL 2732068, at *5 (Tex.App.—Beaumont June 13, 2013, pet. denied) (recognizing that the Supreme Court of Texas held in *Gonzales* that a defendant could still violate an express warranty to perform work in a good and workmanlike manner, even if that express warranty superseded the implied warranty of good and workmanlike manner).
[488] Tex. Bus. & Comm. Code § 17.45(5).
[489] *See Bradly v. Gatehouse Media Tex. Holdings II, Inc*., Case No. 1:22-cv-00304-LY, 2023 WL 2428282, at *7 (W.D. Tex. Mar. 8, 2023).
[490] *Kumar v. Panera Bread Co*., 750 F. Supp.3d 785, 792 (S.D. Tex. 2024) (quoting *Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 623 (Tex.App.—Fort Worth 2017, pet denied)) (internal quotations omitted).

in the absence of a contract between the parties.[491] Furthermore, an unconscionability claim under the DTPA "requires proof of each consumer's knowledge, ability, experience, or capacity."[492] Finally, the unconscionable action must relate to the transaction itself rather than any "post-transaction conduct."[493]

The Plaintiff alleges that the Defendants engaged in unconscionable action under the DTPA by being made aware of the Mondara's numerous defects during the early stages of construction, and subsequently covering up those defects to the HOA and the unit owners' detriment. The Plaintiff argues the repairs to these defects were not made when the defects were "most accessible" and the Mondara's construction was still in progress. The Defendants, according to the Plaintiff, merely hoped nothing bad would happen, ignored Boyd, Schoedel, and Avila's warnings about the repairs, and proceeded to cover up the defects instead, constituting an unconscionable action under the DTPA. Finally, the Plaintiff alleges that the Defendants were still selling units while the various defects and subsequent, unsuccessful repairs were happening, showing further evidence of unconscionability. The Court agrees.

The delineation between this case and those decisions denying claims for unconscionability lies in the particular actions alleged by the Plaintiff to support its unconscionability claim. Unlike its negligence or negligent misrepresentation claims, the Plaintiff focuses on the actions the Defendants took early on in the Mondara's construction process, prior to all units being sold and the HOA taking control of the common elements. The evidence presented highlighted *repeated* opportunities for the Defendants to course correct the Mondara's construction defects. The Defendants, however, not only disregarded these concerns, but continued to build despite them,

---

[491] *See Shakeri*, 816 F.3d at 295.
[492] *Id.*
[493] *Bradley*, 2023 WL 2428282 at *7.

utilizing similarly defective construction techniques, all while marketing and selling units to the unit owners.

The Plaintiff also bore its burden of proof that the HOA's knowledge and capacity of the Defendants' actions, as a representative of the unit owners' collective knowledge and capacity, was purposefully obfuscated by the Defendants, underscoring the unfairness at play. The Defendants did not tell the Plaintiff about Boyd's warnings, the numerous code violations underlying both the design and construction of the Mondara, or any of the reports issued by BCG and Idibri at any point during the original unit purchases. At minimum, the Defendants' façade as to the Mondara's high-quality construction unfairly lured purchasers in without supplying those purchasers essential information of which only the Defendants were aware. Such actions, in the Court's estimation, are unconscionable under § 17.50(a)(3) of the DTPA.

### 4)  *Producing Cause*

Under the DTPA, the requirement that the consumer prove that the defendant's actions were the "producing cause" requires a showing that the actions were a "substantial factor which brings about the injury and without which the injury would not have occurred."[494] This showing does not require foreseeability of the harm be shown, so long as the defendant's act was the cause in fact of the plaintiff's injury.[495] Given the Court's lengthy discussion on causation in its negligence analysis, it need not engage in a repetitive analysis. The Plaintiff bore its burden to prove that the Defendants' deceptive actions were undoubtedly the cause in fact of the Plaintiff's injury because, without the Defendants' breach of warranty or unconscionable actions, the Plaintiff's cost of repair damages would not have occurred.

### 5)  *Knowing and Intentional Conduct Under the DTPA*

---

[494] *Doe*, 907 S.W.2d at 481.
[495] *Id.*

Having found that the Defendants violated the DTPA for both breach of implied warranty and unconscionable actions, the question remains whether the Plaintiff is therefore entitled to additive damages based on the Defendants' alleged knowing or intentional conduct. The Fifth Circuit previously held that a "knowing violation" and "actual awareness" under the DTPA mean that the defendant knows that what it is doing is false, deceptive, or unfair in relation to the transaction at issue.[496] The Supreme Court of Texas has articulated that the defendant must not only be actually aware of its actions, but aware that those actions are false, deceptive, or unfair.[497] Put another way, the defendant must think to itself "[yes], I know this is false, deceptive, or unfair to [the plaintiff], but I'm going to do it anyway."[498]

The Supreme Court of Texas has placed this particular state of mind on a spectrum somewhere between gross negligence and intentional conduct, referring to "knowing" violations of the DTPA as "conscious indifference" to the rights or welfare of the persons affected by the defendant's actions.[499] For example, in *Luna v. North Star Dodge Sales, Inc.*, the court upheld a finding of a "knowing violation" where the defendant repeatedly failed to honor a 30-day money back guarantee related to the plaintiff's purchase of a car after numerous attempts by the plaintiff to get his money back, alongside various excuses by the defendant that it could not return her money.[500]

Here, the Court finds the Defendants knowingly violated the DTPA by virtue of several actions, entitling the Plaintiff to two times the amount of damages under the DTPA.[501]

---

[496] *Streber v. Hunter*, 221 F.3d 701, 729 (5th Cir. 2000).

[497] *See St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc*., 974 S.W.2d 51, 53 (Tex. 1998).

[498] *Id.*

[499] 667 S.W.2d 115, 117–18 (Tex. 1984) (quoting *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981)).

[500] *Id.* at 117 (remanded on different grounds).

