

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

*Michelle V. Larson*

**Signed December 15, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| Stillwater Abbott Development, LLC | § | Case No. 24-30097 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| Mondara Condominiums Association, Inc., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Pro. No. 24-03002 |
| | § | |
| Stillwater Abbott Development, LLC et al., | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AWARDING PLAINTIFF DAMAGES AND ATTORNEY'S FEES

The Court conducted the damages portion of a trial (the "**Damages Trial**") based on the *Plaintiff's Fourth Amended Petition*[1] (the "**Complaint**") filed by Plaintiff Mondara Condominiums Association, Inc. (the "**Plaintiff**") against Defendants Stillwater Abbott Development, LLC ("**Stillwater Development**" or the "**Debtor**"), Stillwater Capital Investments, LLC ("**Stillwater Capital**"), Stillwater Abbott Management, LLC ("**Stillwater Management**"), Robert C. Elliot, individually ("**Elliot**"), Aaron Sherman a/k/a Robert A. Sherman, individually ("**Sherman**"), and Richard Coady, individually ("**Coady**", and, collectively, the "**Defendants**")[2].

The Court held the Damages Trial over the course of two days, on September 15 and September 16, 2025. Counsel for the Plaintiff appeared, as did Counsel for the Defendants. Furthermore, the Court heard the testimony of four fact witnesses and one expert witness, several of whom previously testified at the liability portion of the case.

## I.    JURISDICTION AND VENUE.

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. Although the Construction Defect Claims[3] do not constitute core proceedings under 28 U.S.C. § 157(b), the bankruptcy court has authority to adjudicate this matter pursuant to the United States District Court for the Northern District of Texas Miscellaneous Order No. 33, and more

---

[1] Although the Complaint names Stillwater GC as a Defendant, the Court notes that Stillwater GC is not a Defendant in this case, and that the Complaint was originally filed in connection with a state court trial between the parties in the 95th Judicial District, Dallas County, in Cause No. DC-20-07653. *See* ECF No. 1, Ex. 2, 410.

[2] The Court notes that it issued its *Order Granting Joint Motion to Compromise Controversy Under Rule 9019 Between the Trustee and Plaintiff Mondara Condominiums Association, Inc*. on November 21, 2024, in Case No. 24-03002 [ECF No. 74], wherein it approved a Settlement and Release Agreement between Daniel J. Sherman—the duly-appointed Chapter 7 Trustee (the "**Trustee**")—on behalf of the Debtor's estate, and the Plaintiff, resolving the Plaintiff's claims in this Adversary Proceeding as they pertain solely to Stillwater Development.

[3] Capitalized terms not defined herein shall adhere to the meanings ascribed to such terms in the Liability Decision (as hereinafter defined).

specifically, all parties consent to this Court hearing this matter and determining the issues on a final basis, pursuant to 28 U.S.C. § 157(c)(2).[4]

## II.    PROCEDURAL POSTURE

The Damages Trial was conducted following the Court's *Memorandum Opinion, Findings of Fact and Conclusions of Law* (the "**Liability Decision**") entered on June 24, 2025, in which the Court found Defendants Elliot, Stillwater Capital, and Stillwater Management jointly and severally liable for: (1) negligent misrepresentation under Texas common law; (2) violations of § 17.46(b)(2), (b)(5), and (b)(7) of the Texas Deceptive Trade Practices Act (the "**DTPA**"); (3) breach of the warranty of good and workmanlike manner under § 17.50 of the DTPA; and (4) unconscionable actions under § 17.50 of the DTPA.[5] ECF No. 133. As part of the Court's ruling, the Court held that the Plaintiff was entitled to economic damages under the Texas Residential Construction Liability Act (the "**RCLA**") less the total amount of credits pursuant to settlement agreements between the Plaintiff and various settling parties. *Id.* at 4.

Additionally, the Court held that the Defendants knowingly violated the DTPA, entitling the Plaintiff to two (2) times the total of economic damages. *Id.* The Court further determined that a "full and accurate accounting" of the damages would be computed at a further hearing date. *Id.* Finally, the Court noted in the Liability Decision that a further hearing on damages would be necessary, including the attorney's fees requested by the Plaintiff, if the Defendants were ultimately found liable. *Id.* at 4, n.7. Accordingly, the Court scheduled the Damages Trial to more accurately compute the damages found in connection with the Defendants' joint and several liability in several respects:

---

[4] *See* ECF No. 36 at 18–19 ("Notably, both the Plaintiff and Stillwater parties consent to this Court conducting a bench trial as to the Construction Defect Claims pursuant to 28 U.S.C. § 157(c)(2).").
[5] The Court hereby incorporates the findings of fact and conclusions of law contained therein.