[501] The Court notes that, although § 17.50(b)(1) provides that the trier of fact may award up to three times the amount of economic damages for a knowing violation of § 17.50(a) of the DTPA, the statute does not require the Court to award treble damages. Therefore, based on the facts of the case, the Court finds that the Plaintiff is entitled to two (2) times the amount of economic damages pursuant to § 17.50(b)(1).

Categorizing the Defendants' collective actions as consciously indifferent is, frankly, an understatement. The Court need not rely on solely objective manifestations of actual awareness or even inferences made through analysis of the evidence to reach this holding. Direct evidence shows the Defendants were actually aware that the actions taken before, during, and after the unit purchases were false, misleading, and unfair.

The evidence shows that Elliot: (1) knew that telling Mamary and the HOA Board that Idibri's report would cost an additional $25,000 from the HOA was false; (2) knew that covertly ordering Schoedel to not put the Idibri results in writing in 2017 was deceptive; and (3) knew that not disclosing the Mondara's complete lack of compliance with the IBC and Design Plans to either prospective unit owners or the HOA—while continuing to pitch the Mondara's top-notch construction—was unfair. Elliot's actions are equally attributable to Stillwater Capital and Stillwater Management given his control and position with Stillwater Capital, the dozens of signatures and emails directed to Elliot on behalf of Stillwater Capital, and testimonial evidence underscoring the cloudy nature as to which particular hat Elliot was wearing at any given time in relation to the "Gordian Knot" of Stillwater-related entities. Stillwater Capital and Stillwater Management knew that it would be unfair and deceptive to ignore the noncompliant construction and design of the Mondara while marketing and selling it to purchasers as if there were no known defects, and yet they did exactly that. That is a conscious indifference to the harm ultimately suffered by the Plaintiff, and a knowing violation of § 17.50(b)(1) of the DTPA.

Given the Defendants' liability for knowingly violating the DTPA, the Court need not address whether the Defendants also intentionally violated the DTPA.

### E. AFFIRMATIVE DEFENSES AND LIMITATIONS ON DAMAGES

The Defendants assert a fleet of affirmative defenses and limitations on damages that would either preclude the Plaintiff's recovery entirely or, at the very least, reduce the cost of repair damages based on certain limitations. The Defendants' defenses and proposed limitations include, but are not limited to: (1) statute of limitations; (2) contributory negligence; (3) noncompliance with the notice and inspection requirements under the RCLA, TUCA, and/or the DTPA prior to filing the lawsuit; (4) the economic feasibility doctrine; (5) proportionate responsibility and settlement credits; (6) act of God; (7) waiver; (8) business judgment rule; (9) ratification; (10) failure of presentment; and (11) violation of good faith and fair dealing.[502]

Most of these defenses and limitations were either never argued at trial or were previously ruled upon in the Plaintiff's favor in the Court's order granting the Plaintiff's Motion in Limine.[503] Accordingly, the Court finds there are only three viable arguments presented by the Defendants that remain to be addressed: (1) statute of limitations; (2) proportionate responsibility and settlement credits; and (3) the economic feasibility doctrine. Those arguments are addressed in turn below.

### 1) *Statute of Limitations*

As an initial matter, the Court notes that both the parties and the Court agreed that the Defendants' statute of limitations defense, in relation to the fraudulent concealment claim and whether the Defendants are estopped from raising that defense, would be better served and more

---

[502] ECF No. 91, 3–11.

[503] ECF No. 102. For clarity purposes, the Court's *Order Granting Plaintiff's Motion in Limine* addressed and rejected solely the Defendants' affirmative defense with respect to the Plaintiff's alleged noncompliance with the RCLA, TUCA, and the DTPA's procedural requirements. However, contributory negligence, act of god, waiver, business judgment rule, ratification, failure of presentment, and violation of good faith and fair dealing were not substantively raised by the Defendants in their pre-trial motions or at trial. If any evidence regarding these remaining defenses was arguably brought forth by the Defendants, such evidence was insufficient to carry the Defendants' burden of proof.

fully litigated during the second trial over the Fraud Claims.[504] However, given that the Defendants put forth this defense during cross examination of Dial and through admission of the Limited Warranty, the issue remains as to whether any of the Plaintiff's claims are barred by applicable statutes of limitations.

Under § 17.565 of the DTPA, all causes of action brought under the Act must be commenced within two years of either: (1) the date on which the false, misleading, or deceptive act occurred; or (2) within two years after the consumer discovery or in the exercise of reasonable diligence should have discovered, the occurrence of the defendant's false, misleading, or deceptive act.[505] Furthermore, this limitations period may be extended for a period of 180 days if the plaintiff is able to prove that failure to bring a cause of action within two years was caused by the defendant knowingly engaging in conduct that would "induce the plaintiff to refrain from or postpone" commencing a lawsuit.[506]

The Supreme Court of Texas has previously held that the issue of whether a plaintiff's claims are barred by the statute of limitations requires a determination of when the causes of action accrued, and that determining the date of accrual is a question of law.[507] The general rule for accrual is that the accrual date triggers (and the limitations period begins), "[o]nce a claimant learns of a wrongful injury," even if they do not yet know of the specific cause of the injury, the responsible party, the full extent of the injury, or whether the injury could have been avoided.[508]

---

[504] *See* ECF No. 124, 196:6–200:14 ("And if the argument is any of those have a defense of a statute of limitations and [the Plaintiff's] counter to that is fraudulent concealment, then that [defense] may have to be punted to the next [trial].").
[505] Tex. Bus. & Comm. Code § 17.565.
[506] *Id.* As for the 180-day extension under the DTPA, that rule has been generally interpreted to apply strictly to claims for fraud, such as fraudulent concealment.
[507] *Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003).
[508] *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 207 (Tex. 2011).