(1) an accurate accounting of the cost of repair damages to the Mondara based on an updated 2024 estimated cost of repair damages model prepared by engineering firm Socotec and its Managing Director, Bryan Byrd ("**Byrd**");[6]

(2) an accurate accounting of the additional damages the Court awarded the Plaintiff pursuant to RCLA § 27.001(g) as part of the total cost of repairs estimate;

(3) a final accounting of any reductions to the Plaintiff's final damages award based upon (i) settlement credits with other parties, (ii) reductions in the overall scope of repairs in accordance with the Court's findings in its Liability Decision, and (iii) any computation errors identified in either the Socotec Report or the Liability Decision;[7] and

(4) an accurate accounting of the Plaintiff's reasonable attorney's fees for services rendered in connection with this matter, as permitted under § 38.001(b)(1) of the Texas Civil Practice and Remedies Code and § 17.50(d) of the DTPA.

After considering the evidence and testimony presented, the following constitutes the Court's findings as to the damages awarded to the Plaintiff in connection with the Defendants' joint and several liability:

## III.    COST OF REPAIRS & ASSOCIATED DAMAGES

### A.    SOCOTEC REPORT

As previously mentioned, the Court expressly adopted the methodology used by Byrd in formulating and compiling the estimated cost of repairs as detailed in the Socotec Report. However, there were several areas of the Socotec Report that either the Court did not fully adopt as to the scope of repairs, or remained unclear as to what repairs had already been made. First, the Court did not adopt the entire scope of repairs relative to the soundproofing construction defects at the Mondara, and instead adopted the "cost of repairs to the extent of Idibri's findings related to

---

[6] As stated in the Liability Decision, the Court expressly adopted Byrd's methodology used in connection with the Socotec Report that was issued in parts in January 2022 and March 2023, respectively. *See* ECF No. 133 at 52–53; *see also* ECF No. 597. However, the Court noted several areas of the Socotec Report that would either need adjustments to the estimated cost of reasonable and necessary repairs based on the Court's findings of fact, or would need updated calculations to reflect a 2024 estimated cost of repairs.

[7] As part of the Liability Decision, the Court found that the Plaintiff had reached various settlement agreements with former defendants and third parties totaling $3,817,000. *Id.* at 67.

tested units that did not meet the requirements of the Design Plans and/or the [International Building Code]." ECF No. 133 at 57. Accordingly, the Court only adopted the scope of soundproofing repairs and associated costs with regard to Units 103, 203, 206, 216, 306, and 316. *Id.* at 58. Likewise, the Court did not adopt the entirety of the estimated displacement costs associated with soundproofing repairs at the Mondara, given that only six units were in need of repairs at this time. *Id.* The Court also instructed that, as part of the Damages Trial, the Plaintiff needed to provide an updated tabulation of the Socotec Report—with the Court's reductions in scope of repairs in mind—based on a 2024 estimate.

Second, the Court requested further information as to additional costs associated with work the Plaintiff had done by Forensic Consulting ("**Forensix**"), repairs made by Texas Concrete with respect to the drainage system at the Mondara, repairs made to two of the balconies at the Mondara, and in-kind repairs made by Infinity Roofing. ECF No. 133 at 54.

The Court begins with the soundproofing cost of repairs and the associated costs as presented in the Socotec Report. At the Damages Trial, the Plaintiff provided three variations updating the Socotec Report, making adjustments based on the Court's previous findings. First, the Plaintiff presented an updated version of the original Socotec Report, maintaining the original report's scope of soundproofing repairs and associated costs in terms of each unit, but limiting the overall scope of repairs to reflect the six average units, based on floor level. ("**Option 1**"). *See* Pl.'s Ex. 597. The second variation of the Socotec Report presented by the Plaintiff ("**Option 2**") again represented six units, using the actual square footage of each unit designated for repair in the Liability Decision, as reflected in the Mondara's architectural drawings and design plans (the "**Design Plans**"). *See* Pl.'s Ex. 597.1. Put simply, Option 2 contained the same scope of repairs as Option 1 in terms of the repairs made in each individual unit, but it altered the costs related to each

of those units from a set cost per unit based on the floor the unit was on to a variable cost that incorporated each unit's particular square footage. *Id.*

Finally, the Plaintiff offered a third variation of the original report ("**Option 3**"), which maintained the square footage-based model used in Option 2, but further reduced the scope of repairs for each unit based upon the specific locations within the unit where soundproofing tests failed. More specifically, as noted in the scope of repairs report compiled by Forensix (the "**Forensix Report**"), the acoustical testing in the six units revealed construction defects in certain portions of the individual units—namely, the hardwood areas—but did not necessarily show soundproofing design failures in carpeted areas. *See* Pl.'s Ex. 592 at 217. Therefore, as Byrd testified, Option 3 presents a further reduction to the estimated cost of soundproofing repairs by taking into account both the square footage of each unit, but also limiting the scope of repairs within each unit strictly to tested areas that failed to adhere to meet the standards set forth in the Design Plans. Pl.'s Ex. 597.2. The Court will focus its discussion on Options 2 and 3 because these Options more accurately address the specific units at issue.