The primary exception, especially under a DTPA claim, is the discovery rule. Under the discovery rule, the limitations period is tolled and the accrual date is deferred until "the time that the plaintiff discovers, or through the exercise of reasonable care and diligence should have discovered, the nature of his injury."[509] The rule is typically limited to circumstances where (1) the nature of the injury is "inherently undiscoverable"; and (2) evidence of the injury is "objectively verifiable."[510] In short, if the discovery rule applies, the accrual period will start from the point that a "reasonably diligent and careful plaintiff knows or should have known of the wrongful act and injury."[511]

In an unfortunately circular fashion, an inherently undiscoverable injury has been defined as "the type of injury that is not generally discoverable by the exercise of reasonable diligence during the prescribed limitations period."[512] This type of injury is usually established by determining whether the plaintiff should have reasonably discovered the nature of their injury and the likelihood that the injury was caused by the defendant's wrongful acts.[513] However, the discovery of the "exact cause in fact" is not necessary to trigger the limitations period, so long as the plaintiff uncovered the general cause through reasonable diligence.[514] Nevertheless, the Supreme Court of Texas has distinguished that it is the "nature of the injury" that must be inherently indiscoverable, rather than the particular injury.[515] Put simply, the discovery rule is applied categorically to determine whether a *type* of injury was inherently discoverable.[516] A type

---

[509] *Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 742 (Tex.App.—Houston [14th Dist] 1993, writ denied).
[510] *Cosgrove v. Cade*, 468 S.W.3d 32, 36 (Tex. 2015) (citing *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)).
[511] *Caver v. Clayton*, 618 S.W.3d 895, 899–900 (Tex.App.—Houston [14th Dist.] 2021, no pet.).
[512] *Id.*
[513] *See LaTouche v. Perry Homes, LLC*, 606 S.W.3d 878, 883–84 (Tex.App.—Houston [14th Dist] 2020, pet. denied).
[514] *Id.* at 884.
[515] *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998).
[516] *Id.*

of injury that is not categorically excluded from the discovery rule is an injury caused by latent construction defects.[517] A latent defect is one that is "not discoverable by a reasonably prudent inspection."[518]

As for the objective verifiability element, courts must engage in a "case-specific" analysis focused on whether the particular injury incurred was objectively verifiable.[519] Here, courts generally rely upon direct evidence, expert testimony, or facts that are "otherwise indisputable."[520]

An additional wrinkle in applying the discovery rule is determining what constitutes "reasonable diligence" by the plaintiff in relation to the type of injury. If the plaintiff, using reasonable diligence, discovers, or should have discovered, the injury, the accrual date begins from that point moving forward. Application of this rule can be found in numerous cases applying Texas law, including *Bayou Bend Towers Council of Co-Owners v. Manhattan Construction Company*, where the Texas Court of Appeals held that the plaintiff's discovery of its injury began accruing once it became "aware of construction defects" to its garage roof and windows and once it became capable of discovering the nature of this injury through reasonable diligence.[521] In *Tenowich v. Sterling Plumbing Co.*, the court found that the limitations period accrued the day the plaintiffs discovered pipe leaks after personally investigating the pipes behind the sheetrock, and not at the later date where the plaintiffs hired a plumber to investigate the full extent of pipe defects.[522]

---

[517] *See Orta v. Spectrum Gulf Coast, LLC*, Civ. Action No. 7:23-CV-00374, 2024 WL 1743141, at *2 (S.D. Tex. Mar. 5, 2024) (finding that the discovery rule applied because the plaintiff's claim dealt with latent defects to the plumbing system).
[518] *Brown v. Caldwell & Family Custom Homes, Inc.*, No. 02-11-00490-CV, 2012 WL 4662544, at *3 (Tex.App.—Fort Worth, Oct. 4, 2012, no pet.).
[519] *Caver*, 618 S.W.3d at 901–02.
[520] *Schlittler v. Est. of Meyer*, No. 14-17-00071-CV, 2018 WL 3061124, at *4 (Tex.App.—Houston [14th Dist.] June 21, 2018) (citing *S.V. v. R.V.*, 933 S.W.2d 1 (Tex. 1996)).
[521] 866 S.W.2d at 743–44.
[522] 712 S.W.2d 188, 189–90 (Tex.App.—Houson [14th Dist.] 1986, no writ).

As a threshold matter, the applicable statute of limitations in this case is two years, given that the DTPA provides for a two-year limitations period and the RCLA does not otherwise extend another statute's limitations period.[523] Therefore, the issue is *when* the accrual period began, and *when* the limitations period was established, in relation to the Plaintiff's discovery of the various construction defects at the Mondara.

The Court finds that the discovery rule applies in this case. Latent defects, by their definition, are not inherently discoverable because a plaintiff cannot and could not know of underlying construction defects engrained in the very design and construction of a property, as the defects at the Mondara existed. Although the case involved different facts and an entirely different injury, the holding in *LaTouche v. Perry Homes, LLC* is instructive as to why latent defects are inherently undiscoverable. The *LaTouche* court examined the nature of latent injuries, involving long-term exposure to hazardous substances, and held the discovery rule applies in cases where the nature of the injury is "initially undetectable, inherently dormant, and characterized by prolonged latency, and no immediate injury manifests itself to alert the plaintiff."[524] Each of the latent defects in waterproofing, wall cladding, and drainage at the Mondara, from the ZIP sheathing to the podium slab sloping, were the exact same types of undetectable and dormant injuries that would not manifest themselves immediately to the Plaintiff.

The Court also finds that the specific injuries to the Plaintiff were objectively verifiable. The Plaintiff provided extensive and credible expert witness testimony that verified the existence of the defects at the Mondara and their respective harm to the common elements across the property. The Defendants' experts did not sufficiently refute, and, at many points, agreed with, the

---

[523] *See* Tex. Prop. Code § 27.005; Tex. Bus. & Comm. Code. § 17.565.
[524] 606 S.W.3d at 888.

evidence presented by the Plaintiff that damage to the common elements could be objectively verified.