The Court notes that both Options 2 and 3 further reduce the scope of associated costs to reflect the scope of repairs relative to the repair of only the six designated units.[8] Byrd further testified that Options 2 and 3 incorporate a reduction in the soft costs relative to the entire estimated cost of repairs—such as contingency fees, contractor's fees, storage of affected residents' contents, and displacement costs—to more accurately reflect the total estimated cost of repairs to the Mondara in light of the reduced scope of soundproofing repairs. Likewise, Options 2 and 3 provide updated 2024 estimates, as requested by the Court, as well as inflation percentages added onto the total cost of repairs at either 4.5% or 9%. Pl.'s Exs. 597.1–.2. Finally, Options 2 and 3 provide a

---

[8] The Court notes that Byrd testified that, although he made several cost adjustments between Options 1, 2, and 3, general site costs were identical across all three options. ECF No. 173 at 31:17–31:20.

more accurate accounting of the scope of repairs, as requested by the Court, by zeroing out any cost of repairs with regard to the balconies at Units 306 and 316, which are part of a separate calculation of prior repairs.

Likewise, the estimated cost of repairs as to roofing repairs would need to be removed from the final tabulation contained within all three Options and instead replaced with the $71,490 of in-kind repairs previously performed by Infinity Roofing. *See* Pl.'s Ex. 699.[9] More specifically, the Plaintiff clarified that the $374,985.52 in roofing repairs in the Socotec Report "comes out of the bottom-line total project repair cost" under each Option. ECF No. 173 at 8:10–8:12. This means that the total cost of repair of $8,522,723.67 under Option 2 would be $8,147,738.15, after subtracting the roofing repairs, and the total cost of repair of $7,932,526.43 under Option 3 would be $7,557,540.91, after subtracting the roofing repairs. Therefore, the estimated total cost of repairs under Option 2—less the roofing repairs—totals $8,514,386.37 at a 4.5% inflation rate, and $8,881,034.58, at a 9% inflation rate. Likewise, the estimated total cost of repairs under Option 3—less the roofing repairs—totals $7,897,630.25, at a 4.5% inflation rate, and $8,237,719.59, at a 9% inflation rate. *See* Pl.'s Exs. 597.1–.2.

## B. ASSOCIATED DAMAGES

As to the Court's prior finding that the repairs previously made by the Plaintiff totaling $991,731.13, the Plaintiff presented credible evidence that the Court's initial calculation was slightly off by $2,050 due to evidentiary discrepancies relating to an additional Forensix invoice of $2,050 that the Court did not include as part of its Liability Decision. ECF No. 173 at 11:6–11:11. Therefore, the total additional costs, in conjunction with the total cost of repairs, should

---

[9] The Court notes that the $71,490 was already included in its findings in the Liability Decision as part of the additional costs of repair awarded to the Plaintiff. For the sake of clarity, the Court's adoption of the revised Socotec Report estimated cost of repairs will simply zero out any estimated costs with regard to roofing repairs in the Socotec Report.

instead be $993,781.13, and that this additional cost be added to the damage figure the Court adopts.

### C. TOTAL COST OF REPAIRS

After consideration of the evidence presented, the Court adopts the Plaintiff's Option 3 model for the total cost of reasonable and necessary repairs with a 4.5% inflation rate. As noted by the Defendants at trial, the Forensix Report made specific note of the fact that only the non-carpeted portions of the Units in question failed the soundproofing requirements under the Design Plans. Given that the Socotec Report was intended to reflect the scope of repairs articulated in the Forensix Report, Option 3 reflects the most accurate accounting of the reasonable and necessary repairs with respect to the soundproofing defects.

At the Damages Trial, the Defendants attempted to attack the updated estimated cost of repairs provided by the Plaintiff by drawing the Court's attention to the original testing done by the Plaintiff's soundproofing expert—Courtney Schoedel ("**Ms. Schoedel**")—and arguing that the testing performed by Ms. Schoedel in 2017 on behalf of Idibri showed that certain of the Units in question had passed soundproofing requirements under the Design Plans. ECF No. 171 at 22:24–24:4. At bottom, the Defendants questioned, "If [certain Units] passed in 2017, why are we doing repairs in 2024," and that the Units that had previously passed Ms. Schoedel's testing "should be taken out of the equation." *Id.* at 23:1–23:4. However, the Court finds that the arguments raised by the Defendants speak to the liability aspect of the underlying damages rather than the overall calculation of the damages based on the liability that was affirmatively established by this Court in its Liability Decision. In short, the Defendants had the opportunity over seven days of trial during the liability portion of this case to raise such arguments or provide their own damage model, and failed to do so. Any challenge to the accuracy or veracity of the expert reports establishing the

***need*** for soundproofing repairs, as opposed to the accuracy of the ***calculation*** of said repairs, is untimely and beyond the scope of the Damages Trial.