However, application of the discovery rule in this case does not resolve *when* the Plaintiff, through reasonable diligence, discovered the construction defects at the Mondara for the limitations period to begin. There are two significant complexities. First, much like *Bayou Bend*, the alleged latent defects by the Plaintiff are not confined to one particular area at the Mondara, and the facts surrounding the defects are not uniformly applicable. Second, the testimony provided by Dial regarding his proposed tolling agreement in 2018, and the conversations with Elliot regarding tolling any statute of limitations as to the soundproofing defects at Mondra, create significant fact issues in how Dial's alleged knowledge can be attributed to the Plaintiff.

As for the first issue, despite the numerous defects present at the Mondara, the Court finds that the statute of limitations has not expired for the Plaintiff's DTPA claim as to any of the construction defects. The record reflects that the unit owners, and therefore the Plaintiff, were aware of issues at the Mondara pertaining to issues like flooding and drainage as early as 2017 or 2018, which, theoretically, would make the Plaintiff's claim untimely. Both Mamary and English testified that the unit owners attended meetings to voice their concerns as to a wide array of issues with the property. However, visibly discovering the injury to the property—such as drainage or flooding—is not enough by itself to trigger the limitations period.[525] Rather, it is the discovery of *the injury* <u>and</u> its *general cause* that triggers the limitations period.[526]

Put simply, the injury to the Plaintiff was the property damage to the common elements at the Mondara, and the general cause of that damage was due to the systematically improper and

---

[525] *See* 2024 WL 1743141, at *3 (interpreting the *Bayou Bend* holding to mean that the discovery of a defect such as piping issues, without more, is not enough to trigger the limitations period).
[526] *See Bayou Bend*, 866 S.W.2d at 743.

deceptive construction carried out by the Defendants. For example, in *Orta v. Spectrum Gulf Coast, LLC*, the court found the limitations period did not begin to run simply because the plaintiffs became aware of sewage backflow.[527] Rather, the *Orta* court held that the accrual date began from the point the plaintiffs started emailing their insurance company and indicating that they were aware of the defendant's general involvement in the sewage backflow.[528]

Here, the Court finds that the limitations period did not begin to run simply because the unit owners complained of various problems at the Mondara. Instead, the limitations period began in late 2018 or early 2019, when the flooding became pervasive, or at the latest on September 3, 2019, when the HOA Board hired the Conley Group to test and inspect several units for construction defects for water intrusion.[529] It was at this point that the HOA Board, exercising reasonable diligence in investigating, determined the **general cause** of the injuries incurred, and therefore the Plaintiff's DTPA claim as to all defects is not barred by the statute of limitations.

However, Dial's testimony regarding the tolling agreement complicates this analysis as to soundproofing, which requires further discussion. Unlike other injuries to the property, Dial testified that he was aware of soundproofing issues (noises from the above unit) and its general cause (the Defendants' construction). Not only do emails between Dial and Elliot underscore that Dial was aware of noise issues in July 2018—at the same time he was the HOA President—but the proposed tolling agreement evidences an awareness on Dial's part to toll the limitations period based upon perceived defects caused by the Defendants.[530] Dial's emails to Elliot reference "premature litigation," and the draft tolling agreement contains language regarding "noise issues"

---

[527] *Orta*, 2024 WL 1743141, at *3.
[528] *Id.*
[529] Each of these dates is within two years of the initiation of the State Court lawsuit.
[530] *See* Defs.' Ex. W.

and "alleged liability" arising out of the "construction or development of [the Mondara]."[531] Despite Dial's representations that the draft tolling agreement would only be for him and his wife, Dial also explicitly stated that "others are interested" and that those other unit owners may want to sign the same agreement with the Defendants.[532]

The Court cannot ignore that Dial was the HOA President in and around the time the tolling agreement was proposed, regardless of him proposing it in his individual capacity. If the Plaintiff is to be considered a consumer under the DTPA based on its representation of the unit owners, then any awareness that the unit owners had of the construction defects, especially the HOA's President, must also be attributed to the Plaintiff.  Likewise, in *Bayou Bend*, the Texas Court of Appeals held that the composition of an HOA Board and any "after-acquired knowledge" by subsequent board members did not constitute "new knowledge" for purposes of the discovery rule.[533] Even if the later Mamary-led HOA Board lacked sufficient knowledge for the limitations period to begin, the prior Dial-led HOA Board did from 2017–2018.

Yet, Dial's awareness of soundproofing defects—and thereby the HOA's awareness of those issues—took place before the Defendants blatantly misrepresented and hid the results of the Idibri testing. In other words, even if Dial's actions hypothetically triggered the limitations period to run as to defective soundproofing quality, that is an entirely different analysis than when the accrual period started with regard to the Defendants' misrepresentations about the Idibri report— the same actions underlying the negligent misrepresentation claim and (partially) the DTPA claim.[534] Therefore, the statute of limitations would not bar the Plaintiff from recovering for

---

[531] *Id.*

[532] *Id.*

[533] *Bayou Bend*, 866 S.W.2d at 744–45.

[534] The Plaintiff contends that Elliot's misrepresentations to Mamary speak primarily to the Fraudulent Concealment claim. The Court partially disagrees; Elliot's actions with regard to the 2017 Idibri report also create liability for the Defendants with respect to the Construction Defect claims as well, and therefore whether the statute of limitations bars those claims warrants consideration in this trial.

soundproofing defects as to its claims because the Plaintiff was not aware of that particular injury (the failed Idibri acoustical tests) or its general cause (Elliot's deception) until the Plaintiff became aware of the other construction defects.