Furthermore, the Court adopts the Option 3 model at the 4.5% inflation rate for 2024, as presented by the Plaintiff. While the Plaintiff gave the Court the option to choose between 4.5% to 9% with respect to the original estimated cost of repairs in the Socotec Report—based upon "specific construction indexes" in the Dallas construction market—Byrd also testified that he could not recall "the basis for the two [inflation] calculations" and the Plaintiff did not attempt to pinpoint a particular inflation percentage to adopt. *See* ECF No. 173 at 112:21–114:13. Therefore, the Court finds that the total cost of repair damages awarded to the Plaintiff, including the $993,781.13 in additional costs incurred by the Plaintiff, totals **$8,891,411.38.**

### D.  REDUCTIONS TO THE TOTAL COST OF REPAIRS

As noted by the Court in the Liability Decision, the Plaintiff previously reached a number of settlement agreements with defendants that were either parties to the current proceedings or parties to the original state court case (the "**Settlement Agreements**"). ECF No. 133 at 66. Pursuant to Chapter 33 of the Texas Civil Practices and Remedies Code, "the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements." Tex. Civ. Prac. & Rem. Code § 33.012(b).

As of the date of this Order, the Settlement Agreements reached between the Plaintiff and the various parties total $3,817,999.00. Pursuant to the Court's findings in the Liability Decision, that amount will be deducted from the total cost of repairs damages awarded to the Plaintiff. Accordingly, the Court finds that, after reducing the $3,817,999.00 pursuant to the Settlement Agreements, the Plaintiff's remaining claim for repair damages equals **$5,073,412.38**.

### E.  DECEPTIVE TRADE PRACTICES ACT MULTIPLIER

Finally, pursuant to the Court's conclusions of law in the Liability Decision, the Defendants' knowing violation of § 17.50(a) of the Texas Deceptive Trade Practices Act (the "DTPA") provides the Court with the ability to award the Plaintiff with up to three times the amount of economic damages under § 17.50(b)(1) of the DTPA. ECF No. 133 at 116–17. As noted in the Liability Decision, the Court found that the Defendants' actions entitled the Plaintiff to two (2) times the amount of economic damages after reduction of the total amount received by the Plaintiff pursuant to the Settlement Agreements. *Id.* at 139.

Accordingly, the Court finds that the ***final award for cost of repairs*** totals **$10,146,824.76**.

## IV.    **ATTORNEY'S FEES**

Under Texas law, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019) (citation omitted) (internal quotations omitted). Under § 17.50(d) of the DTPA, "Each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." Tex. Bus. & Comm. Code § 17.50(d). Accordingly, for a prevailing party to secure an award of attorney's fees from an opponent, "the prevailing party must prove (1) the recovery of attorney's fees is legally authorized by statute or contract, and (2) only fees <u>reasonable and necessary</u> for the legal representation may be shifted to the non-prevailing party, and not necessarily for the amount contracted for between the prevailing party and its attorney. . . . An amount incurred or contracted for is not conclusive evidence of reasonableness or necessity." *Rohrmoos,* 578 S.W.3d at 487-88 (emphasis added). "Both elements are questions of fact to be determined by the fact finder and act as limits on the amount of fees that a prevailing party can shift to the non-prevailing party." *Id.* at 489.

Under the lodestar analysis adopted by the Supreme Court of Texas, the first step in the analysis in calculating an attorney's fee award is "determining the *reasonable* hours worked multiplied by a *reasonable* hourly rate." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020) (emphasis added) (quoting *Rohrmoos*, 578 S.W.3d at 498). The burden is on the claimant to show that the requested fees are reasonable. *Id.* To satisfy the burden, the claimant's evidence should include, at a minimum, "evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.*

In *Rohrmoos*, the Texas Supreme Court noted what bankruptcy courts typically refer to as the *Johnson* factors to determine reasonableness:

(1) the time and labor required;
(2) the novelty and difficulty of the questions;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

*Rohrmoos*, 578 S.W.3d at 490–91 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). In the DTPA context, the Supreme Court of Texas has applied a similar set of non-exclusive factors for determining the reasonableness of attorney's fees in *Arthur Andersen & Co. v. Perry Equipment Corporation*. 945 S.W.2d 812, 818 (Tex. 1997). The *Arthur Andersen* factors include:

  (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id.* Under the lodestar method, once reasonableness is determined, the trier of fact "may then adjust the base lodestar up or down . . . if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case." *Rohrmoos*, 578 S.W. 3d at 501. The Supreme Court of Texas additionally noted in *Rohrmoos* that the *Arthur Andersen* factors can be "relevant considerations that may justify an adjustment" to the base lodestar figure established in the first step, but that any such considerations that were "already incorporated into the base calculation"—such as the *Johnson* factors, for instance—cannot be applied to rebut the presumption of reasonableness established in the first step of the analysis. *Id.* at 501–02.