### 2)  *Proportionate Responsibility and Settlement Credits*

The Defendants contend that the Plaintiff's DTPA claim is subject to Chapter 33 of the Texas Civil Practices and Remedies Code, requiring the Court to determine the percentage of responsibility for each of the Defendants and allocate any subsequent damages based on the Defendants' proportionate responsibility.[535] Additionally, the Defendants contend that, if the Court finds the Defendants liable, the Plaintiff's damages award should be reduced by any amounts already awarded to the Plaintiff based on settlement credits with other parties.[536]

At trial, the Plaintiff asserted that Chapter 33 and proportionate responsibility do not apply when there is an indivisible injury. Courts applying Texas law have held that, "[i]f responsibility for the plaintiff's injury cannot be apportioned with reasonable certainty among the defendants and other responsible parties . . . then by definition the trier of fact cannot find any of them 'responsible for a percentage of the harm.'"[537] The Plaintiff further contends that the Defendants cannot receive both settlement credits and place a limit on damages using proportionate responsibility, and that Sections 33.012 and 33.013—which address settlement credits and proportionate responsibility, respectively—are treated separately and independently for recovery purposes. The Court need not reach the question of whether the Defendants could, in theory, "double dip" and limit the Plaintiff's damages based on both proportionate responsibility and

---

[535] ECF No. 91, 5.

[536] *Id.* at. 7.

[537] *In re Tex. E&O Op., Inc.*, Adv. No. 19-03231, Case No. 17-34386-sgj, 2024 WL 3490242 (Bankr. N.D. Tex. July 19, 2024) (Jernigan, C.J.) (quoting *Lakes of Rosehill Homeowners Ass'n, Inc. v. Jones*, 552 S.W.3d 414, 420 (Tex.App.—Houston [14th Dist.] 2018, no pet.)).

settlement credits, because the Court finds that property damage to the Mondara is an indivisible injury and Chapter 33 does not apply.

In *Texas E&P Operation, Inc.*, the Honorable Stacey G. Jernigan addressed the conflict between common law principles of joint and several liability and Chapter 33 to determine whether the statute abrogated joint and several liability.[538] The Defendants in this case would argue that Chapter 33 has three provisions that, when read in conjunction, mandate proportionate responsibility. First, § 33.001 states that a plaintiff may not recover damages "if his percentage of responsibility is greater than 50 percent."[539] Second, § 33.002 states that Chapter 33 applies to "any action brough under the [DTPA]" where a defendant, settling person, or third party is found responsible for a percentage of the harm.[540] Finally, § 33.013 states that a defendant is liable only for the percentage of damages "equal to the defendant's percentage of responsibility with respect to . . . property damage."[541] Although § 33.013 maintains that joint and several liability is available for each liable defendant so long as the percentage of responsibility attributed to each defendant is greater than 50 percent, it contains no indivisible injury exception.

Conversely, several courts, including this one, have concluded that the indivisible injury exception survived the enactment of Chapter 33, and therefore proportionate responsibility is not applicable when the plaintiff's injury cannot be reasonably apportioned. As Chief Judge Jernigan noted, "apportionment of liability is made on a 'reasonable certainty' standard—meaning that liability must be apportioned among multiple defendants based on a reasonable certainty as to the percentage of liability."[542] Therefore, if the plaintiff's injury cannot be apportioned with

---

[538] *See Tex. E&P*, 2024 WL 3490242, at *20.

[539] Tex. Civ. Prac. & Rem. Code § 33.001.

[540] *Id.* at § 33.002.

[541] *Id.* at § 33. 013.

[542] *Tex. E&P*, 2024 WL 3490242, at *20.

127

reasonable certainty, the court, "by definition," cannot apportion the responsibility among the defendants as Chapter 33 dictates.[543]

The Court agrees with her learned colleague. The proportionate responsibility provisions of Chapter 33 do not apply to the instant facts because the property damage at the Mondara cannot be reasonably apportioned among the Defendants, settling parties, or any other responsible third parties. The lengthy factual history displayed above illustrates the herculean effort it would take the Court to untangle each and every party's role in causing the property damage at the Mondara. It is nearly impossible to distinguish whether the construction defects were the product of improper design and construction, improper repairs, or improper supervision, nor can the Court accurately point to the parties to which the litany of mistakes should be attributed. As the Plaintiff rightfully noted at trial, the Court cannot make heads or tails of where each party's responsibility began and where their respective liability ended. While certain actions taken by Elliot may look to be attributable to him on the surface, credible testimony from witnesses like Mamary highlights that it was never clear which "hat" Elliot had on at any given time or which entity he was acting on behalf of at the time of his actions.

The Defendants' choice not to instill an RFI process throughout construction further clouds the Court's ability to apportion responsibility with any reasonable certainty. Notwithstanding testimonial evidence and scant records of invoices sent to Stillwater Capital, there remains little to no evidence to distinguish which parties were more responsible than others for each individual defect at the Mondara. For example, the lack of podium slab sloping was improperly designed by the Defendants, improperly constructed by the subcontractor while overseen by Savannah Developers, continued to be defective throughout the remaining construction under Stillwater

---

[543] *Id.*

GC's supervision and repair work, and all of this was supervised by the Defendants. The Court cannot parse who was in control of whom and to what degree with any reasonable certainty; doing so would be an exercise in futility. Likewise, the burden of proving an affirmative defense falls unto the Defendants. Therefore, the Court finds the Defendants are jointly and severally liable for the entirety of the damages awarded to the Plaintiff.

However, the Court does agree with the Defendants that the damages award will be reduced to the full extent of the settlement credits reached with settling third parties. As § 33.012 dictates, if the plaintiff has settled with one or more persons, "the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements."[544] As previously noted and stipulated at trial, the Plaintiff has obtained settlement credits with third parties totaling $3,817,999.00. The Court's damages award to the Plaintiff will be reduced as such upon final computation of the Plaintiff's economic damages at a further hearing.

### 3) *Economic Feasibility Doctrine*

The Defendants' argumentative Alamo is the contention that, even if the Court finds the Defendants liable under the DTPA, and their remaining affirmative defenses do not apply, the Plaintiff is barred from recovering based on the economic feasibility doctrine.[545] The Defendants argue that because the market value of the Mondara "far exceeds" its unimpaired value, the Plaintiff is not entitled to any damages.[546] Put another way, the Defendants contend that the Plaintiff is not entitled to repair damages to "fix" the Mondara because the sale of units at the Mondara indicates that units are selling at prices beyond the "unimpaired value."