At the Damages Trial, the attorney's fees at issue belong to four distinct sets of attorneys for the Plaintiff: (1) Thomas, Feldman & Wilshusen, L.L.P. ("**TFW**") as the Plaintiff's litigation counsel; (2) Rochelle McCullough LLP ("**Rochelle**") as the Plaintiff's bankruptcy counsel; (3) Chad Baruch ("**Baruch**") as the Plaintiff's appellate counsel; and (4) Misty H. Gutierrez, PLLC ("**MHG**") as the Plaintiff's additional litigation counsel for a portion of the proceeding.[10] *See* Pl.'s Exs. 703–707. At the Damages Trial, the Plaintiff articulated that the reasonable and necessary attorney's fees for the recoverable causes of action could be calculated as follows: (1)

---

[10] Counsel noted for the Plaintiff noted that while Ms. Gutierrez was previously employed and serving as litigation counsel at TFM, she had since formed MHG in the interim between the liability portion of the trial and the Damages Trial, but had nevertheless remained co-counsel for the Plaintiff through MHG.

$1,641,544.20 for TFW; (2) $59,500 for Rochelle; (3) $21,395 for Baruch; and (4) $3,800 for MHG. *See* ECF No. 171 at 13:1–13:24.[11] Additionally, the Plaintiff provided the Court with its proposed reasonable and necessary attorney's fees after segregation of recoverable and non-recoverable causes of action in this case, which were calculated as follows: (1) $1,051,000 for TFW; (2) $59,500 for Rochelle; (3) $13,700 for Baruch; and (4) $3,800 for MHG. *Id.* In totality, the Plaintiff requests $1,128,000 in attorney's fees.

Furthermore, the Plaintiff requests "recoverable costs", including e-filing fees of $1,852.07, service of process fees of $11,203.51, and court reporter/deposition costs of $49,606, totaling $62,661.58 in sum. *Id.* at 14:1–14:5. Finally, the Plaintiff noted that, if the Court's Order were appealed, Baruch's estimated appellate costs would total an additional $80,000 at the "first level of appeal" and $70,000 for a "second level" of appeal to the Fifth Circuit. *Id.* at 14:6–14:10.

As a threshold matter, and based on the uncontroverted evidence presented, the Court grants the Plaintiff the recoverable costs of **$62,661.58**. Likewise, the Court finds that the Plaintiff provided sufficient evidence and credible testimony through its litigation counsel—Mr. Fred Wilshusen of TFW ("**Mr. Wilshusen**")—of Mr. Baruch's reasonable and necessary appellate costs if the case were to be appealed. Accordingly, the Court finds that $80,000 in attorney's fees with respect to an appeal to the District Court for the Northern District of Texas, and $70,000 in attorney's fees for a subsequent appeal to the Fifth Circuit Court of Appeals would constitute reasonable and necessary fees to be added to any award in the event of an appeal. However, given the fact that the Defendants dispute the reasonableness and necessity of the Plaintiff's requested attorney's fees, namely the requested attorney's fees for TFW and Rochelle, and given the fact

---

[11] The aforementioned fees for Rochelle and TFW included voluntary reductions.

that Mr. Baruch did not testify as to the reasonableness of the $13,700 in attorney's fees incurred by the Plaintiff thus far, the Court will address these matters more fully below:

### A. TFW'S ATTORNEY'S FEES

The total fees incurred by TFW totaled $1,641,544.20 through September 3, 2025, accounting for approximately 5,359 hours of time over <u>five years</u>. *See* Pl's. Ex. 700 at 6–7; *see also* ECF No. 173 at 150:13–150:25. This amount included "courtesy write-downs" of approximately $255,066.25 and a two-year time period where Mr. Wilshusen, as lead counsel, did not record a portion of his time. *See* ECF No. 173 at 150:1–150:6. Of this amount, TFW is only requesting $1,051,000 as part of its award—a reduction of approximately 36% based upon a segregation of the Plaintiff's attorney's fees for recoverable causes of action. Accordingly, the primary dispute between the parties as to the reasonableness of TFW's request for attorney's fees revolves around whether the Plaintiff has provided a reasonable segregation of its fees with respect to the remaining Defendants.