---

[544] Tex. Civ. Prac. & Rem. Code § 33.012(b).
[545] ECF No. 91, 7.
[546] *Id.*

Unpacking this argument requires addressing *Gilbert Wheeler, Inc. v. Enbridge Pipelines*, a 2014 Supreme Court of Texas case that discussed the economic feasibility exception in the context of damages to real property, as well as tracing the Texas law the *Wheeler* holding derives from. In *Wheeler*, the court's primary task was to distinguish between temporary and permanent injuries to real property, and how categorizing an injury determines the appropriate measure of damages.[547] As noted by the court, Texas courts have held for over a century that a temporary injury to real property entitles the owner to recover "the amount necessary to repair the injury, and put the land in the condition it was at the time immediately preceding the injury."[548] However, if the injury to the land is permanent, the measure of damages is "the value of the land immediately before the injury and its value immediately after."[549]

An injury can be considered temporary if "(a) it can be repaired, fixed, or restored, *and* (b) any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty."[550] Conversely, an injury is considered permanent if "(a) it cannot be repaired, fixed, or restored, or (b) even though the injury can be repaired, fixed, or restored, it is substantially certain that the injury will repeatedly, continually, and regularly recur, such that future injury can be reasonably evaluated."[551]

Determining which measure of damages should be utilized is applied with "some flexibility," where the court will engage in a fact-specific inquiry to "compensate the owner for the injury received" with some measure of equity without tipping the scale for or against the

---

[547] *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 478 (Tex. 2014).
[548] *Id.* (citing *Trinity & S. Ry. Co. v. Schofield*, 10 S.W. 575, 576–77 (Tex. 1889).
[549] *Id.* (quoting *Fort Worth & D.C. Ry. Co. v. Hogsett*, 4 S.W. 365, 366 (Tex. 1887) (internal quotations omitted).
[550] *Id.* at 480 (emphasis in original).
[551] *Id.*

plaintiff too far in either direction.[552] Adhering to that purpose, the Supreme Court of Texas acknowledged a significant exception to using the temporary injury damages formula—the economic feasibility exception.

Under this exception, courts will refrain from awarding a plaintiff cost of repair or restoration damages for temporary injuries if the cost "exceeds the diminution in the property's market value to such a disproportionately high degree that the repairs are no longer economically feasible."[553] While the goal under a temporary injury damages formula is to place the plaintiff in the same position as they were prior to the injury incurred, the *Wheeler* court acknowledged that the economic feasibility exception is applied "when necessary to prevent a landowner from being overcompensated."[554]

The language used in *Wheeler* naturally triggers the question of what constitutes a "disproportionately high" damages award for a temporary injury that would require a court to adopt the diminution in market value formula instead. In *North Ridge Corporation v. Walraven*, the court held that a jury award of $509,000 for cost of repairs to excavate and replace the damaged soil was not economically feasible because the repairs exceeded the maximum value of the entire damaged tract by "more than six times."[555] In *Atlas Chemical Industries v. Anderson*, the court determined that the correct measure of damages was the diminution in fair market value of $10,500 to a polluted tract of land, because the $45,000 cost of restoration was "well in excess" of the diminution to the land's market value.[556]

---

[552] *Id.*

[553] *Id.*

[554] *Id.* at 481–82.

[555] *N. Ridge Corp. v. Walraven*, 957 S.W.2d 116, 119 (Tex.App.—Eastland 1997, pet. denied), *on reh'g in part* (Dec. 18, 1997).

[556] *Atlas Chem. Indus., Inc. v. Anderson*, 514 S.W.2d 309, 319 (Tex.App.—Texarkana 1974), *aff'd*, 524 S.W.2d 681 (Tex. 1975).

Federal courts applying Texas law have helped draw similar boundaries on what "disproportionality" looks like. In *Long v. Faenes Transport*, the District Court for the Eastern District of Texas found that allowing the plaintiff to recover $607,000 in cost of repair damages—when it exceeded the entire market value of the burned down property, the cost to lease the property, and its annually generated income combined—was not economically feasible.[557] Conversely, in *Tri-Con v. Union Pacific Railroad Company*, the same court held that cost of repairs estimated to be $178,000 or 14.38% more than the diminution in market value to hurricane-damaged property did not constitute excessively high damages to warrant applying the economic feasibility exception.[558]

Determining whether damages are excessive is ultimately dependent on measuring it against the property's loss in fair market value. This measurement is "the difference between the value of the land immediately before the injury and its value immediately after."[559] Proof of the difference in market value can be admitted via expert testimony.[560] However, if there is conflicting or insufficient evidence to adequately determine the actual value of the property at the time of the injury, the court is "permitted to assign a value within the range of evidence."[561] Additionally, proof of the property's actual value may be shown through such evidence as purchase prices.[562]

First, the Court finds that the injuries at the Mondara constitute temporary injuries under *Wheeler*. Notwithstanding the fact that the Defendants do not contest the temporary nature of the

---

[557] *Long v. Faenas Trans., LLC*, Civ. Action No. 1:19-CV-200, 2020 WL 4677686, at *5–6 (E.D. Tex. June 23, 2020).

[558] *Tri-Con, Inc. v. Union Pac. R.R. Co.*, Civ. Action No. 1:20-CV-535-MAC-CLS, 2023 WL 5831504, at *5–6 (E.D. Tex. Aug. 4, 2023).

[559] *Wheeler*, 449 S.W.3d at 478 (quoting *Hogsett*, 4 S.W. at 366) (internal quotations omitted).

[560] *See id.* at 484 (highlighting the parties' uses of expert witnesses in determining the property's diminution in value).