Given that, under Texas law, attorney's fees are not recoverable "unless authorized by statute or contract," courts applying Texas law have required attorney's fee claimants to "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). In other words, the Supreme Court of Texas noted in *Tony Gullo Motors* that the plaintiff is "required to show that [attorney's] fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees." *Id.* at 311 (citations omitted) (internal quotations omitted).

In *Tony Gullo Motors*, the court was specifically tasked with handling attorney's fees in relation to a complaint that contained contract, tort, and DTPA causes of action, noting that, even where segregation of attorney's fees is required, the standard "does not require more precise proof

for attorney's fees than for any other claims or expenses," and that "attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of [the plaintiff's] petition." *Id.* at 314. Rather, as noted by the Fifth Circuit, "To meet a party's burden to segregate its attorney's fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours related to claims for which fees are not recoverable." *ATOM Instrument Corp. v. Petroleum Analyzer Co., L.P.*, 969 F.3d 210, 217 (5th Cir. 2020) (citation omitted) (internal quotations omitted).

The Defendants' argument as to the reasonableness of TFW's attorney's fees essentially boils down to two main points: (1) the amount requested by the Plaintiff unreasonably includes attorney's fees incurred by TFW related to causes of action against former defendants; and (2) the segregation model used by TFW to reduce its fees is based on a percentage of the overall requested amount by TFW rather than a percentage of the overall hours of work in pursuing the specific causes of action against the Defendants.

Turning first to the reasonableness of the total amount requested by TFW, the Defendants primarily take issue with the fact that the Plaintiff did not separate the fees incurred by TFW in relation to non-recoverable causes of action against defendants who have since settled with the Plaintiff. ECF No. 171 at 19:8–19:22. The Defendants contend that the Plaintiff "lumped everybody in the same ship," and that there was no "specific identification" of the recoverable claims against the remaining Defendants and the non-recoverable claims against a number of third-parties who are no longer parties to the case. *Id.*

In response, Mr. Wilshusen provided the Court with several considerations as to how TFW ultimately arrived at the $1,051,000 (or approximately 64%) in fees requested. First, settlement credits related to the Settlement Agreements have been made available to the Defendants in this

case to reduce the overall damages awarded to the Plaintiff, Mr. Wilshusen testified that it is "absolutely reasonable" to charge fees to the Defendants jointly and severally if they go all the way through trial. *Id.* at 165:18–166:1. Mr. Wilshusen testified that the fees incurred in reaching these settlements reflect the "elbow grease" provided by TFW in narrowing the case for the Defendants, and that it is reasonable for the Court to award TFW attorney's fees with respect to such efforts. *Id.* at 166:2–166:10.

Second, Mr. Wilshusen testified that "the need for the Plaintiff to pursue those dozens of parties on negligence theories was precisely because the [remaining Defendants] refused to notify any of the [settled third-parties] of any of the alleged defects," and that, regardless of whether these numerous third-party defendants were sued by the Plaintiff, the Plaintiff was "going to have to get their contract and their scope of work and all of their invoices" in order to "carry through a DTPA and breach of warranty cause of action." ECF No. 173 at 168:5–168:15. Put simply, work related to the various third-parties—including subpoenas, depositions, and dispositive motions—was necessarily "going to be done to pursue the causes of action where you can recover [attorney's fees]." *Id.* at 168:16–168:18.

The Court agrees with the Plaintiff and finds that, based on the rulings in both *Tony Gullo Motors* and *ATOM Instrument*, the attorney's fees requested by TFW are not only reasonable and necessary under the circumstances, but do not require the unrealistic segregation of legal services that the Defendants are requesting. As previously noted in *Tony Gullo Motors*, legal services such as "[r]equests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, voir dire of the jury, and a host of other services may be necessary whether a claim is filed alone or with others." *Tony Gullo Motors*, 212 S.W.3d at 313. Here, the legal services provided by TFW with respect to the third-parties who have since settled

with the Plaintiff were reasonably incurred for the very reason set forth in Mr. Wilshusen's testimony—the services were reasonable and necessary to more accurately pursue the proper causes of action related to the alleged defects at the Mondara against the right defendants.

Regardless, the Defendants' argument on this point ultimately fails because the Plaintiff segregated **$590,000** of the total amount of TFW's attorney's fees to resolve the exact dilemma that the Defendants contend is a lingering issue. TFW has willingly reduced its own fees by over a third of the total amount to rectify any concern that it is requesting fees in relation to non-recoverable causes of action that are not against the remaining Defendants.[12] In the Court's mind, such a drastic reduction in fees produces an undoubtedly reasonable request for attorney's fees.