[561] *Long*, 2020 WL 4677686, at *5 (quoting *Moore v. Moore*, 383 S.W.3d 190, 200 (Tex.App.—Dallas 2012, pet. denied)) (internal quotations omitted).

[562] *Id.* (citing *Espronceda v. Espronceda*, No. 13-15-00081-CV, 2016 WL 3225860, at *5 (Tex.App.—Corpus Christi June 9, 2016, no pet.)).

construction defects, the evidence presented sufficiently shows that the defects can be repaired, and that any anticipated recurrences in the defects would most likely be irregular and difficult to estimate with any reasonable certainty. Expert testimony by both Lee and Bice illustrate that the repairs to the Mondara could be made to fix the foundational defects caused by the Defendants. Likewise, none of the evidence presented by either side reflects a situation where the damage to the common elements will repeatedly occur if the property is repaired.

Next, the Court does not find that the economic feasibility exception applies in this case for several reasons. As an evidentiary matter, the Defendants have not supplied their own fair market value at any point in this case. In *Tri-Con*, the court denied the defendant's motion for summary judgment on the basis that *it* failed to demonstrate the cost of repairs would greatly exceed the diminution in value means, and therefore the economic feasibility exception could not apply.[563] Although in *Tri-Con* the court had the benefit of utilizing the plaintiff's expert witness and their appraisal of the property, the point remains that the Defendants in this case have not put forth any evidence to show how or why the cost of repairs awarded to the Plaintiff would be disproportionately high compared to the diminution in value.

To be certain, neither party established the fair market value of the Mondara as a whole; thus, there was no starting point for the Court to determine "disproportionality." In *Wheeler*, *North Ridge*, and *Tri-Con*, the courts had fair market values to measure against the cost of repairs sought by the respective plaintiffs. Here, while the Plaintiff attempted to supply a diminution in fair market value estimate, the flaws in McRoberts' methodology left the Court with no credible market value to evaluate the repair estimate against.

---

[563] *Tri-Con*, 2023 WL 5831504, at * 5.

Notwithstanding this complication, the Court cannot adopt the Defendants' interpretation of *Wheeler* and preclude the Plaintiff's recovery for cost of repairs for both policy and equity reasons. Understanding the fault in the Defendants' logic requires going back a century to the holding in *Pacific Express Company v. Lasker Real-Estate Association*, which *Wheeler* is founded upon. The *Pacific Express* court was similarly faced with a lack of evidence showing the value of the property and denied awarding the plaintiff cost of repairs damages to rebuild a partially destroyed house.[564] However, the court's reasoning for denying the plaintiff damages is key. As the *Wheeler* court noted, the result in *Pacific Express* was predicated on the fact that not only was the home in question notably dilapidated and old, but "declining local land values" meant that rebuilding the house would naturally result in utilizing new materials and a better structure, thereby overcompensating the plaintiff with a newer house than they had prior to the injury.[565] In essence, the newly-constructed house would still sit atop deteriorated land, that land would ultimately depreciate the value of the house over time, and the defendant would ultimately bear the costs of rebuilding a house that's value would never be worth what it cost to build.[566]

The policy underlying the court's holding in *Pacific Express* can be traced all the way through *Wheeler* and beyond. The purpose behind the economic feasibility exception is to prevent the inequitable result of forcing a defendant to gift the plaintiff with repaired or rebuilt property that is exponentially more valuable than it was prior to the initial injury. It is an acknowledgement that the value of property and the cost to repair that property are intrinsically related to the surrounding circumstances at the point in time an injury occurs. If a plaintiff owns land worth $20,000, and a defendant's actions create a $10,000 diminution in value to the property, it would

---

[564] 16 S.W. 792, 793 (Tex. 1891).
[565] *Id.*; *Wheeler*, 449 S.W.3d at 482.
[566] *Id.* at 793–94.

134

be inequitable to force the defendant to foot a $100,000 bill for the cost of repairs rather than the amount necessary to match the diminution in value.

The Defendants in this case attempt to present a similar scenario to the current case law; by awarding the Plaintiff millions in cost of repair damages, all while Mondara units are being sold for much more than the supposed impaired value of the defective units, the Court would be putting the Plaintiff in a better position than it was originally in. In other words, there is no diminution in value to the Mondara based on the current sales, and therefore any money awarded to the Plaintiff to repair the Mondara would essentially be forcing the Defendants to improve a property that's value is already increasing despite its defects. This theory cannot be how the Supreme Court of Texas intended *Wheeler* to apply.

The Defendants' position is nearsighted; their argument begs the Court to apply *Wheeler* to bar the Plaintiff's recovery based on a handful of unit sales. But the Defendants failed to prove by any stretch that the unit owners were ever "adequately" compensated for the injury incurred.[567] In this case, there is no alternative form of damages for the Court to apply to compensate the Plaintiff. In *Wheeler*, *North Ridge*, *Atlas Chemical*, and *Tri-Con*, there existed evidence that the fair market values of the affected properties adequately compensated the plaintiffs, and that awarding cost of repairs damages was disproportionate.[568] That is simply not the case here.

The interpretation of *Wheeler* by the Defendants is a clever one, especially under the facts of this case. If the Court were to find that the final computation of cost of repairs damages greatly exceeds any diminution to the Mondara's market value, which the Defendants contend is insignificant given the unit sales, then the Court would be forced to award the Plaintiff only the

---

[567] *Wheeler*, 449 S.W.3d at 482.
[568] *See*, *e.g.*, *Atlas Chem.*, 514 S.W.2d at 319 (finding that the jury in the lower court was justified in using a diminution in value estimation for damages when the costs to repair exceeded the diminution in value).

amount for the diminution in market value. In turn, the Court would essentially be forced to award the Plaintiff a fraction of the cost of repairs estimate because the Mondara's market value has gone up post-injury. Taken to its logical extreme, this argument is, by definition, inequitable.