However, the Defendants also take issue with the Plaintiff's segregation model, arguing that even if the fees were reduced, the Plaintiff's requested amount is based upon an improper reduction using the percentage of the total amount of fees rather than a percentage of the total hours incurred by TFW. The Defendants contend that the Plaintiff's segregation model fails to take into consideration certain factors, such as different billing rates by the attorneys involved, that would presumably affect the overall requested amount. *See* ECF No. 171 at 30:8–31:6.  The Plaintiff points out that not only is the Plaintiff's segregation model the only one provided to the Court in this case and that the Defendants provided "no specific evidence" that the model is "inadequate," but that segregating the total fee amount as opposed to segregating by hour is ultimately a "distinction without a difference" in terms of TFW's requested attorney's fees. *Id.* at 33:9–33:21.

Once again, the Court agrees with the Plaintiff. First, the Plaintiff correctly notes that, much like the liability portion of this case, the Defendants have not provided an alternative model for

---

[12] This is <u>in addition to</u> the voluntary "write-downs" of approximately $255,000 in fees testified to by Mr. Wilshusen.

the Court to utilize in determining whether the Plaintiff has provided a reasonable segregation of TFW's fees. Second, while the Defendants correctly note that *ATOM Instrument* states that a party's burden of showing segregation of attorney's fees is ***sufficiently*** met by providing testimony "concerning the percentage of hours" related to recoverable and non-recoverable claims, the Fifth Circuit does not state that testimony with respect to percentage of hours is ***strictly necessary*** for a party to meet its burden. *ATOM Instrument*, 969 F.3d at 217.

The principle underlying segregation of attorney's fees is that a claimant can sufficiently and reasonably distinguish its attorney's fees for recoverable and non-recoverable causes of action. Here, regardless of whether the Plaintiff provided for this distinction by the hour or by the total amount incurred, the Court reiterates that TFW's were voluntarily reduced ***by over a third*** of the total amount. Furthermore, the Defendants have not provided any evidence to the contrary as to why such a substantial reduction would result in an unreasonable attorney's fee award to TFW or how the result would be significantly different had the Plaintiff segregated its attorney's fees by a percentage of the total hours.

Therefore, the Court finds that TFW's requested attorney's fees of $1,051,000 are reasonable and necessary under the circumstances, and shall be awarded to the Plaintiff.

## B. ROCHELLE'S ATTORNEY'S FEES

The dispute with respect to the attorney's fees requested by Rochelle revolves around whether the Plaintiff can reasonably allocate the fees incurred by Rochelle onto the Defendants when those fees were primarily incurred as part of a negotiation with Stillwater Abbott Development, LLC ("**Stillwater Development**")—the Debtor in the underlying bankruptcy proceeding and a former defendant who has since settled with the Plaintiff.

According to the evidence presented by the Plaintiff, as well as testimony provided by Ms. Shannon Thomas, a partner with Rochelle, the Plaintiff is seeking recovery of $59,500 in attorney's fees from the Defendants for over 123 hours of time, primarily with regard to negotiating towards, and ultimately reaching, a settlement agreement with Stillwater Development that resulted in a $5,625,001.00 allowed claim against Stillwater Development in this case. *See* ECF No. 173 at 133:20–134:2. Ms. Thomas testified that, given that the *Joint Motion to Compromise Controversy Under Rule 9019 Between the Trustee and Plaintiff Mondara Condominiums Association, Inc.* (the "**Stillwater Development Settlement**") [Case No. 24-30097, ECF No. 49], which was negotiated by her firm, purportedly "advanced the ball as to moving the case forward", Rochelle therefore requests the entirety of the $59,500 incurred—without the need for segregation—for its role in settling the Plaintiff's claims with respect to one of the defendants. *Id.* at 135:17–135:19. As to the lack of segregation, Ms. Thomas further testified that it would be "impossible" to ultimately separate the causes of action asserted against the Defendant (and against Stillwater Development at the time of Rochelle's involvement) given Rochelle's "unique role" in the case. *Id.* at 129:12–129:17.

Here, the Court finds that the Plaintiff will be awarded the same percentage of fees as were awarded to TFW, or 64%. Rochelle played an instrumental role in facilitating and finalizing the Stillwater Development Settlement. Without the settlement, Stillwater Development would still be a defendant in this proceeding.

Rochelle played a crucial role in moving this case forward by removing one of the Defendants from the equation, which candidly also reduced the amount of fees that the Debtor Defendant's estate was forced to bear. The fees incurred by TFW and Rochelle as part of the settlement process also involved a continual refinement of the causes of action the Plaintiff sought

to recover under, as well as a gradual narrowing of the Defendants the Plaintiff sought to pursue. Moreover, Rochelle assisted the Plaintiff as local bankruptcy counsel of sorts, the necessity of which was based upon the Defendants' counsel opting to file bankruptcy as part its litigation strategy. The Court likewise finds the rates charged, time spent, and voluntary reductions taken by Rochelle all result in reasonable and necessary fees.