Under this interpretation, the Defendants' liability would be inherently tied to the fortuitous nature of the real estate market and the Mondara's location in an affluent neighborhood like Highland Park, and the Plaintiff would be barred from recovery simply because the market happened to turn in its favor. Damages, however, are not assessed based on a game of real estate roulette, where the existence of increased unit sales negates the fact that significant construction defects remain on the property.

Notwithstanding the fact that the Defendants, after four years of litigation and two trials in both federal and state court, have never supplied a fair market valuation of the Mondara beyond these unit sales, there is also no explanation for how the presence of this supposed upturn in fair market value has compensated the Plaintiff. As the Plaintiff argued at closing, the Plaintiff did not receive the funds directly from any of the unit purchases; the Defendants did. Likewise, the Defendants have not supplied any evidence to show that the funds from these purchases have been used to repair the Mondara, thereby adequately compensating the Plaintiff for the injury incurred.

This argument is even more troubling when extended further out in time. The evidence presented shows considerable structural deterioration in nearly every facet of the common elements at the Mondara, and, at some point, someone is going to have to foot the bill for those repairs. Without those repairs, there is nothing to prevent the construction defects from getting worse over time and ultimately causing considerably more damage than there currently is. Whenever that point may arise, however, the Plaintiff would likely be barred from recovering based on statutes of limitation or repose, or precluded based on the Court's judgment in this case.

An application of the economic feasibility exception that facilitates this type of waiting game by the Defendants is untenable.

The Defendants' position crucially overlooks that *Wheeler* emphasized that the economic feasibility exception should be applied with "flexibility," accounting for the specific circumstances of the case at hand "to ensure that an award of damages neither over- nor under-compensates a landowner for damage to his property."[569] Conversely, the Defendants' application of the rule is impossibly rigid, and the logic in their interpretation contains more cracks than the defective stucco currently plaguing the Mondara. Not only would rewarding the Plaintiff not be "unjust," but precluding the Plaintiff from recovery in this case based on the economic feasibility doctrine would undoubtedly under-compensate it.

Finally, the Court believes this result is ultimately in accordance with the purpose behind not only the DTPA, but with the purpose behind its treble damages provision. The DTPA explicitly contemplates awarding a plaintiff actual damages in the form of cost of repairs when a defendant is found to have violated § 17.50. Additionally, knowingly violating the DTPA allows for the plaintiff to recover exemplary damages based on the defendant's actions. Barring cost of repair damages in this case would upend the DTPA's purpose, by finding that the Defendants' knowingly violated the Act, awarding the Plaintiff damages based on years of unlawful conduct, but then awarding the Plaintiff virtually nothing simply because the Defendants raised the economic feasibility exception without fulfilling their burden to actually prove their affirmative defense. The only adequate compensation the Plaintiff can receive is to be awarded the estimated cost of repairs found by this Court.

## V. <u>CONCLUSION</u>

---

[569] *Wheeler*, 449 S.W.3d at 481.

Based on the Findings of Fact and Conclusions of Law stated herein, the Court makes the following determinations:

First, the Court finds that all claims brought by the Plaintiff against Defendants Richard Coady and Aaron Sherman are hereby dismissed as to those defendants. Second, the Court finds that Defendants Stillwater Capital Investments, LLC and Stillwater Management, LLC are not liable for negligence under Texas common law because the Plaintiff's cause of action is barred by the economic loss rule.

Third, the Court finds that Defendants Robert Elliot, Stillwater Capital Investments, LLC, and Stillwater Management, LLC are jointly and severally liable for negligent misrepresentations under Texas common law as described herein. Fourth, the Court finds that Defendants Stillwater Capital Investments, LLC and Stillwater Management, LLC breached the warranty of performing services in a good and workmanlike manner and are jointly and severally liable under Texas common law. However, the Court finds that, pursuant to § 17.43 of the DTPA, any damages with regard to the Plaintiff's common law negligent misrepresentation and breach of warranty claims are subsumed in those damages awarded to the Plaintiff for the Defendants' respective violations of the DTPA, given that the Defendants' DTPA and common law liability are based on the same act or practice.

Separately, the Court finds that Defendants Robert Elliot, Stillwater Capital Investments, LLC, and Stillwater Management, LLC are jointly and severally liable for violations of the Deceptive Trade Practices Act (DTPA) in several respects. First, the Defendants are jointly and severally liable for violation of § 17.50(a)(1), pursuant to § 17.46(b)(2), (b)(5), and (b)(7) of the DTPA. Second, the Court finds that the Defendants are jointly and severally liable for breach of warranty under § 17.50(a)(2) of the DTPA. Finally, the Court finds that the Defendants are jointly

138

and severally liable for unconscionable acts and/or practices in violation of § 17.50(a)(3) of the DTPA.

Furthermore, the Court finds that the Defendants' violation of § 17.50 of the DTPA, entitles the Plaintiff to economic damages under the Residential Construction Liability Act (RCLA) and the DTPA. A final computation of the Plaintiff's economic damages will be made at a further hearing, in which: (1) the total cost of repairs will be finalized using the formula provided in the Socotec Report based on 2024 estimates; (2) the $991,731.13 in reasonable and necessary interim repairs incurred by the Plaintiff will be added to the total cost of repairs (to the extent not accounted for in the Socotec Report); (3) all costs not adopted by the Court in its findings of fact with regard to (i) soundproofing defects, (ii) any duplicative amounts related to balcony repairs for Units 216, 306, and 316, and (iii) displacement costs will be reduced from the total cost of repairs; and (4) the $3,817,999.00 in credits pursuant to the Settlement Agreements will be reduced from the total cost of repairs.

Furthermore, the Court finds that the Defendants' knowing violation of the DTPA entitles the Plaintiff to two (2) times the amount of economic damages (after reduction of the settlement credits). This final amount will also be determined at a further hearing *after* the Court has determined the final cost of repairs using the formula described above herein.

### ### END OF MEMORANDUM OPINION ###