Therefore, the Court finds $38,080, or 64% of the $59,500 in attorney's fees and expenses incurred by the Plaintiff on behalf of Rochelle to be reasonable and necessary under the circumstances.[13]

### C. BARUCH AND MHG'S ATTORNEY'S FEES

The final two sets of attorney's fees before the Court are those requested by the Plaintiff with respect to the legal services performed by Baruch and Ms. Gutierrez on behalf of MHG, respectively. As to Baruch, Mr. Wilshusen testified that a "significant portion" or Mr. Baruch's work was performed in relation to a writ of mandamus that was filed by the Defendants during the discovery phase of the state court proceeding. *See* ECF No. 173 at 155:9–155:14. According to Mr. Wilshusen, Baruch is a highly regarded appellate attorney who assisted with several motions in the state court proceeding in late 2022. *Id.* Mr. Wilshusen testified that Mr. Baruch's attorney's fees would also be segregated to conform to the recoverable causes of action against the Defendants, reducing the reasonable and necessary attorney's fees from $21,395 to $13,700 after segregation. *See* ECF No. 171 at 13:18–13:19.[14]

---

[13] The Court recognizes that the 64% is not necessarily apples to apples with the five years of fees incurred by TFW and that many of the causes of action had already been removed by the time Rochelle was retained. Nevertheless, it is a consistent allocation, and is representative of the reductions that the Court might otherwise make for non-compensable or duplicative services.

[14] Bruce Mamary—president of the Mondara Homeowners' Association—the Plaintiff already paid Baruch in the amount of $21,395. *See* Pl.'s Ex. 706.

As for MHG, Mr. Wilshusen testified that Ms. Gutierrez opened MHG on January 1, 2025, after previously working on the case as a partner with TFW. According to the affidavit provided by Ms. Guiterrez, MHG expended 10.3 hours of legal services at a rate of $370 per hour, and .3 hours of paralegal services at a rate of $150 per hour, totaling $3,856, which the Plaintiff has since rounded to $3,800. See Pl.'s Ex. 707 at 2–4. The Defendants did not substantively object to the reasonableness of MHG's fees. *See* ECF No. 173 at 157:2–157:9.

Based upon the evidence presented, as well as the credible testimony from both Mr. Wilshusen and Mr. Mamary, the Court finds that Baruch's fees are reasonable and necessary under the aforementioned applicable standards, and the Plaintiff shall be awarded an amount of $13,700 in attorney's fees with respect to Baruch's services. Likewise, the Court finds that MHG's attorney's fees are reasonable and necessary, and the Plaintiff shall be awarded an amount of $3,800 with respect to MHG's services.

Finally, as to the overall reasonableness analysis, the Court would reiterate that the Plaintiff sufficiently met its burden as to the reasonableness of the attorney's fees sought, and therefore the burden was on the Defendants to provide specific evidence as to why the fees in question should be reduced in any capacity. *See Rohrmoos*, 578 S.W.3d at 501 ("Likewise, if a fee opponent seeks a reduction [in attorney's fees], it bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure."). The Defendants provided no such evidence.

For the reasons set forth above and those set forth in the Liability Decision, which is incorporated herein by reference, it is hereby

**ORDERED** that, after reduction for $3,817,999 in credits pursuant to the Settlement Agreements have been applied, Mondara is awarded **$5,073,412.38** in actual damages for cost of repair and associated damages; it is further

**ORDERED** that, pursuant to § 17.50 of the DTPA, based upon the Defendants' knowing violation of the DTPA, the Plaintiff is awarded two (2) times the amount of actual damages as exemplary damages, totaling **$10,146,824.76**; it is further

**ORDERED** that, pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and § 17.50(d) of the DTPA, the Plaintiff is awarded reasonable and necessary attorney's fees with respect to the legal services provided by Thomas, Feldman & Wilshusen, LLP, Rochelle McCullough LLP, Chad Baruch, and Misty H. Gutierrez, PLLC, totaling **$1,106,580.00**; it is further

**ORDERED** that the Plaintiff is awarded **$62,661.58** in recoverable costs associated with this case; it is further

**ORDERED** that the Plaintiff will be awarded an additional **$80,000** in appellate costs (plus post-judgment interest under applicable state law) if the Court's final judgment is appealed to the District Court for the Northern District of Texas, as well as an additional **$70,000** (plus post-judgment interest under applicable state law) if the case is appealed a second time to the Fifth Circuit; it is further

**ORDERED** that, in sum, Defendants Robert Elliot, Stillwater Capital Investments, LLC, and Stillwater Abbott Management, LLC are jointly and severally liable to Plaintiff Mondara Condominiums Association, Inc. in an amount totaling **$11,316,066.30**; and it is further

**ORDERED** that, the Court will separately enter a final judgment in conformity herewith.

### END OF ORDER ###